17

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,          )
                                   )  Criminal
                 Government,        )  No. 23-292 (RPK)
                                   )
     vs.                            )
                                   )  JURY TRIAL
     (1) LESLY VALENTIN,           )
     (2) JARRETT BRUCE,            )
     (3) AASIM BOONE, and          )  Brooklyn, New York
     (4) GREGORY BRUCE,            )  Date:  June 18, 2025
                                   )  Time:  10:00 a.m.
                 Defendants.        )
_____

TRANSCRIPT OF FURTHER JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE RACHEL P. KOVNER and a JURY
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Government:          Andrew D. Wang, AUSA
                             Joshua Dugan, AUSA
                             Lorena Michelen, AUSA
                             Erik Paulsen, AUSA
                             United States Attorney's Office
                             Eastern District of New York
                             271 Cadman Plaza East
                             Brooklyn, New York  11201
                             718-254-6144


For Defendant                Gary M. Kaufman, Esq.
(1) Lesly Valentin:          Law Office of Gary Kaufmann, PLLC
                             377 Broadway, 8th Floor
                             New York, New York  10013
                             347-855-9102

(Appearances continued on the next page.)

18

APPEARANCES:   (Cont'd)


For Defendant          Nicholas Hine, Esq.
(1) Lesly Valentin:    Hine Law PLLC
                       PO Box 170096
                       Brooklyn, New York  11217
                       406-272-2481

For Defendant          Peter J. Guadagnino, Esq.
(2) Jarrett Bruce:     30 Wall Street, 8th Floor
                       New York, New York  10005
                       212-709-8099
                            -and-
                       Andrea Ferrante, Esq.
                       404 Manor Road
                       Staten Island, New York  10314
                       347-230-8449

For Defendant          Jacob Kaplan, Esq.
(3) Aasim Boone:       David Gelfand, Esq.
                       Agnifilo Intrater LLP
                       445 Park Avenue, 7th Floor
                       New York, New York  10022
                       646-205-4350


For Defendant          Phillip C. Hamilton, Esq.
(4) Gregory Bruce:     Ethan Van Buren, Esq.
                       Hamilton Clarke, LLP
                       48 Wall Street, Suite 1100
                       New York, New York  10005
                       212-729-0952



Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
_____

Court Reporter:        Nicole Sesta, RPR, RMR, CRR
                       Official Court Reporter

Proceedings                                          19

THE COURTROOM DEPUTY:  United States of America versus Lesly Valentin, Jarrett Bruce, Aasim Boone, and Gregory Bruce.  Counsel, state your name for the record.

MR. DUGAN:  Good morning, Your Honor.  Josh Dugan, Lorena Michelen, Andrew Wang, Erik Paulsen, Paralegal Specialist Wesley Roberts, FBI Special Agent Tom Ford for the government today.

THE COURT:  Good morning.

MR. KAUFMAN:  Good morning, Your Honor.

THE COURT:  Can I ask you all a question?  Are these the same appearances as yesterday for everybody?  Can I just say the same appearances for yesterday or do you want to state your appearances individually?

MR. KAUFMAN:  We're fine.

THE COURT:  Same appearances as yesterday.  I understand the jury is here and ready to go.  So I'm hoping we can keep preliminaries brief.  My experience is if we keep the jury waiting they will not be here on time tomorrow.

Do you want to give us a brief update on the MDC laptop situation?

MR. DUGAN:  Yes, Your Honor.  First of all, we have been in contact with the MDC.  The MDC reports that Mr. Bruce has the laptop, it is still at the MDC, and they received no complaints about the laptop not working.  So that's sort of the first issue.

Proceedings                                                      20

I think the second issue, I think, because as perhaps seemed clear the last two days we were discussing it, kind of more in the record making land than the request for relief land.  So I just want to be perfectly clear about what the government's understanding is about what Mr. Bruce has had access to in terms of discovery, even leaving aside the laptop and for how long he's had it, just so the record is clear.

So back in March, March 15th to be exact, of 2024, so more than a year ago, counsel for Jarrett Bruce confirmed to the government that he delivered a hard drive containing all non-sensitive discovery that had been produced by the government at that point to the MDC.  Then on May 30, 2024, counsel for Mr. Bruce confirmed that he had delivered a second hard drive with updated discovery that had been produced by the government to the MDC to Mr. Bruce.

There were subsequent communications between the government and counsel for Mr. Bruce.  On June 28, 2024 counsel for Mr. Bruce e-mailed the government and said that because the government had interceded on his and Mr. Bruce's behalf, both of the hard drives had gotten to Mr. Bruce and, indeed, he had access to them and there was no need for him to have a laptop given what he had at that point.

So then, at the request of Mr. Bruce on July 15th, or his counsel on July 15 of 2024, the government e-mailed the MDC to ensure that he had more time with his electronic

Proceedings                                    21

discovery on those two hard drives at that point.  The government followed up with the MDC, and then on July 19th counsel for the defendant e-mailed the government to say that he was going to be meeting Mr. Bruce, he copied the MDC on it to confirm that he was having sufficient access to both of those hard drives.  There was no follow up from that July 19th indicating that he was having any additional trouble accessing those two hard drives.

Then on August 26th counsel for Mr. Bruce e-mailed the government again, asking specifically that certain paper files the government had produced and marked sensitive be de-designated so that he could bring those paper files to Mr. Bruce to review at MDC.  The government did not object to de-designating any of those materials.  The government understands that all of those materials were printed and brought to Mr. Bruce at the MDC.

Subsequent to that, there was a change in counsel. There was a request for a laptop.  The government did not object to the request for the laptop for any of the defendants.  The government made every effort to comply with the MDC's policies regarding the configuration of the laptop, which included multiple attempts to make sure the laptops fit the specifications.  The government ensured that the laptops were delivered to the MDC on March 3, 2025.  Again, we've confirmed the MDC has no reports of an issue.

Proceedings                                                    22

After the last conference, the government's understanding, my understanding, was that we were to both make sure that we didn't have a laptop sent back to us and to confer with counsel for the defendant to make sure there wasn't a specific request for discovery at that point.

I did that. There was no laptop. At the beginning of jury selection on Monday, I conferred with counsel for Mr. Bruce. I asked him if there was anything specific he wanted us to do. He said no. My understanding is that Mr. Bruce has been regularly receiving visits from a paralegal who has been providing him with access to discovery in this case. Mr. Bruce, also at the conference last week, mentioned specifically concern about having enough time to review 3500 material and exhibits that were produced two weeks in advance of trial in this case.

The government reached out to the MDC to ensure that two days after the exhibits and 3500 material were produced in this case, all of the defendants were able to have a meeting with their counsel to review that material. Subsequent to that meeting, I personally reached out to the MDC to make sure that not withstanding any separation orders or anything else, between that time and trial all of the defendants could meet with their counsel so that they could review those materials.

So just to be clear here, I think we're kind of in a universe where every time the defendants, specifically

Proceedings                                          23

including Mr. Bruce, have asked for any specific thing for the government to do with respect to discovery, the government has done it.  I think all counsel for all defendants would recognize that.

Since the last hard drive was delivered to Mr. Bruce on May 30, 2024, there have been a handful -- there were a handful of -- excuse me -- of non-sensitive production of materials that had gone out between them and when the laptop went out, I would say marginal relevance, all of which could have been reviewed very quickly assuming that there was any -- assuming that there was any attempt to access the discovery in that six or seven month period.

So, again, I think the government finds itself in the position of saying what else could we have done given the information that we had.

THE COURT:  Okay.  So I guess my thought on this is it may make sense for counsel when we have a break to confer with their clients and let me know if there's something that you want me to do about discovery at this point.  I think the difficulty is MDC is saying to our knowledge there's a laptop and it's working.  I'm not sure.  I'm suggesting you all talk about it and let me know if there's something you want to do.

It might make sense to do that at a break so we can get sooner with the jury sooner rather than later, and you all have an opportunity to talk to each other before making a

Proceedings                                                    24

request.

MR. DUGAN:  Your Honor, I'm reminded that I buried the lead here.  We have a laptop with all of the discovery on it for Mr. Bruce.  If the Court will order it and the MDC will accept it, we're happy with that.

THE COURT:  That's an option.  Do you want me to direct the MDC to accept a new laptop for Mr. Bruce?

MR. GUADAGNINO:  I would ask, Your Honor, that he be given that laptop for what it's worth now so that he can continue reviewing his -- or he can review his discovery at this time, yes.

THE COURT:  So now meaning give it to the MDC?

DEFENDANT J. BRUCE:  The government is correct.  I was given the hard drive, Your Honor, this is on the record, back in March.

The whole purpose of me requesting the laptop was for me to be able to review my discovery.  I was given two drives of the discovery that I could not review.  I came back to court again and told you that they haven't still given me my laptop.  You gave them another order to send the laptop to me.

The laptop was sent months later.  All three laptops were broken.  MDC's legal department came to me and said the laptops were broken.  We sent it back.  Since then, I have never received a laptop.  You could check MDC records.

Proceedings                                                    25

There's no record of my signature on file of receiving any laptop from the government.

So me having access to it is impossible.  Nobody came to me with any signature telling me your laptop is here, it works.  You have access to it.  You could come down.

THE COURT:  I think the government is saying, and I understand you have two kind of different versions, but the government is saying, among other things, they have right now a new laptop that they can deliver to the MDC.

Do you want them to do that?

DEFENDANT J. BRUCE:  Yes.  At this point, here I am in trial and not properly prepared.  That's more of an issue. And if my counsel had notice he would have took the necessary steps.

THE COURT:  I think --

DEFENDANT J. BRUCE:  Your Honor, this has been deliberate.  You mentioned yesterday about relief.  Yes, relief, I'm requesting.  This is government misconduct the whole time.  I'm asking for a dismissal of the indictment.

THE COURT:  I think one issue I'm struggling with here, and maybe we should talk about it now, is everybody here is represented and I've kind of led us and I've let folks speak in court when the jury is not present.  Ultimately I do think any kind of motion would have to come through counsel. I'm happy to have you articulate the facts here you're relying

Proceedings                                          26

on.  Any motions have to come through counsel.

MR. KAUFMAN:  Your Honor, on that vein, Mr. Valentin has prepared a motion.  I do not believe I can file it based on my obligations as an attorney.  It's very important to Mr. Valentin that it get filed.  So while I cannot file it, I do not feel I can file it, I would ask the Court to accept his motion pro se status because it's extremely important to him.

THE COURT:  Part of what I'm struggling with in the first case is that there are some litigation choices that I think should be made by an attorney, and that may not be the case with respect to the particular motion.  So it may be that I'm less sensitive to accepting this motion.

Do you want to present it orally or you have a written motion?

DEFENDANT VALENTIN:  I've written it, Your Honor. Excuse me.  I don't want to be belligerent to the Court but this is a private matter and I would not like to just blurt it out.  I would like you to receive the motion.  It's very important that you do.  Upon research, I found a financial document that was attached to this case.  It's on TreasuryDirect.gov.  It's attached to the case number and the date of its inception.

THE COURT:  This is the issue you were raising earlier about bonds.

DEFENDANT VALENTIN:  I asked you already, I asked my

Proceedings                                27

attorneys, and nobody knows what's going on.  What I'm saying is why is there a financial attachment to this criminal matter.  That's all I'm asking.  I would like for you, Your Honor, to direct the government to show cause because it's my document.

MR. KAUFMAN:  What I can do, Your Honor, I would suggest is that if the Court would allow me to -- obviously there are reasons I can't file this, but I can file this on Pacer on Mr. Valentin's behalf later today, if that's something the Court would allow, if that's easier.

THE COURT:  I understand.  It sounds like Mr. Valentin doesn't want to present it orally.  He wants to make a written submission, so I think that's going to be the easiest way to go about doing that.

MR. KAUFMAN:  So I have the Court's permission to file a pro se motion on Pacer?

THE COURT:  That's right.

MR. GUADAGNINO:  Your Honor, Mr. Bruce has the same motion, Mr. Jarrett Bruce.  I would also --

THE COURT:  This is also the Treasury.gov?

MR. KAUFMAN:  I'll file on behalf of all defendants, if they want that with the Court's permission.

DEFENDANT VALENTIN:  Please, just please, Your Honor, for the sake of fairness, direct the government to explain what this is about.  Because you don't know, you said

Proceedings                                          28

you didn't know on the record.  My attorneys don't know.  I would like to put the government to explain it.  If it's another form of remedy that could resolve this matter, we should know about it.

THE COURT:  It sounds like I have to read the motion and I have not read it yet, but counsel is going to file it on your behalf on Pacer.  I think we should get started.  Can we get started?

MR. DUGAN:  Just two more points, for the record, that I left off so there's clarity here.  It would be very brief.  First is that on the issue of the laptop, it is an exceedingly rare privilege for defendants to have a laptop at the MDC.  Our understanding, based on communications with MDC legal, is that there's 20 to 25 inmates who have laptops.

THE COURT:  While you're making this point, I'll ask Mr. Chen to get the jury.

MR. DUGAN:  The second point is MDC legal did say that the first time they heard an issue from Mr. Bruce about his laptop was on Monday, and they said that they communicated to him that the laptop was available for him to review and that's that.

THE COURT:  All right.  We're getting the jury.  I'm going to give preliminary instructions.  They'll take less than five minutes and we'll go to opening statements.  Can I ask a question about start times?  So if we're not -- if the

Proceedings                                29

transportation to the MDC or the changing is going to be in a position where we can't start with the jury before 10:00, we should adjust our start time.

I don't know if it's sending a production order that has a time of 9:30 or if it's a transportation issue, but is there something we can do about that?

MR. DUGAN:  We don't put in -- I mean --

THE COURT:  You just say produce.

MR. DUGAN:  I think it's the morning shift.  We can talk to the marshals about it.

THE MARSHAL:  10:00 is good.

THE COURT:  So you can have them here and changed by 10:00?

THE MARSHAL:  Yes.

(Jury present.)

THE COURT:  Good morning, everybody.  I think we need to swear the jury.

THE COURTROOM DEPUTY:  All the jurors please stand and raise your right hand.

(Jury sworn.)

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

THE COURT:  Everybody can be seated.  Good morning. I apologize for the delay in getting started.  We had a legal issue we needed to discuss before we got started, but we're ready to go.  Now that you've been sworn in, I have some

Proceedings                                                          30

preliminary instructions to give you.

At this trial you and I have different roles.  You are the judges of the facts and I am the judge of the law. That means that you and you alone decide what happened based on the evidence presented at this trial.  You should not speculate about what I think about the facts.  Nothing I say or do at this trial is intended to indicate what your verdict should be.

That being said, I'm the judge of the law and you have to apply to the facts the law as I give it to you. Please follow the law as I explain it, whether you agree with the law or not.  You can't say well, I think the law is different or it ought to be different.  I promise not to step on your toes as judges of facts, and please just follow my instructions about the law.

The evidence from what you will find in the facts consists of the testimony of witnesses who will testify here from the witness stand under oath.  The evidence will also include documents and other things that have been accepted into the record as exhibits, which we'll have exhibit numbers, and the lawyers may also agree or stipulate to certain facts or certain testimony.

If they do that you should accept those facts as true and accept that testimony as what the witness would have said, but you must still then decide the weight as to those

Proceedings                                                      31

stipulated facts or stipulated testimony.

Certain things are not evidence and I want to tell you what those are. First of all, statements or arguments or questions about the lawyers are not evidence. Objections that the lawyers make to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they think that evidence is being offered for an improper purpose under the rules of evidence, and there's nothing wrong with that.

They should object when they think there's a basis to do so, but the fact that a lawyer has objected or my ruling on the objection shouldn't give any more weight to what the question was.

So you probably know from television or movies that if I sustain an objection, that means the witness should not answer the question and you shouldn't speculate about what the witness would have said if the answer would have been allowed. Just put it out of your mind. If an objection is overruled, then the witness will be directed to answer the question and then the answer is entitled to as much weight as you think it's entitled to.

But the fact that there was an objection or the fact that I overruled an objection doesn't change the value of that testimony. There's no special magic to the fact that somebody objected or that I ruled on an objection. It's just for me to

decide what's allowed under the rules of evidence, and if I overrule an objection on the questions allowed then the answer should be considered by you just like any other answer by a witness.

It might happen during this trial that I instruct that some piece of evidence is being offered for a limited purpose only. If that happens, you must follow that instruction. If I strike an answer or instruct you to disregard an answer, then please disregard that testimony. It's not evidence and shouldn't be considered by you as evidence. I know I can't take the evidence or testimony out of your brain and make you forget it, but you're adults and I assume that you can take a piece of testimony and just put it to the side. You say to yourself that you're not going to consider it because it's not part of the evidence and the judge told you to disregard it.

Anything you might see or hear outside of the courtroom is not evidence and must be disregarded by you, because your verdict must be based solely on the evidence that is introduced here in court. There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact, like the testimony of an eyewitness. Circumstantial evidence is proof of facts from which you can infer some other facts exist.

I'll give you more instructions about this and other

Proceedings                                    33

matters at the end of the case, but keep in mind you can consider both kinds of evidence.  One of the most important tasks you have as jurors is to evaluate the credibility of the witnesses who testify here at trial.  It's up to you to decide which witnesses to believe, which witnesses to disbelieve, and how much a witness' testimony, if any, to accept or reject.

I'll give you more guidance and instruction on this at the end of the case about the credibility of witnesses, but in the meantime, just pay careful attention and listen to the witnesses as they testify and watch what they do because everything a witness does or says is relevant to your assessment of credibility.  So if you pay careful attention, you'll be in a better position to assess the credibility of witnesses.  That's where your own experiences in life and your common sense and your judgment come in to play.  That's part of the genius of the jury, that all these different people with all these different backgrounds and experiences and you're all able to assess credibility in a way that will be much deeper and richer than what a single judge could do.  So that's part of why we have the jury system, and I'll give you further instructions about that at the end of this case.

There might be times during the trial, and I think this might have happened once or twice during jury selection, when counsel might ask or I might ask that you be excused from the courtroom while counsel are making argument or objections.

Proceedings                                                     34

Those arguments might include matters of evidence that would be excluded from trial, or it might also involve legal issues that just aren't the province of the jury.

So the reason I would ask you to step outside is just so you won't hear evidence or arguments that are not admissible as evidence in this case.

I want to remind you that a defendant in a criminal case is presumed innocent and can't be found guilty unless a jury, after hearing all the evidence, unanimously decides that the evidence proves that defendant guilty beyond a reasonable doubt. In a criminal case, the burden of proof is with the prosecution. That's the government. It stays that way throughout the whole case.

For a jury to return a verdict of guilty as to the defendant on any count, the government must prove that the defendant is guilty beyond a reasonable doubt with respect to that count. A person who is charged with a crime has absolutely no burden to prove that he's not guilty. If the defendant chooses not to present any proof or chooses not to testify, that's a decision that can't be held against him and cannot enter into your deliberations at all.

Now, you must, as a matter of law, consider each count of the indictment and each defendant's alleged involvement in that count separately and return a separate verdict for each defendant on each count with which he's

Proceedings                                                        35

charged.  Bear in mind that non-guilt or guilt is personal and individual.  A verdict of guilty or not guilty must be based solely upon the lack of evidence or evidence about each defendant.

The case against each defendant on each count stands or falls upon the proof, or lack of proof, regarding that defendant alone and your verdict as to any defendant on any count should not control your decision as to any other defendant or any other count.

A few words about your conduct as jurors.  First, I know Judge Merkl mentioned this already, but during the trial please don't discuss this case with anyone or permit anybody to discuss it with you until you retire to the jury room at the end of the case to deliberate.  Please just don't talk about the case.  If somebody asks, just tell them you've been selected as a juror on a case and you've been instructed by the judge not to discuss it.

That means even at breaks amongst each other you shouldn't be saying what did you think about that, or I don't know, I got a weird vibe from that witness.  It's too early and you shouldn't be talking about that in the jury room. Obviously you'll get to know each other in close quarters and often real friendships can form from jury service, and that's a good thing.  But just don't discuss the case until the end of the case and until all the evidence is in, until after

Proceedings                                            36

you've heard the summations of the lawyers and my instructions about the law.  It's not until that point that you're in a position to make firm decisions about proof and whether the burden of proof has been met.

I think Judge Merkl also mentioned please don't go online or do any research or blog or Tweet about the case, or your experience as jurors while you're serving.  That would be a violation of your oath as jurors.  You've probably seen on television or heard about in past cases how a whole trial had to be redone because a juror didn't follow that instruction. So please take that seriously.

When the case is over, feel free to write about the case or talk to your friends about it or blog or tweet about it.  But until your deliberations are over, please just don't do any of those things.

Please don't go on the internet and do searches about the parties, or the lawyers, or me, or anything like that.  Again, that would be introducing things that are not evidence here into court and it would make it hard for you to be a fair and impartial juror, so it would be a basis for a mistrial.

If at any point during the trial you recognize somebody that comes into the courtroom, please just let me know.  You can let me know or you can let my deputy, Mr. Chen, know.  There's nothing wrong with that.  It's a public

Proceedings                                                    37

courtroom and anybody can come in if they want.  But if it's somebody close to you or somebody you happen to know that comes into the court, I would want to know that.  It might be that when you were excused in the jury room that person would hear something that you aren't meant to hear because it's not part of the evidence in the case and they might inadvertently share it with you.  So if I know you've got somebody that you know who's in the courtroom, I could address that.  I could either instruct them not to discuss it with you or I could ask them to step out for a minute.

The bottom line is, I just don't want you to be even tempted to discuss this trial with people you know.  So just let me know if anything like that happens.  You all will have notepads.  I see you have them now.  Great.  So the only notes you take should be in those notepads.  You can put your name on the front.  It's for you to use.  It's an aid to your recollection while you're deliberating, and you can leave them in the jury room.  You should leave them in the jury room at the end of the day.  We'll lock that room.  Nobody will have access to it.  Don't take them out of the courthouse.

The notes are for your use, but ultimately it's your memory that controls and the notes are an aid to your memory. If you do take notes, just be careful not to get so caught up in the note taking that you miss the testimony.  At some point in school or in our jobs, I'm sure all of us figured out the

Proceedings                                                                    38

right balance for us personally between note taking and listening. So just strike the balance that works for you.

In your deliberations if it turns out there's a discrepancy or a disagreement between one juror's notes and another juror's notes, or one juror's notes and another juror's memory, the fact that one juror has a note doesn't entitle that juror's view to any greater weight. It's your memory that controls.

But if there is a dispute or disagreement about what some witness said or some piece of evidence, you can always ask for a transcript. You probably noticed there's a court reporter here who is taking down everything that is said. So there will be a transcript of the testimony, and you'll have access to that testimony, or you can have access to that testimony when you're deliberating to clarify what a witness said.

During the course of trial, as I mentioned, exhibits will be received into evidence with exhibit numbers. If you think an exhibit is particularly interesting and that you're going to want to review it later, feel free to jot down the number. But also at the end of the case, I'll give you a list of all the exhibits that were received into evidence with a brief description so you'll be able to figure out what's what and ask for exhibits, if you want to review them. So take the notes that you think are appropriate, but I'll also give you

Proceedings                                                                39

access to access to an exhibit list and an opportunity to review that transcript testimony, if you want.

I'll also give you a copy of my instructions of the law at the end of the case. So you'll have those as well. We're about to begin trial. We'll start trial every day 10:00 a.m., and thank you all for being here on time today. I'm going to keep the parties on a pretty tight schedule getting here before you do to make sure we've resolved issues and we're ready to get started. I want to make the most effective time as we possibly can.

We'll stop for a one hour lunch break when there's a logical break in the testimony around the middle of the day, sometime between 12 and 1, and we'll end each day by no later than 5:00 p.m. Let me tell you how the trial is going to proceed. We're going to have first opening statements from the lawyers. The government will make an opening statement and after that I expect the defendants will make opening statements through their attorneys, but no defendant is required to do so. As I said, defendants have no obligation to do anything. So no defendant even has to make an opening statement.

The opening statements, you should remember, are not themselves evidence. They're also not argument. They're just preview, a preview of the evidence the lawyers think will be introduced in this case, and what they think the evidence will

Proceedings                                                    40

show.  It's basically designed to give you a roadmap so you have a sense when the evidence is coming in of the context and you can understand what's happening as it takes place, but it's not itself evidence.

After opening statements, the government will start to present its case.  So the government is going to call its witness, its witnesses, and after each witness testifies on direct examination with the government asking questions, then they'll be cross-examined by attorneys for the defendants.

You've probably all seen that on TV.  Basically the government first has a direct examination and then each defendants' lawyer gets to ask questions of the witness. After that, there might be some redirect where the government gets to follow up on a couple of points that might have been covered on the cross, and then perhaps one or more defendants will do some recross after that following up on a couple points that were covered in the redirect.  But it should get shorter and shorter every time and there won't be too much of that.

Once the government has rested, in other words, put on all of its witnesses and evidence, then the government is done and at that point each defendant is entitled to put on a case he wishes.  But no defendant is required to do so and there should be no expectation that any defendant will. Because of the presumption of innocence no defendant is

Proceedings                                                          41

required to put on evidence at all.

If any of the defendants does present a case, it basically works the same way.  The defense witnesses will testify and then the government has a chance to cross-examine and the drill I just complained.  After all the evidence is completed and both sides have rested, then the attorneys get to give their summations, or their closing arguments.  That's their opportunity to summarize what they think the evidence showed during the trial, and give their argument about what conclusions you should draw.

Obviously that's important and you should pay careful attention, but keep in mind, again, that these summations or arguments from the lawyers are not themselves evidence.  So if your recollection of the evidence differs from what the lawyers have told you, it's your recollection that controls.

Finally, after summations I'll give you instructions about the law and it'll be more detailed than I'm being now. I'll give you some general instructions and some more specific instructions about the charges in the indictment.  I'm not telling you what the elements of those charges are.  That you would have to find beyond a reasonable doubt in order to return a conviction.

So I think you know this already, but you have a tremendously important function as jurors.  We're all really

Proceedings                                        42

grateful to you for doing it.  It's a public service of the highest order.  It's part of our Constitution and I'm grateful to you.  I know that you'll be able to discharge the role of a juror truly and faithfully.  Thank you very much.  We're ready for opening statements.

OPENING STATEMENT BY MR. WANG:

MR. WANG:  One winter night a group of masked men abducted a victim from his apartment in Queens.  They threw him in the back of a minivan and for hours they beat him and tortured him.

The kidnappers eventually released the victim after he agreed to pay them.  Three defendants in this case, Jarrett Bruce, Aasim Boone, and Lesly Valentin planned and carried out this plot.  A few days after the victim's release, Valentin sent a series of threatening text messages warning that the victim and his loved ones would be in danger if the victim didn't pay up.

And when the defendants realized that law enforcement was onto them, Jarrett Bruce asked the fourth defendant, his brother, Gregory Bruce, to try to pressure a witness to shut his mouth while Boone told his girlfriend to destroy evidence.  That's why we're here today.  My name is Andrew Wang and I'm an Assistant United States Attorney in the Eastern District of New York.

I'm joined today by Assistant United States

Proceedings                                             43

Attorneys Josh Dugan, Lorena Michelen, and Erik Paulsen, Paralegal Speciliast Wesley Roberts and Special Agent Tom Ford of the Federal Bureau of Investigation, or FBI.  Together, we represent the United States of America.

It's our responsibility to present you with the evidence in this case.  Here is what that evidence will show. On December 9, 2022 a man named Shaon Khaled returned home to his apartment in Astoria, Queens.  Several masked men were waiting for him, including Aasim Boone, who grabbed Mr. Khaled, punched him, and threw him into a red minivan waiting outside.

The kidnappers drove off, leaving Queens, and eventually arriving in New Jersey.  During the drive, Boone brutalized Mr. Khaled.  Boone beat him, pistol whipped him, and sliced his ear with a knife.  But that wasn't enough. Boone and the other kidnappers threw bleach on the victim and burned him with a lighter.  This went on for hours.  And they stopped only after Mr. Khaled agreed to pay them a large amount of money and marijuana.

Now, you will learn that Mr. Khaled sometimes dealt marijuana.  That's why the kidnappers wanted marijuana as part of a deal.  You will also learn that Jarrett Bruce planned the kidnapping because of a financial dispute that he had with Mr. Khaled.  After Mr. Khaled said he would pay them, the kidnappers drove back into New York and dumped Mr. Khaled onto

Proceedings                                                    44

a busy street in Manhattan.

As I just explained, the evidence will show that Jarrett Bruce coordinated the kidnapping while Boone provided the muscle.  As for Lesly Valentin, his role included making sure Mr. Khaled followed through on payment.  Days after the kidnapping, Valentin visited a cell phone store in New Jersey. He activated a prepaid phone, which he then used to send threats to the victim's phone.

Valentin warned that if Mr. Khaled didn't pay large amounts of money and marijuana, then Mr. Khaled and his loved ones would be in danger.  Those threats never reached Mr. Khaled.  That's because immediately after the kidnapping Mr. Khaled reported it to the police.  By the time Valentin sent those threats, the FBI was on the case and they had Mr. Khaled's phone.

The FBI eventually traced those threatening text messages back to Mr. Valentin and arrested him.  But the crimes didn't end there.  As the investigation continued, Jarrett Bruce and Boone started to worry that they were under suspicion.  So they tried to control the damage.  Jarrett Bruce and his brother, Gregory Bruce, attempted to intimidate a witness.  Separately, Boone attempted to destroy evidence.

Specifically, you will learn that a friend of Jarrett Bruce had spoken to the FBI and that the Bruce brothers heard about it.  That was a problem for them.  So

Proceedings                                                    45

they came up with a plan to stop him.  At Jarrett Bruce's insistence, Gregory Bruce stalked and tried to find the witness, including by using people close to him to find him. Gregory Bruce told someone close to the witness that the witness had said too much.  They were determined not to let him get away from them and only stopped when law enforcement learned of and disrupted their plan.

Similarly, Boone realized that he had a problem.  On the night of the kidnapping he used two cell phones to talk to his accomplices, one belonging to him and another belonging to his girlfriend.  After he was arrested, he learned that the FBI had gotten a warrant to search the Apple iCloud account for his personal phone.  You will learn that an iCloud account can hold all sorts of data messages and call history.  So a few days later, Boone spoke with his girlfriend and told her to delete the iCloud account for her phone because he knew her phone had evidence linking him to the crime.

Jarrett Bruce, Aasim Boone, and Lesly Valentin are charged with conspiring to kidnap the victim for ransom while using instrumentalities of interstate commerce, in this case cell phones.  As you will learn, a conspiracy just means agreeing with another person to commit a crime.  In this case, kidnapping.  Lesly Valentin is also charged with sending threatening text messages to the victim in order to extort money and other things of value.

Nicole Sesta, RPR, RMR, CRR
Official Court Reporter

Proceedings                                             46

Relatedly, Jarrett Bruce and Gregory Bruce are charged with attempting to corruptly persuade a witness, to change, delay, or withhold his testimony from the grand jury investigation and this criminal case generally.

Finally, Aasim Boone is charged with attempting to corruptly persuade another witness to delete an Apple iCloud account to make sure it would not be available for the grand jury investigation and this criminal case generally.

Members of the jury, during this trial, we will present you with several kinds of evidence that prove beyond a reasonable doubt that the defendants committed the crimes I just described.  First, witnesses.  You will hear from witnesses who will describe the kidnapping and the investigation that followed.  Indeed, you will hear from Mr. Khaled himself.

He will describe how he was forcefully taken in front of his building by several masked men and suffered hours of pain and violence.  You will also hear from witnesses describing statements as certain defendants made implicating themselves in the kidnapping.

Second, photos and medical records, pictures of Mr. Khaled taken right after the kidnapping and records of his hospital treatment will show you the injuries that he suffered at the hands of the kidnappers.  Third, video recordings, for example, cameras in the alleyway where Mr. Khaled was

Proceedings                                                    47

abducted, recorded the masked kidnappers arriving beforehand and lying in wait, as well as the kidnapping itself.  You will also see video of Valentin entering a cell phone store in New Jersey and activating the same phone that he later used to threaten Mr. Khaled.

Fourth, phone location data.  That data will give you important insight into where Jarrett Bruce, Boone, and Valentin were before, during, and after the kidnapping.  You will see from that data that those defendants traveled -- all traveled -- from New Jersey to the area of the abduction, and that each traveled to key locations along the kidnapping route.  The data will also show that these defendants had a meeting the day before the kidnapping and that days later it was Mr. Valentin who used the prepaid phone to threaten the victim.

Fifth, text and call records.  Those records will show Jarrett Bruce, Boone, and Valentin talking to and coordinating with each other on the night of the kidnapping at key points.

Finally, you will hear the defendants' own statements showing how they tried to cover up their crimes.  For instance, you will hear phone calls between Jarrett and Gregory Bruce during which they discussed trying to see the friend who had talked to law enforcement.  Similarly, you will hear calls when Boone warned his girlfriend about the police

Proceedings                                         48

investigation and directed her to delete the iCloud account for one of the phones that Boone used during the night of the kidnapping.

After you've seen and heard all the evidence, we're going to come back before you and ask you to hold each of them accountable based on their actions and the law.  We will ask you to return the only verdict consistent with the evidence, guilty on all counts.

(Continued on next page.)

OPENING STATEMENT - MS. FERRANTE                    49

OPENING STATEMENT BY MS. FERRANTE:

THE COURT:  Go ahead.

MS. FERRANTE:  Good morning.

During the course of the trial you're going to hear many things, not all pleasant, including for Mr. Jarrett Bruce.  The problem with that is, none of that has anything to do with the two charges that he's here for, only two.  You'll hear a lot of prior history that the Government will bring out.  And they will hope that based on that prior history you ignore what two charges he's here for.

So let's be clear, I know Mr. Wang touched on it, but he's here, Mr. Jarrett Bruce, for witness tampering, that's one charge, and for conspiracy for kidnapping.  Two charges total.

Before we delve further into discussing that, let me stop and introduce you to Jarrett Bruce who has sat there this entire time; and myself, along with Mr. Guadagnino, have the pleasure of representing him.  During the Government's opening he was referred largely as the defendant or defendants.  He has a name, it's Jarrett Bruce.

Now, during the Government's presentation of the case you might hear history like in May of 2022 he was arrested for driving a stolen vehicle.  In fact, you might even hear about drug dealing for multiple witnesses, including for Jarrett Bruce.  And that's very interesting.  Why?  It

doesn't apply to a single charge.  He's not charged with driving a stolen vehicle.  He's not charged with drug dealing. He's not charged with possession of drugs.  It is a distraction technique.

For example, Mr. Wang stood here for the Government and he pointed at Mr. Bruce, right.  That has a strong impact; it is a distraction technique.  So let me say two things about that.  Look all you want at Jarrett Bruce.  He sat there during the entire jury selection, calm and composed, you'll see him doing the same during the trial.  The Government can point all they want, but the second thing I want to remind you of when they point at Jarrett Bruce or anybody at the defense table, is let that serve as a reminder to look at the Government's table, Ms. Michelen, Mr. Dugan, Mr. Wang because they have the burden of proof.  Jarrett Bruce is presumed innocent.  So when they point, don't let that get you distracted.  Let that be a reminder:  You have to show me something, they don't.  You have the burden of proof.

Now, what is really interesting is during the course of the case Mr. Wang commented that you would hear from witnesses.  Some of these witnesses are civilians.  They don't come from a law enforcement background, they are not medical professionals.  They don't work for the FBI.  They are people who also have a history of doing similar things that the Government wants you to look at Jarrett Bruce badly for.  They

OPENING STATEMENT - MS. FERRANTE                51

want you to look at him as a criminal.  They want you to ignore what the charges are in this case and what evidence they don't have, in the hopes that you convict just based on the fact that you think he's a bad guy.

Now, when you look at the civilian witnesses you'll hear from, some of them have non-prosecution agreements where the Government said come in and testify and we won't prosecute you for the crime that we know you did, just come in on the stand and say what we need you to say.

And you'll hear that Mr. Khaled is one of those people.  Mr. Khaled is the victim in this case, as Mr. Wang told you.  He suffered injuries.  And maybe that makes you mad.  Maybe you think somebody needs to pay.  The problem is, it has to be the right person.  Not someone the Government selects.  It has to be the person that did it.

And you'll also hear that Mr. Khaled on this very night where this incident occurred was in the course of arranging several drug deals where he was selling to people. Those are the witnesses the Government wants you to rely on to secure a conviction.

There is a reason Jarrett Bruce is presumed innocent.  There is a reason they have the burden of proof.

Now, one of the other things that Mr. Wang touched on is this idea of statements that Jarrett Bruce made.  So let me give an example.  Think of any time that something serious

OPENING STATEMENT - MS. FERRANTE                52

in your life happened, whatever it was, a lawsuit, something serious.  Who do you discuss it with when you need help, you need emotional support, I need money for an attorney, I don't have it.  Who do you go to?  Family, friends?  I don't need to know the list, you know it in your head.  Sometimes when you make a statement it's exactly what you said that you meant:  I need money, I need a loan to get a new attorney.

So we want to peddle this idea that what was said was meant differently, it's code, it's text.  It's exactly that I said that I meant:  I need money for a new attorney. I'm in a midst of a legal battle.  That should not seem so strange.  We're literally trying to force a square peg into a round hole.

That's why, ladies and gentlemen, you have the most important duty, and you see evidence of it every time you walk in and out of the courtroom.  I'm not sure if it's been highlighted.  Every time you stand up to leave, every single person in this courtroom stands.  We don't sit down until the last juror exits or the last juror sits.  The litigants, the attorneys, the judge.  Because you have the most important role.  You get to determine the facts.

Don't let past history that the Government wants to throw at you distract you from that that.  Jarrett Bruce is asking you to keep an open mind and listen to all the evidence and look at the things that you don't get to hear, the lack of

OPENING STATEMENT - MR. KAPLAN                    53

evidence.

Because quite frankly, ladies and gentlemen, you'll hear through cross-examination questions the attorneys will ask of the Government's witnesses, you'll hear Jarrett Bruce's version.  And it's credible.  It's truthful.

How do we know that?  Well, he's going to own all the things he did that the Government brings out in his past that he did, including the past crimes.  And yet he's standing here today and he's telling you, I may have done that, but I did not do this.  Thank you.

THE COURT:  Thank you, counsel.

OPENING STATEMENT BY MR. KAPLAN:

MR. KAPLAN:  Good morning.

Aasim Boone sells drugs.  We can get that out of the way right now.  He's a drug dealer, that's what the evidence in this case will show.  He doesn't do that alone.  He sells drugs sometimes with his friend Jarrett Bruce.

As you can all imagine, selling drugs not a nine-to-five job.  You don't take the subway to your office and sit behind your desk.  You don't have a lunch hour and talk to your co-worker by the water cooler.  You're constantly in motion.  You need to drive to pick up the drugs.  You need to drive to deliver the drugs.  It's a competitive market, you need to always be on the move, always available and always ready.  That's what Aasim Boone does and that's what he was

doing on the night of December 9, 2022.

On that night, the evidence will show that Mr. Boone traveled to Astoria, Queens to meet with his friend Jarrett Bruce to pick up drugs from Bruce.  After that, like he's done many times before, he went to deliver those drugs.  Back in New Jersey where he lives, the Bronx, Westchester.  Because that's what you do, you go where your customers are.

But looking at the same evidence, the Government wants you to believe that Mr. Boone was part of a conspiracy to kidnap a victim in this case.  They charge him in Count One with conspiracy to kidnap Shaon Khaled.  Now that's not what happened that night and it's not what the evidence will show. So let's discuss what the Government believes the evidence will show.

Before we do that, it's important you keep in mind that there will be no direct evidence or testimony that Aasim Boone was part of this kidnapping conspiracy.  The victim in this case does not know Aasim Boone.  The victim in this case will not identify Aasim Boone.  He's never met him.  And there will be no direct evidence that Mr. Boone and the others in this case conspired to kidnap him on December 9, 2022.

Instead, what the Government is going to try to do is they are going to try to use circumstantial evidence.  They will use cell-site locations, they use surveillance footage to try to convince you that Mr. Boone was part of this kidnapping

conspiracy.

But while Mr. Boone was in Astoria that night, the evidence will not show beyond a reasonable doubt that he was part of any kidnapping conspiracy. I expect that one of the witnesses you'll hear from likely today will be the victim, Shaon Khaled. As I said before, the evidence will show that Mr. Khaled does not know Mr. Boone, has never met Mr. Boone. And he cannot identify Mr. Boone as one of his kidnappers.

I still want you to pay close attention to his testimony today. You'll hear how his story changes over time. How it evolves. You'll hear how he had several meetings, numerous meetings, with law enforcement, including with the FBI Special Agent Tom Ford and these prosecutors. You'll hear as he goes through all these meetings, how his story starts to evolve, how he starts to remember things that he didn't remember before, who was saying what, who was doing what, what they were wearing. Things that he didn't remember in the beginning. Things that suddenly he starts remembering now two and-a-half years later as we get closer to trial. For most people, your memory fades, you don't remember things like when it happened. But somehow in this case, Mr. Khaled, an admitted drug user, is going to try to convince that you his memory got better. His memory got stronger in the past two and-a-half years.

The evidence will also show that Mr. Khaled is not

just a drug user, he's also a drug dealer. You'll hear that when Mr. Khaled first speaks to law enforcement after this happens, one of the first times he speaks with the federal agents he tells them a man named Chelo might have been involved. Chelo is important. Chelo is someone that Khaled sells drugs to. This evidence indicates that Khaled believes that this kidnapping had to do with his drug selling.

I expect the Government will call many other witnesses to the stand. Most of these witnesses will not know Aasim Boone. Most of these witnesses won't say anything about Aasim Boone.

They may call witnesses who claimed have seen the kidnapping actually happen. Pay close attention to the testimony. See how their stories change, how the story changes within days. One day a witness says he saw it, the next day he says I didn't really see it, somebody told me about it or I heard about. It's not both, it's one or the other.

Ask yourself, what is their incentive to lie? What is their incentive for them to tell the story the Government wants? You'll hear what the incentive is, some of these witnesses have agreements with the Government. They could be charged with crimes and instead they have an agreement to come here to testify against Aasim Boone and the other defendants with the understanding that if they do that, the Government

will not charge them for their crimes.

As you heard from the prosecutor, Mr. Wang, the Government is going to try to prove their case through surveillance video, video of the kidnapping happening, video of the alleyway where it took place. And they will try to convince you that Aasim Boone is the man on the video. They are going to try to convince you that Aasim Boone likes to wear Nike Air Force Ones, and that must be what the guy in the video is wearing; therefore, he's the guy in the video. Again, use your common sense, your every day experience, how common are Air Force Ones? How many millions of pairs were sold in 2022? Black men are not interchangeable, and that's not Aasim Boone on the video.

The Government mentioned also that they are going to rely on cell-site information to argue that certain people were in certain places at certain times. But as I expect you'll hear from the Government's own witness, cell-sites cannot pinpoint exact locations, at best they can give you a general area where someone's phone might be at a certain time.

We don't challenge that Mr. Boone was in Astoria, Queens that night, or that he drove to New Jersey, or to Westchester, to the Bronx, and back to Manhattan. Again, that's what you do when you sell drugs, you go where your customers are.

I also expect that the Government will focus on some

text messages in this case.  One text message I expect them to rely on is a text message from Jarrett Bruce to Lesly Valentin around 12:23 a.m. on December 10, 2022.  In that message Mr. Bruce sends Mr. Boone's contact information to Valentin.

Now, keep in mind this is more than four hours after the kidnapping started, and just a few minutes before the victim was released in Manhattan.  When you hear this testimony ask yourself, Boone and Valentin are alleged have been conspiring together to commit a kidnapping, but they don't have each other's contact information until it's almost over?

The Government will also rely on text messages between Lesly Valentin and Aasim Boone at 12:24 a.m. on December 10 where Mr. Valentin texts:  Yo, hit me.  I'm behind.

Pay close attention to where the people are at this time.  The victim is about to be dropped off.  What is the point of meeting up to drop off the victim?  What is the purpose?  The kidnapping is over.  Is this evidence of a kidnapping or is this evidence of a plan to meet up for a different reason.

You will hear evidence at trial that Lesly Valentin is in the drug business.  So is Jarrett Bruce.  So is Aasim Boone.  This evidence will show you that these text messages had nothing to do with a kidnapping that was almost completed,

but had everything to do with the drug deal.

Mr. Boone is also charged in Count Four with attempting to obstruct justice.  For allegedly telling his girlfriend Charle Sampson to delete her iCloud account.  Now, the Government is claiming that he did this in order to destroy evidence against him, potentially, in this case.  But I ask you to please listen to the call, pay close attention. Listen how Sampson brings up the issues she's having with her phone, the issues are so bad she's about to buy a new phone. Listen what Aasim Boone tells her.  The evidence will show that he tells her to delete her iCloud because that's the issue that is causing the issue with her phone.  Nothing to do with this investigation.  He doesn't tell her delete it because it's evidence.  Listen to the call.  He tells her, delete it because it's messing up your phone, don't buy a new one.  Once you hear this evidence, that will be clear.

So I'll be finished in a minute.  But before I sit down, I want to share one thought.

As jurors you are the only thing that stands between a Government accusation and a criminal conviction.  That's a tremendous responsibility, but it's one that we as a free society require before the Government can remove someone's presumption of innocence that we're all entitled to.  As jurors, you're here to listen to the evidence and determine whether the Government has met their burden beyond a

reasonable doubt.  After hearing all the evidence in this case, you'll find the Government has not met their burden and Mr. Boone is not guilty of these charges.  Thank you.

THE COURT:  Thank you.

OPENING STATEMENT BY MR. HINE:

MR. HINE:  Yo, hit me.  I'm behind.

Mr. Kaplan just mentioned this, Lesly Valentin sent two text messages to Aasim Boone on December 10, 2022 at 12:24 a.m.:  Yo hit me.  I'm behind.

He was able to text Aasim Boone because Jarrett Bruce had one minute earlier sent Aasim Boone's contact information to Mr. Valentin.  Now the timing of these messages is important, as you'll learn, because I expect the Government's evidence will show that the kidnapping that's charged in this case began around 8:00 p.m. December 9, the day before these messages and ended about 12:43 a.m. on December 10, about 20 minutes after these two messages were sent:  Yo, hit me.  I'm behind.

I expect the Government will try to use these messages to try to prove beyond a reasonable doubt that Mr. Valentin was involved in this kidnapping conspiracy.  The messages are important to the Government's case because they don't have any direct evidence that Mr. Valentin was involved. Circumstantial evidence like these messages form the foundation of their case against Mr. Valentin.

But let's think for a second about what these messages actually show.  The first thing they show us is that Mr. Valentin wasn't with Mr. Boone or Mr. Bruce on the morning of December 10.  If he was, he wouldn't have to text them.

Second, Mr. Valentin wasn't part of this kidnapping conspiracy like Mr. Kaplan mentioned.  If he and Mr. Boone had been part of this elaborate scheme together, wouldn't they have had each other phone numbers before the thing is basically over?  And when he texted "I'm behind," what does that mean?  It suggests he was running late for something. What was he behind?  A kidnapping that started five hours earlier?  He didn't send these texts at six or 7:00 o'clock the day before prior to the abduction, he was texting Mr. Boone for another reason, for something criminal to be fair, you've heard a little bit about this now, but something that he's not charged with, that no one is charged with in this case.

Lesly Valentin was a drug dealer.  Aasim Boone is a drug dealer.  And the guy who connected them, Jarrett Bruce, was also a drug dealer.  Mr. Valentin wasn't texting Aasim Boone about a kidnapping that was basically over, he was a drug dealer texting another drug dealer to talk about drug dealer things.

The Government will show you other circumstantial evidence too to try to prove their case beyond a reasonable

OPENING STATEMENT - MR. HINE                    62

doubt.  And you heard a little about it that in their opening, stuff like phone records, cell-site location data, surveillance videos.  And like the text messages that I've been talking about, if you look closely, the evidence won't quite show what the Government says it does.

For example, we expect the Government will show a video from a wireless store to try to prove that Mr. Valentin bought or activated a burner phone.  But this video isn't going to show anyone buying or activating a phone.  When I say we, I mean me and Gary Kaufman, sitting next to Mr. Valentin over there.  Together we have the honor of representing Lesly Valentin in this case.

And you'll hear plenty more from the two of us as this trial continues about why the evidence doesn't meet the Government's high burden of proving Mr. Valentin's guilt beyond a reasonable doubt.

I've mentioned reasonable doubt a few times, the Government's high burden.  And you heard plenty of what the expected evidence will show, so I'm going to shift gears and talk about a way that you can think about the case as you hear the evidence over the next few weeks.

I don't know if you've ever wondered why all or most of the sky scrapers in New York City are over there in Manhattan but I recently learned something about this; which is that during the last Ice Age a glacier came down from

Canada and covered most of what is now New York.  The edge of the ice sheet cut through Staten Island, through Queens, Brooklyn, and all the way out to the end of Long Island.  When the glacier retreated it deposited gravel and sand across the district that we're in right now.  So that's why Prospect Park and Greenwood Cometary are so hilly.  It's why the whole south shore of Long Island exists.  And it's why the Manhattan has all the skyscapes; and Brooklyn, Queens and Staten Island don't.

Manhattan is solid bedrock, close to the surface.  And here the ground is made of the sediment left by the glacier.  And it's tough to build on the sand and gravel.  That's why most of the subway lines go above ground in Queens and Brooklyn.

Talking about rocks and ice and not the expected facts this case of the law is to illustrate a quick point, which I hope you remember during this trial.  The Government is going to argue that their case against Lesly Valentin is build on solid facts.  On things like, "Yo, hit me.  I'm behind," messages.

Then we'll dig deeper and you'll see that their case is built only on circumstantial evidence.  You'll see that the evidence that is presented as bedrock is actually sand.  And you'll see that the ground that they built their case on cannot support the high burden, the highest burden under the

law of proving Lesly Valentin's guilt beyond a reasonable doubt.  That's why at the end of this trial, we'll ask that you return a verdict of not guilty.

THE COURT:  Thank you.

OPENING STATEMENT BY MR. HAMILTON:

MR. HAMILTON:  Ladies and gentlemen, good morning.

My name is Phillip Hamilton, along with my associate Ethan Van Buren, I represent Mr. Gregory Bruce.  I want to introduce them so it's clear.  Also I want to reference, I'm typically in federal court where we tend to be very formal with respect to Mr. Bruce, Mr. Boone, but because we have two Bruces here, Jarrett Bruce and then Gregory Bruce, I'm going to, for the most part, be referencing them as Jarrett and Greg so the record isn't confused and I don't confuse you in the opening as well.  Okay?

So after listening to everyone's opening statements, I really want to make it clear at the outset that Greg, as he sits here, he's not charged with any of the kidnapping, assault, torture, or extortion counts that you heard of about thus far.  He didn't participate in any of those allegations; because as you'll learn, he didn't even know about them at the time.  And it's for that reason that this is going to be one of the only moments throughout the course of this trial that you're really going to see me or Mr. Van Buren speak.  You're not really going to see us cross-examining a lot of witnesses.

You're not going to see a lot of hoopla in any way coming from us, because at the end of the day this case is not about us and it's certainly not about Greg.  The only reason it becomes about Greg is because the Government has charged him with the one count of witness tampering and obstruction of justice.

Let me be clear.  Greg is not guilty of this charge.

To help you better understand why nevertheless he's been charged with it, I want to framework this for you in less so of a legal sense -- I'm not going to go to the Ice Age -- but I'm going to framework this more in a human sense for you, an every-day, day-to-day life type of sense.

Ladies and gentlemen, there are times in life when we think we see the entire picture.  But we don't.  We might see a few pieces, we might make a quick judgment, and we find ourselves moving forward with this full confidence really believing that we are right, only -- and I'm sure we've been in this situation later and sometimes too late -- to realize that we were wrong.  And there are times when being wrong can have enormous consequences.  Now this happens every day, I'll give you some examples.

There may be a situation where you have a teacher who sees two students whispering during a test and makes the assumption that they are cheating on a test.  There may be a situation where you see a man surrounded by about eight or nine police officers and you presume he's being arrested, when

in fact he's the victim giving the police a statement about what happened to him.  You may have a situation where a husband hears his wife having a conversation with a colleague and suspects that it's the affair he always suspected that they were happening; not necessarily about what was directly said, but because he interprets what is said to fall into the reality that he already has believed and confirmed to be true.

The truth is ladies and gentlemen, the human brain does this all the time.  Psychologically we crave explanation, we crave clarity.  And there are times maybe we only see bits and pieces of a picture, our brain starts to do the thing where we try to put the picture together to fit the reality that we're comfortable with, whether based on our own world view or our day to day life experience.

So at that point when we do that, it can become difficult to consider the alternatives, and we unfortunately start building everything we hear to fit the version of reality that we already decided to be true, even if the evidence doesn't support it.

And for Gregory Bruce, that's exactly why he's here. This case is not about a direct threat, it's not a coded threat, or any act that amounts to witness tampering or obstruction of justice with respect to Greg, and certainly Jarrett, on the count with which I'm discussing.  It's about the Government, specifically the FBI, hearing parts of some

conversations between brothers, seeing pieces of a 37-year-year long sibling relationship to which they are not a part of and do not have the full context, and fitting the version of reality that they believe to be true into this case by wrongly assuming what they interpreted and heard on those conversations; even, frankly, as you'll learn, when the innocent truth was right there in front of them and was actually a part of the conversations. You'll hear them and you'll see them.

But let me be very clear here, Gregory Bruce did not commit witness tampering or obstruction of justice in this case. And he never intended or attempt to do so. He never threatened anyone. He never told anyone to stop speaking to law enforcement or from testifying in the Grand Jury. And I'm going to be really frank here, he never even spoke to the witness that is at the heart this case.

Now that witness is a man by the name of Humayen Khan. Now, presuming that the Government is even bringing him to testify, I don't know if they will or won't yet, what Humayen Khan will tell you, if he takes the stand, is very specifically -- you have your notepads -- Greg never contacted him, never threatened him, never intimidated him. And that the only reason Greg was reaching out to Humayen Khan was to try to get money for a lawyer for his brother Jarrett who was dealing with a case in New Jersey, not even this case.

The Government can't see that picture.  Because when they heard a few phrases on phone calls between Greg and Jarrett, these are phrases that can mean many different things, they filled in the blanks with what they already believed, and they assumed the worse.  But ladies and gentlemen, that's not proof and that's not criminal intent.  That is confirmation bias, dressed up as a federal case.

Speaking about that New Jersey case that Jarrett was dealing with, I cannot fully impress upon you the importance of the timeline between that case and this case where you all are sitting right now.  Because the primary phone call that the Government is relying on to prove that Jarrett and Greg intended to commit witness tampering in this case, happened on January 29, 2024.  But at that point Jarrett hadn't yet been indicted in this case.  Okay.  And Greg didn't even know that Jarrett was a defendant in this federal case until February 2, 2024.  Thus, anything that you hear in that discussion on the January 29 phone call either, A, had to deal with the New Jersey case because Jarrett wasn't in this case yet; or B, anything else that brothers talk about that all of us who are not a part of that sibling relationship wouldn't know, but what you will clearly know is it didn't have to do with witness tampering in this case.  And ladies and gentlemen, that matters.  Because in this case the Government must prove that Greg acted with knowledge of a specific official

proceeding, i.e., this federal case and that he intended to influence, obstruct or interfere with this federal proceeding.

But the evidence in this case will show you that until Greg knew about this case, any help he was trying to get his brother centered around the New Jersey case. When Greg did find out about this case, his own focus was trying to get Jarrett a good lawyer for it.

The Government likewise can't see that picture because, unfortunately, they can't see past the misinterpretations within their own. So outside of some overheard misinterpreted phone call between the Bruce brothers, who will the Government rely on to prove their case?

Let's start with Janae Cain. This is Jarrett's on-again-off-again girlfriend for the last 15 years. I suspect the Government will call her, not so that she will take the stand to say that Jarrett and Greg were witness tampering; rather, I suspect the Government will focus on her past conduct in New Jersey. Mind you, conduct that she'll be testifying about under a non-prosecution agreement, where they believe she obstructed justice along with Jarrett and Greg in New Jersey. But that conduct, which was never charged in New Jersey, has absolutely nothing to do with this case, except for being a very large red herring that is swimming upstream.

And the irony, ladies and gentlemen, is that Greg's innocence in this case is proven by the very communications

that he sent to Janae after he learned about Jarrett's Indictment in this case.  You'll see those communications and within them you will see a few things.  No conspiracy.  No plot.  And no scheme to silence any witness.

What you will see is one brother reacting to the very serious news of another now that he had this case over here, as opposed to in New Jersey.  And him saying, all I can do is help Jarrett get a good lawyer.

Now there is another potential witness by the name of, or he goes by I should say, Lil Bro.  He's a good friend of Humayen Khan.  He likewise will be testifying under a non-prosecution agreement.  But even with that protection he'll be clear, when Greg was reaching out to him to try to get in touch with Humayen Khan, Greg never tried to silence Humayen.  And the only thing Greg asked Lil Bro was whether Humayen might be willing to help pay for a lawyer for Jarrett's New Jersey case.

Then there is Humayen Khan himself, the alleged intended victim of this supposed witness tampering.  Like I said earlier, we'll see if the Government even brings him in to testify.  If he does come in, he'll tell you, plain, Greg never contacted him, never threatened him, they never even met.  The only thing that Humayen said that was that Greg was trying to reach out to him for lawyer money for Jarrett.  Which, we're going to be frank, and it will come out,

presuming he comes in, wasn't a strange request.  Because Humayen had lent money to Jarrett before.  They lived together for close to years, they were close.

These are the witnesses the Government is going to rely.  Witnesses who essentially need immunity to testify.  And witnesses even under pressure will never say that Greg committed witness tampering in this case, which I remind you is the one and sole charge that he's charged with here.

So look, ladies and gentlemen, just like the teacher who gets it wrong about her students teaching, or the spouse who jumps the gun and accuses their partner of an affair that doesn't exist, the Government in this case confused possibility with certainty.  They stopped caring about what else those conversations between these two brothers -- who have been brothers at this point close to 40 years, but at the time of the allegations in the late 30s -- what those conversations could have meant, and they started bending every piece of information to fit the version of events that they decided was true.  But ladies and gentlemen this courtroom doesn't run on assumption.  It doesn't run on confirmation bias.  This courtroom runs on evidence.  And in this case, the evidence will make it abundantly clear that Greg did not intend or attempt to witness tamper or obstruct justice.  Which is why at the end of the case -- which frankly will probably be the next time you hear from me or Mr. Van Buren --

Proceedings                                              72

we'll stand back up here and ask you for the only logical verdict that I shared with you, a verdict of not guilty. Thank you.

THE COURT:  Counsel, I think it might be a good time for a ten-minute break before we call the first witness.

(Jury exits the courtroom.)

MR. WANG:  One brief note, your Honor.  The Government noted during counsel for Gregory Bruce's opening status, he strongly intimated to the jury that the charges are a legal impossibility fee because Jarrett Bruce had not yet been charged when the conversation in question happened.  As the Court knows, that's not law.  If the proceeding is foreseeable, that is sufficient for an attempted obstruction of justice charge.  So the Government would appreciate if the Court would, at the minimum, clarify for the jury that the Court's instructions on the law control here, and that counsel's statements of the law do not control.

MR. HAMILTON:  With respect to the latter part of Mr. Wang's statement, I'm fine with that.  In terms of the factual component, if we're going to do that then I need to reopen on the lack of evidence about the foreseeability.

THE COURT:  I didn't hear the word foreseeability. I don't see any harm, tell me if you object, I could just say: You just heard the opening statements.  Those are counsel's statements about what they expect the evidence in this case

Proceedings                                          73

will show.  At the end of trial I'll give you instructions about the law, and you should follow the instructions.

MR. HAMILTON:  We consent to that, that's fine.

(Brief recess.)

(Continued on next page.)

*Proceedings*                                                    74

(In open court - jury not present.)

(In open court.)

THE COURTROOM DEPUTY:  All rise.

(Judge RACHEL P. KOVNER entered the courtroom.)

THE COURT:  Is the Government ready?

MS. MICHELEN:  Your Honor, we have a brief issue.

During the opening for Mr. Jarrett Bruce, Ms. Ferrante said multiple times that the defendant was an open book, that we would hear about his full criminal history, which, as Your Honor knows, Your Honor limited those rulings.

So, we would ask that, we argue that the defendant has opened the door to certain additional criminal conduct, including the fact that the defendant Jarrett Bruce dealt additional drugs, so not just marijuana.

MS. FERRANTE:  Judge, I think I was very specific in what I mentioned on purpose to be in line on what your rulings already were.

THE COURT:  Yes, I don't really get it.  All the defendants opened on that they deal drugs — maybe not all, but there was a lot of that in the openings.

What does that, I mean --

MS. MICHELEN:  So, are we allowed to elicit from the first witness that the defendant dealt cocaine as well or --

THE COURT:  Why?  Just because I don't see how this is changing the calculus.

MS. MICHELEN:  Well, the way that Ms. Ferrante presented it to the jury is that the Government was gonna admit evidence of all of his past crimes and criminal record, and that's just not the case.

THE COURT:  I didn't hear that.  Give me a sec.

MS. FERRANTE:  Judge, if I can.

I don't know if I want you to jump in right now if you're looking something up.

THE COURT:  I was just going to look at what you said.

MS. FERRANTE:  I specifically said --

THE COURT:  Tell you what, it might just be helpful if I just look at it for one second.

(Pause.)

THE COURT:  Okay.  I've re-read the opening statement.  I'm not seeing anything that would change my ruling about the scope of the drug dealing evidence.

So, who is the first witness?

MS. MICHELEN:  The Government calls Shaon Khaled.

THE COURT:  I'm just trying to figure out when we should take a break.

MS. MICHELEN:  Probably in about an hour, Your Honor.

THE COURT:  So you think his testimony is about an hour.  So, great, I think we should able to get through the

*Proceedings* 76

direct and then take a break.

So, let's get the jurors.

THE COURTROOM DEPUTY:  Sure, Judge.

(Pause.)

THE COURTROOM DEPUTY:  Jurors entering.

(Jury enters.)

THE COURT:  Everybody can be seated.

So, you just heard the opening statements.  These are the attorneys' statements about what they expect the evidence to show during this trial.  At the end of the trial, I will also give you instructions about the law and you should follow those instructions.

I think we're ready for the Government to call its first witness.

MS. MICHELEN:  Your Honor, we are going to start by reading a stipulation first.  It's been marked as Government Exhibit 1201.

It is hereby stipulated and agreed by the defendants Aasim Boone, through his attorneys Jacob Kaplan and David Gelfand; Jarrett Bruce, also known as "Inf," "Infinite," and "Infamous," through his attorneys Peter Guadagnino and Andrea Ferrante; Gregory Bruce, through his attorneys Philip Hamilton and Ethan Van Buren; and Lesly Valentin, through his attorneys Gary Kaufman and Nicholas Hine; and the United States of America, through Joshua Dugan, Lorena Michelen and Andrew

Wang, Assistant United States Attorneys, that if called to testify at trial, a digital forensic examiner from the Federal Bureau of Investigation would testify:

Government Exhibits 102A to 102B and 103 are Cellebrite extractions that contain true and accurate copies of information obtained from Apple for an Apple iCloud account with the name Val, va13ntin@icloud -- and that's n-t-i-n -- @iCloud.com.

2.    Government Exhibits 120A, 120B(3) -- 120B and 121 are Cellebrite extractions that contain true and accurate copies and information and data obtained from Apple for an Apple iCloud account with the name simb110282@iCloud.com.

3.    Government Exhibit 129, is a Cellebrite extraction that contains a true and accurate copy of information obtained from Apple for an Apple iCloud account with the name asapcha@iCloud.com.

4.    Government Exhibits 137 and 138 are Cellebrite extractions that contain true and accurate copies of information obtained from Apple for an Apple iCloud account with the name Jarrett, J-A-R-R-E-T-T, Bruce8138@gmail.com.

5.    Government Exhibit 150 is a Cellebrite extraction that contains a true and accurate copy of information obtained from an Apple iPhone belonging to Gregory Bruce.

6.    Government Exhibit 161 is a Cellebrite

extraction that contains a true and accurate copy of information obtained from an Apple iPhone belonging to Shaon Khaled.

7.   Government Exhibit 164 is a Cellebrite extraction that contains a true and accurate copy of information obtained from a Nokia G310 5G cell phone found at the Metropolitan Detention Center, Brooklyn, on or about October 9, 2024.

8.   The parties further stipulate and agree that any Government exhibits or Defense exhibits that are extracted from and contained within Government Exhibits 102A, 102B, 103, 120A, 120B, 121, 129, 137, 138, 150, 161 and/or 164 are authentic.  Each party reserves the right to challenge the admissibility at trial of any of the aforementioned exhibits pursuant to Federal Rule of Evidence 401, 403, 404 and/or 802.

This stipulation marked as Government Exhibit 1201 is admissible as evidence at trial.

So stipulated, dated Brooklyn, New York, June 17, 2025, and signed by all of the parties.

THE COURT:  And I take it you're offering this exhibit?

MS. MICHELEN:  What, Your Honor?

THE COURT:  I take it you're offering this exhibit?

MS. MICHELEN:  Yes.  We're offering it into evidence.

THE COURT:  So, Exhibit 1201 is admitted.

(Government's Exhibit 1201 was received in evidence.)

MS. MICHELEN:  Thank you, Your Honor.

And the Government now calls Shaon Khaled.

(Witness enters and takes the stand.)

THE COURTROOM DEPUTY:  Please raise your right hand.

You do solemnly swear that the testimony you shall give this Court and jury in this issue now on trial shall be are the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

(Witness sworn.)

THE COURTROOM DEPUTY:  Please state your full name and spell your first name and last name slowly for the record.

THE WITNESS:  Shaon Khaled, S-H-A-O-N, last name Khaled, K-H-A-L-E-D.

THE COURTROOM DEPUTY:  Thank you.  Please be seated. Speak into the mic.

(Continued on the following page.)

**S H A O N   K H A L E D**,

called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MICHELEN:

Q    Good morning, Mr. Khaled.

A    Good morning.

Q    How are you?

A    Good.

Q    How old are you, Mr. Khaled?

A    I'm 40 years old.

Q    And where were you born?

A    Bangladesh.

Q    How old were you when you came to the United States?

A    Seven years old.

Q    Where do you live now?

A    Queens.

Q    And in December of 2022, where were you living?

A    Astoria.

Q    Is that in Queens?

A    Correct.

Q    And who were you living with?

A    I was living by myself.

Q    What was your address in December of 2022?

A    21 -- 2135, 27th Street, Astoria, Queens.

Q    Mr. Khaled, how far did you go in school?

A    I almost got my Associate's.  I didn't get to finish.

Q    Which college did you go to?

A    LaGuardia Community College.

Q    And what did you study?

A    Business management.

Q    How long did you study business management?

A    Two years.

Q    Did you get a degree?

A    No, I didn't.

Q    Where do you work, Mr. Khaled?

A    Right now I take care of my father.  I do home care.

Q    And how long have you been doing that?

A    For a year or so.

Q    And before doing that, what were you doing for work?

A    I was doing -- I was selling stuff on eBay, and I also did something on the side.  I used to sell marijuana.

Q    You sold marijuana?

A    Yes.

Q    When were you selling marijuana?

A    Like around end of 20 -- 2021 to '22.

Q    When did you stop?

A    '22.  After the incident, I stopped.

Q    And how much marijuana approximately were you selling per

month?

A     30 to 40 pounds a month, I'd say.

Q     How did you get started in that business?

A     I used to smoke -- I mean I used to smoke weed and, you know, it's something like, hey, I'll just smoke for free and so....

Q     And approximately how much money were you making per month in that business?

A     Three to 4,000 a month.

Q     Who were you selling to?

A     Just close people that I knew.

Q     And where were you selling it?

A     In Astoria, Queens.

Q     Did you have any disputes with any -- anyone, any client over marijuana?

A     No, I didn't.

Q     Or over the marijuana business?

A     No, I didn't.

Q     Did you owe anyone any money?

A     No, I didn't.

Q     Did anyone owe you any money?

A     No.

Q     Do you know what the term plates, and that's P-L-A-T-E-S, means?

A     Yeah.  It's for pounds, pounds of marijuana.

Q    Mr. Khaled, I direct your attention to December 9th of 2022.

Can you tell us what happened that night?

A    Sure.  So, I was doing laundry and I come home, I dropped my girlfriend off and -- I drop her off and I park at my parking spot.  As I parked the car, I get out and I start taking things out of my back seat, meaning like groceries I had to take upstairs.  And then as soon as I closed the door and locked the door, someone approached me.

Q    Approximately what time was that?

A    Around 8 o'clock, 8:00 p.m.

Q    And what was the address of the parking where you parked?

A    2127 27th Street.

Q    You said someone approached you.  Can you describe that incident?

A    Yeah.  They had a black mask, black jacket, black pants, gloves, white sneakers.

The person approaches me.  As soon as he approaches me, I kinda see a shiny -- like a gun that came out.  And then he grabs me.  So, I fall.  I try to get back up and I get pistol-whipped in my right eye.

Q    Was that individual that you just described male, female?

A    Male.

Q    And can you describe the gun?

A    It was -- it was very -- it was very quick.  So it was

just maybe black with like a little shiny piece on top.  So, the light kinda glared off of it.

Q    And where was the person -- where did you first see the gun?

A    As soon as he approached me, I saw him like take it out.

Q    And what happened after he took the gun out?

A    So, I lose my balance because we were on a -- on a -- on like a little steep -- like a little hill.  So I kinda fall back.  So, when I'm -- so when I tried to run and get up, he came behind me and just pistol-whipped me in my right eye.  So, my eye just blows up.  And then he tells me if I move he'll blow my brains out.

Q    Did you recognize their voice?

A    No, I didn't.

Q    What happened after that?

A    He told me to get up.  And as soon as I get up, I see a minivan pull up with the doors open -- with the door open.

Q    Do you remember -- do you remember the color of the minivan?

A    Yeah, I believe it was red or maybe maroon.  It was red, maroon.

Q    What happened after you saw the red minivan?

A    He told me to walk towards the minivan.

Q    And did you walk?

A    Yeah.  So I started walking towards the minivan, and as I

got close to the minivan I started yelling.  I said:  Yo, help.  So -- because it was so quiet and I didn't want to disappear.

So, I was kinda like struggling, fighting with them not to get in the van, and then somehow they got me in there.

Q    And did you have anything on you at that time?

A    I'm sorry?

Q    Did you have anything on you like a phone?

A    Yeah, I had my -- I had a jacket on.  I had a fanny pack with my keys and my cell phone.

Q    And what happened to all of those items?

A    So, I -- I believe my phone fell out of my pocket, but everything else was taken from me.

Q    What about -- what did you have inside of the fanny pack that you mentioned?

A    I had my wallet.  I had my car keys.  I had my house keys.  I had about maybe like 30 dollars.

Q    And did you recover your phone at some point?

A    Yes.

Q    Do you remember when?

A    I didn't recover, the super did because it fell out of my pocket.

Q    The super of the --

A    Of the buildings, yeah.

Q    And do you remember at approximately what time or which

day you recovered it?

A    No idea.

Q    And were you wearing any jewelry during --

A    Yeah, I had a gold bracelet on.

Q    And what happened to the gold bracelet?

A    It was taken.

Q    By who?

A    The kidnappers.

Q    Do you remember who?

A    I can't tell you who it was, it was so much going on.

Q    So, can you tell us what happened after you got pushed into the minivan?

A    Yeah.  I got pushed into the minivan.  They closed the door.  They zip tied me behind -- my arms behind my back and my legs.  And they said:  Shaon, we've been waiting for you for a long time.

So, it was like, okay.  They did mention:  Oh, you have a nice car.  If that was the case, take the car, and that's it.

And then after that I asked them:  What do you want? They said they wanted money.

Q    What car were you driving when you got kidnapped?

A    I had a Land Rover.

Q    Do you remember how many people were inside of the minivan?

Khaled - direct - Michelen                                87

A     As much my eyes saw there was three people.

Q     And do you know where they were sitting?

A     One driver, one guy in the back who opened the back door, I believe, and the guy with the gun on me.

Q     And that's the guy that you described having white shoes?

A     Correct.

Q     What were they all wearing, can you describe their outfits?

A     So, in the minivan it was kinda dark, but they all had masks on, ski masks.  So, only like they eyes was showing.

Q     What color masks?

A     I believe black.

Q     And you said the minivan was dark.

      When you got pushed into the van, the door was open. Was there any light at any point inside the car?

A     No, the dome light was closed.

Q     So what happened after you got zip tied inside the van?

A     They demanded money.  I told them I don't have.  And then they started beating me.

Q     How much money did they demand, if you remember?

A     In the beginning I think 500,000.

Q     And then?

A     And I told them I don't have it.  And then I started getting tortured, beaten.  They started punching me in my head.

Khaled - direct - Michelen                                          88

Q    Who punched you, do you remember?

A    I think the guy with the white sneakers.

Q    And what else did he do?

A    So, he's just -- he was just beating me.  He was beating me, and then I told him I don't -- I don't have anything to give him.

Q    You said that you were tortured.

     Can you describe what happened?

A    Yeah.  So, at one time -- at one point they started cutting my ear, my left ear.

Q    Who's "they"?

A    The white sneakers.  Yeah, he -- he took a knife, he started cutting my ear and I started bleeding like all over my eye and everything.  And then after that, they torched my back with a torch lighter.

Q    Can you describe that?

A    Very painful.  But yeah, he started torching my back and he tells me:  Hey, your back is getting crispy.

Q    Who said that?

A    The guy with the white sneakers.

Q    And the guy with the white sneakers was the same guy who used the torch?

A    Yes, correct.

Q    What else did they do in terms of torturing you?

A    After they burned my back, they started beating me again.

And one guy was beating my back and the other guy was beating my ribs.  And then I think the guy with the white sneakers hits me in my face and I knocked out.

Q    You knock out you said?

A    Yeah, I knocked out.  So, I wake up.  I take a deep breath and I was hoping I was home.  And then he says: Welcome back.

Q    Who said that?

A    The guy with the white sneakers.

Q    What happened after that?

A    After that, I told them, like, you know, whatever you need, you know, I'll get it for you.

Q    Did you notice anything on your body when you woke up?

A    Well, I was tied up, right, so -- and one eye's closed and the other one is full of blood.  So, like I felt the punches, I know he was trying to break my ribs.  But after a while, I think I felt like the cigar burns all over my body.

Q    Was anyone smoking during the kidnapping?

A    Yeah, the guy with the white sneakers.

Q    Do you remember what he was smoking?

A    I believe Black & Milds.

Q    Are those cigars or cigarettes?

A    Cigars, cigarettes, something like that.

Q    At this point had you recognized any of the kidnappers?

A    No, they were wearing masks.

Q    What about their voices?

A    No, I didn't.

Q    At any point during the kidnapping did you recognize any of the kidnappers?

A    No.

Q    Or their voices?

A    No, I was just laying on the floor.

Q    What about their voices?

A    Nothing.

Q    So you described part of the torture that you endured.

Was this all taking place inside of the van?

A    Correct.  Everything was inside the van.

Q    Was the van stopped or --

A    Yeah.

Q    -- in movement?

A    At one time they stopped.

Q    Can you describe that?

A    So when I was taken from my house, they drove off.  But since I was getting tortured, I don't know how long it was anything going on.  So at one time -- one point that we stopped and that's when he, basically, cut my ear and burned me.  And after that, I told him, like:  Hey, whatever you need, you know, I'll get it.  So I could just, you know, go home.

Q    You said you heard -- you saw at this point three

kidnappers.

Do you remember how many different voices you heard at that point inside of the van?

A    At that point, no.  Just one voice at that point.

Q    Whose voice?

A    The guy with the white sneakers.

Q    And you said that at some point there was a stop.

Can you describe that first stop?

A    Yeah, we stopped and after the -- after all the torture when I agreed I'll give something, after a while they took me out to pour bleach all over my body.

Q    Can you describe that?

A    So since they pulled me in, my shirt came off.  So I was kinda like shirtless.  So, my body was open, my pants, and they told me to get out and make sure I don't make noise or there was gonna be more.

Q    Do you remember who said that?

A    The guy with the white sneakers.

Q    He told you not to make noise, and then what happened?

A    So I got out and somebody came with a bottle of bleach and started pouring it all over my body.

Q    Is this a new person or one of the three individuals you previously mentioned?

A    It could have been a new person or it could have been the person that was in the back now because I'm like traumatized,

I'm beaten.  You know, my eyes are like one closed, one is bloody.  So, it could have been the guy who was in the back or it could have been somebody else.

Q    How many kidnappers were you -- do you remember seeing at this point in the first stop?

A    First stop, so when I got out there was one guy in the back.  And then when I got up, one guy was pouring the bleach on me, but I saw the driver and a passenger in the front seat.

Q    And what about the guy with the white shoes?

A    He was in the van.

Q    So, approximately how many kidnappers have you seen at this point?

A    So, maybe four.

Q    And what happened after one of the kidnappers comes out with the bleach and pours the bleach on you?

A    He pours it on me and tells me to go back inside the van. And then I go back inside the van and my private part was burning, so I kinda like screamed.

        I'm like:  What the fuck -- what the hell did you guys pour on me?

        And he's like:  It's bleach.

        And I was like:  Okay.

Q    Were you still zip tied when you got out the first time?

A    Yes, I was zip tied.

Q    What color shirt were you wearing?

A      I was wearing a black shirt.

Q      And then did you go back into the minivan after you were poured that bleach?

A      Yeah.  I went back into the minivan and they put a -- a beanie cap on my face.

Q      Were you able to see anything?

A      No.  After that, I didn't get to see anything.

Q      And did you have that -- for how long did you have that beanie on your eyes?

A      I don't know.  It felt forever.

Q      And what happened after that?

A      After that, I guess we sat there for quite a bit and then we went to another place after that.

Q      You said you sat there for quite a bit.

       You mean the same first stop?

A      Yeah, first stop.  And then they took me to another stop.

Q      Did you hear -- did you -- did you hear anyone having any conversation during the first stop?

A      Yeah.  Somebody went on the phone right after the bleach and made a phone call and said:  Hey, can we come by to your place?

Q      Do you remember who made that phone call?

A      I believe it was the guy with the white sneakers.

Q      Do you know who he called?

A      No idea.

Q    What happened after that?

A    We went to the second place.

Q    Can you describe what happened there in the second stop?

A    The second stop was -- basically, we went there and we sat there for maybe a couple of hours and I was just tied up and on the floor.

So at one point I told them:  Hey, my fingers are swelling up -- because they tied it so tight.  My fingers were swelling up.  I'm like:  Hey, can you loosen it?

So the guy goes:  What if you fight us?

I'm like:  Dude, it's like three of you guys, it's only me.  My fingers are swollen.  I can't feel anything.

So, he burnt the zip tie off, and then he put a new zip tie on again.

Q    And who was "he"?

A    The guy with the white sneakers.

Q    Did you say anything to them or offer them anything at this point?

A    Yeah, I offered them I'll give them money and some weed.

Q    And what happened?

A    They agreed, they'll call me on Monday and I should have it ready.

Q    And before that, did you ask them to drop you off anywhere or take you?

A    I told them, if you need -- if you want, if you want the

money, I could -- we could go back and I could tell my brother maybe whatever I have to give it to them.

Q    Go back where?

A    To where they picked me up from.

Q    Your place?

A    Yes.

Q    And what did they say?

A    They said no, there's too many cops there.

Q    There's too many cops?

A    Yeah.

Q    And do you know how they knew that?

A    I have no idea.

Q    So what happened after the second stop, do you remember the car -- the minivan going anywhere or moving somewhere?

A    The second stop, no.  We were there for a couple of hours.

And after that, towards the end I kinda asked the driver, I'm like:  What's going on?  If you need the money, I could give it -- get it.

But the driver said:  Don't worry, you'll be going home soon.

So that's when I got the relief that I would be going home.

Q    And what happened after that?

A    I guess after that I remember somebody saying:  Oh, she

needs gas.  So when they took off from the second place, we stopped somewhere else also.

Q    Do you know who said that?

A    I believe the white sneakers.

Q    He said "she needs gas"?

A    She needs gas.

Q    You said there was another stop.

Can you describe that?

A    It was short compared to the other two.

Q    Were your eyes still covered?

A    Yes.  It was still covered with the beanie.

Q    Were you able to see anything during this stop?

A    No.

Q    What about the second stop, were you able to see anything?

A    No.  The second stop I didn't.

Q    And going back to when you got bleached and you saw an individual coming out with the bleach before they put it on you, did you notice any additional cars at that point?

A    Yeah.  There was a sedan behind my minivan with the lights on.

Q    Do you remember the color of the sedan?

A    I believe it was silver.

Q    Did you see if anyone was inside of that car?

A    I couldn't see because of the glare.

Q    Can you describe where that car was in relation to the minivan?

A    Right behind it, like four or five steps behind it.

Q    So what happened after the short third stop that you just described?

A    After that, they dropped me off in Manhattan and told me to roll out the car with my head down.

Q    Did you do that?

A    Yeah.

Q    Can you describe that?

A    Yeah.  They opened the door -- they stopped, they opened the door.  They're like:  Get out and when you get out, put -- put your head down.  And as soon as they leave I could walk away.

Q    And before they dropped you off, did any of the kidnappers say anything to you?

A    Yeah, they're gonna call me Monday for what they need.

Q    Do you remember which day of the week you were first kidnapped?

A    Which day?  That was a Friday.

Q    Friday.  And they said, when dropping you off, that they were gonna call you when?

A    Monday.

Q    Did they say what the purpose of that call was or that communication?

A    It's what they demanded, money and the weed.

Q    And you said earlier that you offered them weed as part of payment.

What was their reaction when you offered them the weed?

A    They seemed okay with it.

Q    Did they ask any questions?

A    No.

Q    Do you remember where you were dropped off, the address?

A    Yeah.  It was York and I believe 50 -- maybe 60th Street. Yeah, it was like when you get off the upper level and the first right and you go straight to York, right there.

Q    Is that in Manhattan?

A    Correct.

Q    And so, can you describe the drop-off, what happened during and after the drop-off?

A    They just said I'm gonna call Monday, just to get everything ready and just to roll out the car and just put my head down while they leave so I can't see them.

Q    And you said earlier that you were wearing a black shirt.

Do you remember if the shirt was still black when you got dropped off?

A    No.  By the time I put it back on, there was white stains with my pants white, my sneakers white.

Q    Why was it white?

A    Because of the bleach.

Q    And so what happened after you were dropped off?

A    After I got dropped off, I started walking towards First Avenue and I saw a couple there.  The guy wasn't feeling well and, like, the lady said her -- I asked her if I could use her phone, and she's like:  My phone is dead.

So I go to the corner, I was walking towards the corner and a couple saw me and they approached to help me. They're like:  What happened?

I said:  Oh, I got robbed.

Q    Do you remember approximately the time?

A    I believe 1 a.m.

Q    Okay.  And what happened after you told them you were robbed?

A    We went to the deli.  I got a bottle of water so I could freshen up, and she actually called me a Uber to my girlfriend's house.

Q    What's your girlfriend's name?

A    Arina Kraim.

Q    How do you spell that?

A    A-R-I-N-A, last name Karim, K-A-R-I-M.

Q    And where did she live during this time?

A    Sunnyside.

Q    Is that in Queens?

A    Correct.

Q    Do you know what your girlfriend's phone number is?

A    Yes.

Q    What is it?

A    917-420-1101.

Q    Did she have that same phone number in December of 2022?

A    Yes, she did.

Q    And do you remember at approximately what time you called her?

A    Maybe like 10 minutes after I got out the van.

Q    And you said you ordered an Uber to your girlfriend's place?

A    Yes.

Q    And at what time did you arrive to her place, approximately?

A    Maybe like twenty minutes later, 25 minutes later I got to my girlfriend's house.

Q    Past 1:00 a.m.?

A    1:00 a.m., after 1:00 a.m., yeah.

Q    And what happened after you arrived at her place?

A    One of my other friend was there, and I wanted to go home.  I just wanted to rest up.  And the detectives show up and they take me to the hospital.

Q    Which friend was there?

A    His name is Praz.  He was just helping out, giving a ride to my girlfriend.

Q    And you mentioned detectives.

What was that?

A    Yeah, the two detectives came because she told them that: Hey, we found Shaon.  And so they came to our house.

And they're telling me:  Hey, you have to go to the hospital.

But I told them I want to go home.  I just want to wash up.

Q    And what happened after you interacted with the two detectives?

A    They took me to Mount Sinai in Astoria, Queens.

Q    Is that a hospital?

A    Correct.

Q    When did they take you there?

A    Right after, like, I got there, two minutes later they showed up.

Q    And how long did you stay at the hospital?

A    It was like five to six hours, at least.

Q    And you said you remember seeing about four kidnappers, is that correct?

A    Correct.

Q    Do you know what their genders were?

A    Male, I believe.

Q    All of them?

A    Correct.

Q    Did you recognize any of them?

A    No.

Q    Their voices?

A    No.

Q    Do you know what language they were speaking?

A    With me they were speaking English.

Q    Were they speaking another language?

A    No.  I didn't hear any other language.

Q    You said earlier that they said they were gonna reach out to you by Monday?

A    Yeah.

Q    Do you know if they called you?

A    I didn't have the phone, the -- the detective -- the FBI agent had my phone.

Q    Can you describe that, what happened?

A    Yeah.  I met up with the detectives, I believe on a Sunday, and I gave them permission to go through my phone.

Q    And when you say "detectives," you mean officers from the -- from which agency?

A    The FBI and one of the NYPD.

Q    And did you give them your phone?

A    Yes, I did.

Q    That was on Sunday?

A    They -- yeah.  I gave them permission to go through my phone on Sunday, correct.

Q    And how long approximately did the officers kept your phone for?

A    I'd say a few months.

Q    Did you get your phone back at some point?

A    Yes, I did.

Q    Do you remember when?

A    I don't remember the exact month or date.

Q    But a couple months after --

A    Yes.

Q    -- you gave it to them?

A    A couple months after, correct.

Q    Did you ever pay the kidnappers?

A    No.

Q    Did you ever give them marijuana?

A    No.

Q    Anything else?

A    No.

Q    Did you ever have any other interaction with the kidnappers after they dropped you off on -- in Manhattan near York street?

A    No.

Q    Do you know someone named Humayen Khan?

A    Yes.

Q    And that's H-U-M-A-Y-E-N, Khan, K-H-A-N?

A    Yes.

Q    Who was he?

A    He's one of my best friends.

Q    And how did you meet him?

A    We grew up in the same block as I lived on 27th Street in Astoria.  So, I know him for over thirty years.

Q    Do you know someone who goes by the name Inf, I-n-f?

A    Yes.

Q    Do you know if he goes by any other name?

A    I knew him by Inf, but I believe his real name is Jarrett.

Q    Do you know his last name?

A    Bruce.

Q    And how did you meet him?

A    I met him through Humayen.

Q    How, how through Humayen?

A    He used to live with Humayen and he used to work for him.

Q    He used to work for Humayen?

A    Yeah.

Q    Doing what?

A    He was doing property management.

Q    Does Humayen own buildings?

A    Yes.  He owns -- his father left him a few, quite a few buildings to take care of.

Q    And do you remember approximately when you met Inf?

A    It could be 2021 or 2022.

Q    Do you remember meeting him before the kidnapping?

A    Yeah, I met him plenty of times.

        MS. MICHELEN:  Your Honor, may I show a picture to the witness only?

        THE COURT:  Sure.

        MS. MICHELEN:  You can show Government Exhibit 163.

BY MS. MICHELEN:

Q    Mr. Khaled, I am showing you what has been marked as Government Exhibit 163 for identification.

        Do you --

        MS. MICHELEN:  Can you go a little bit -- yeah, right there.

Q    Do you recognize that chat?

A    Yes.

Q    Do you recognize the two participants?

A    Yes.

Q    Are you one of them?

A    Yes.

Q    And do you see your phone -- a phone number that belonged to you in that chat?

A    Yes, I do.

        MS. MICHELEN:  Your Honor, at this time the Government moves to admit Government Exhibit 163 into evidence.

        MS. FERRANTE:  No objection.

THE COURT: Admitted.

(Government's Exhibit 163 was received in evidence.)

BY MS. MICHELEN:

Q    And, Mr. Khaled, there are two participants listed on this chat --

MS. MICHELEN: Oh, and may we publish it to the jury. My apologies.

THE COURT: Sure.

(Exhibit published.)

Q    There are two participants listed in this chat.

Who is the one listed at the bottom, STIKY, S-T-I-K-Y-1 asterisk owner?

A    That is me.

Q    What does that mean, STIKY1?

A    That's my Xbox tag, gamer tag.

Q    And what's the phone number listed above that?

A    917-365-0431.

Q    Do you recognize that phone number?

A    Yeah, that's my old phone number.

Q    Did you have that phone number -- when did you have that phone number?

A    I had it even after -- a few months after the kidnapping, but I changed it because they had my number and I was very uncomfortable with it.

Q    So, that's the phone number you had in December 2022?

A     Yeah, that's the number I gave them.

Q     That's the phone number you gave who?

A     The white sneakers.

Q     To reach out to you on Monday?

A     On Monday, correct.

Q     And who's the other participant above?

A     Inf.

Q     And is that the same Inf we've been talking about?

A     Yes.

Q     Can you read the first message in green?

A     Yeah, it says:  Infamous my number -- my new number.

Q     Oh.  Who sent that message?

A     I sent it to him.

      MS. MICHELEN:  Can we go to the next page?

Q     Can you read the response?

A     Who this, Shawn?

Q     And what's the date in the bottom to the right?

A     October 18, 2022.

Q     And who is Infamous?

A     I used to call Inf Infamous, just out of love.

Q     And now directing your attention to page 4.

      Can you read the first message up there?

A     It says:  What's up homie?

Q     And what does he respond?

A     Yo.  What's up, bro.

Q    And what's the date?

A    10/28/2022.

Q    Okay.  Can you read the next message?

A    Did you end up getting those plates?

Q    Who sent that?

A    I sent it.

Q    And what do you mean by that?

A    I was shopping around.

Q    Shopping around for what?

A    For weed, to see if I could get better prices.

Q    You were asking -- and what were you asking?

A    If he could get me a better price on something.

        MS. MICHELEN:  And if we can go to the next page to the response.

A    That at the -- that at the house they been there.

Q    What's the date at the bottom?

A    10/28/2022.

        MS. MICHELEN:  Your Honor, may I show an exhibit to the witness only?

        THE COURT:  Sure.

        MS. MICHELEN:  And that would be Government Exhibit 164.

Q    Mr. Khaled, I'm showing you what has been marked as Government Exhibit 164 for identification.

        Do you recognize --

MS. MICHELEN: Mr. Roberts, if we can go a little bit lower to the participants box.

BY MS. MICHELEN:

Q    Do you recognize the participants in the chat?

A    Yeah, it's Inf and me.

Q    So the same participants?

A    Correct.

Q    Is it the same phone number that you had that we just talked about?

A    Correct.

MS. MICHELEN: Your Honor, at this time the Government moves to admit this into evidence.

MS. FERRANTE: No objection.

THE COURT: Admitted.

(Government's Exhibit 164 was received in evidence.)

MS. MICHELEN: And can we publish to the jury?

(Exhibit published.)

Q    Mr. Khaled, so who are the -- you said it was the same participants, but we're seeing here a different name for the owner of the chat.

Is that you?

A    Yes, that is me.

Q    Can you read the name?

A    Shawn The Man.

Q    And the other participant is Inf, correct?

*Khaled - direct - Michelen*                                          110

A    Inf, correct.

Q    Okay.  And can you read the first message?

A    Yoyo.

Q    What's the date?

A    11/27/2022.

Q    How often would you say you would text with Inf?

A    Often.  We would talk like here and there.

          MS. MICHELEN:  And, Your Honor, may I show a picture to the witness only?

          THE COURT:  Sure.

          MS. MICHELEN:  Government Exhibit 158A.

Q    Mr. Khaled --

          MS. MICHELEN:  And we can zoom in a little bit.

BY MS. MICHELEN:

Q    Mr. Khaled, do you recognize the individuals in that picture?

A    Yes.

Q    Are you one of them?

A    Yes.

Q    And do you know where this picture was taken?

A    I believe in Humayen's house.

          MS. MICHELEN:  And, Your Honor, at this time the Government moves to admit Government Exhibit 158A into evidence.

          MS. FERRANTE:  No objection.

*SAM  OCK  RMK  CRK  RPR*

THE COURT:  Admitted.

(Government's Exhibit 158A was received in evidence.)

BY MS. MICHELEN:

Q   So, Mr. Khaled, from left to right can you identify who, if you know who the four --

MS. MICHELEN:  Oh, I'm sorry.  Can we publish to the jury?

(Exhibit published.)

Q   Can you identify, if you know, who the four individuals in that picture are?

A   Yeah.  From the left it's Inf, and then there's Haitham, me.

Q   Can you spell that, sorry, Haitham, do you know?

A   I know him as Hack.

Q   Hack?

A   Yeah.

Q   Is that H-A-C-K?

A   C-K, yeah.  It's his nickname.

Q   Inf, hack?

A   Me and Humayen.

Q   And then in between Hack and you, I think we can see half of a face.

Do you know who that is?

A   No idea.

MS. MICHELEN:  Your Honor, may I show one more picture to the witness only?

THE COURT:  Sure.

MS. MICHELEN:  And that would be 157A.

BY MS. MICHELEN:

Q    And, Mr. Khaled, do you recognize the individual in that picture?

A    Yes.

Q    Who is that?

A    That is me.

MS. MICHELEN:  And, Your Honor, at this time the Government moves to admit that picture into evidence.

THE COURT:  Admitted.

MS. FERRANTE:  No objection.

(Government's Exhibit 157A was received in evidence.)

Q    Mr. Khaled, do you see Inf in the courtroom today?

A    Yeah, I do.

Q    Where?

A    He's wearing a light blue shirt with blue tie.

MS. MICHELEN:  Let the record reflect that the witness has identified defendant Jarrett Bruce.

Q    Mr. Khaled, do you know where Inf lived in December of 2022?

A    I'm not sure, either Astoria or Jersey, New Jersey.

Q    And do you know if he knew where you lived in December of 2022?

A    Yes, he knew where I lived.

Q    How do you know that?

A    He used to manage the property around, so he would come around the house, take care of things.

Q    Did you live at a property owned by Humayen?

A    Correct.

Q    And do you know if he knew what car you drove in December of 2022?

A    Yeah.  He saw me in my vehicle plenty of times.

Q    When was the last time approximately that you spoke to Inf?

A    It is after the incident or before?

Q    The last time.

A    The last time would be maybe 2023 I saw him at Humayen's house.

Q    So, after you were kidnapped?

A    Correct.

Q    And do you remember what you talked about?

A    No, just said what's up, maybe shared a joke, and then I left.

Q    Do you remember talking to him about the kidnapping?

A    After the kidnap he did reach out to me, see how I was doing.  And I explained what happened that night and told him

and stuff.

Q   Do you remember approximately how much time after the kidnapping he reached out to you?

A   I don't remember, it could be a few weeks.

Q   Did you ever have any disagreements with Inf?

A   Disagreement, I did.  It had to do with a dealer plate.

Q   Can you describe that?

A   I -- I got him a dealer plate for his cars because he was selling cars.

Q   Sorry.  What is a dealer plate?

A   A dealer plate is a plate that you take from -- let's say if you need to go service your car, you put it on and you take it to the mechanic, they'll service it, and you just bring it back.  It's like for transporting vehicles.

Q   And what's the benefit of having a dealer plate?

A   If it's like -- if it's like a broken car and you can't really like -- you need to finish fixing it in order to register it, you would take it to the mechanic, fix it up, and then you could register it or sell it.

Q   And where did you get that dealer plate from?

A   I get it from one of my friends in Connecticut.

Q   And can you continue describing what happened?  You said you got him a dealer plate, and what happened?

A   I got him a dealer plate and one day he told me he got in trouble for the plate.  He said that the plate was fake and he

Khaled - direct - Michelen                                       115

got in trouble for that.

Q    Did you sell that plate to Inf?

A    Yeah, I sold it to him.

Q    Do you remember for how much?

A    25 to 3500.

Q    $2500?

A    Yeah.

Q    Approximately?

A    Yeah.

Q    How much money did you make from that sale?

A    Zero.

Q    So what happened after he told you that he got in trouble because the plate was fake?

A    So he told me he got in trouble, the plate was fake.  And he wanted me to pay for his lawyer fees.

Q    Did he want you to pay for something else?

A    For his lawyer fees.  Also, I paid him back for the plates because he said it was fake.

Q    So you refunded the 2000 -- the approximate 2000 --

A    25 to $3500, correct.

Q    And how much -- did he say how much money he needed for legal fees?

A    $5,000.

Q    Did you give him that money?

A    No, I didn't have it.

Q    What did you tell him?

A    I said I couldn't give him because I don't have it.

Q    And after Inf -- after this incident with Inf and the dealer plate, what happened, did you hear anything else from him?

A    Nothing from him, and just -- he never threatened me, like he was never like -- anything that he told me like I should have been aware of that I might get hurt.

Q    And approximately when did this incident happen with the dealer plate?

A    In 2022.

Q    Do you remember in relation to the kidnapping how much time before, approximately?

A    A few months before.

Q    Okay.

        MS. MICHELEN:  Your Honor, may I have just one minute to consult with my colleagues?

        THE COURT:  Sure.

        (Pause.)

BY MS. MICHELEN:

Q    Mr. Khaled, you said just now that you refunded the money that Inf paid you for the plate.

        How did you refund him that money, did you give it to him?

A    I give it to Humayen Khan.

Q    And one last question regarding the kidnapping in general, Mr. Khaled.

You mentioned earlier, I believe, that you didn't have a sense of timing.

Did you have access to the time at any point?

A    No.  I was just tied up.

Q    Did you have a watch or anyone --

A    Nothing.

Q    -- mention the time?

A    Nothing.  Everything was taken away and I was tied up with my hands behind my back.

Q    Okay.

MS. MICHELEN:  No further questions, Your Honor.

Thank you, Mr. Khaled.

THE COURT:  Would this be a logical time to break for lunch?

MR. GUADAGNINO:  Yes.

THE COURT:  Okay, great.

So let's break now and come back at 1:40 p.m.

THE COURTROOM DEPUTY:  Arise.

Jurors, follow me.

(Jury exits.)

THE COURT:  So, anything you all want to raise or we'll just back at a couple minutes before 1:40?

MR. HAMILTON:  You said 1:40, Judge?

THE COURT:  Yes, 1:40.

MR. GUADAGNINO:  Thank you.

(Luncheon recess now taken.)

(Judge RACHEL P. KOVNER exited the courtroom.)


(Continued on the following page.)

AFTERNOON SESSION

(In open court at 1:40 p.m.)

(Parties present.)

MS. MICHELEN:  Your Honor, we found out for the first time, I believe, that Ms. Ferrante has exhibits she's planning on showing the witness, Mr. Khaled.  We had not seen this.  This is the first time.  I don't know how many, I don't know, it's 50 pages or so, text messages pages which we believe hearsay.

From what we saw, we haven't had the time to read all those pages.  Text messages from the witness' phone with other individuals, not the defendants, talking about what appears to be marijuana dealing, which he already admitted doing.  So it's irrelevant, one; hearsay, two; and third, we haven't had a chance to review that.

THE COURT:  How are we planning to deal with the point that there may be evidentiary objections to these going through one by one conversations with other people?

MS. FERRANTE:  In terms of the hearsay objection, which I understand the government to be making, it's not hearsay.  It's a statement against penal interest.  And the prior statements that he's responding to give context to his responses.  It's not being offered for the truth of the matter.

THE COURT:  You're offering statements where he's

Proceedings                                           120

effectively engaged in marijuana dealing, that's the point, and other statements are context to establish that's what he's saying.

MS. MICHELEN:  Your Honor, he already admitted he deals marijuana.  It's irrelevant.  His testimony was mostly about the kidnapping and the torture.

THE COURT:  It's probably going to get cumulative at some point, I can imagine, but it seems like fair game.

MS. MICHELEN:  If he were to be asked about -- again, we haven't reviewed those messages, but about something that he then denies he could get impeached with those messages.  But it's our position that they are otherwise inadmissible and irrelevant.

MS. FERRANTE:  Judge, if I could respond to that. The government just introduced text messages from Jarrett Bruce from the period of October 2022 through December of 2022.  Mr. Khaled is saying he knew Mr. Bruce through Humayen Khan.  So he's also opened up the door because he's opened up the door to that period of time he mentioned the marijuana dealing.  But the idea that I would be limited to if and when he makes an inconsistent statement to impeach him --

(Jury present.)

THE COURT:  I think we should get started.  Is this an issue you anticipate coming up immediately or not immediately?

MS. FERRANTE:  Towards the second half.

THE COURT:  Let's get started.

THE COURTROOM DEPUTY:  Mr. Khaled, you're still under oath.

THE COURT:  Go ahead.

MS. FERRANTE:  Thank you, Judge.

CROSS-EXAMINATION

BY MS. FERRANTE:

Q    Good afternoon.  Prior to testifying today, you had a time to speak to the government, correct?

A    Correct.

Q    And you spoke with the AUSAs, some of whom who are seated at the table?

A    Correct.

Q    Did you speak to all of them?

A    No.

Q    Did you speak to Mr. Dugan?

A    Yes.

Q    The individual in the middle?

A    Josh, yes.

Q    And Mr. Wang, the very first AUSA?

A    Correct.

Q    How about Ms. Michelen?

A    Yes.

Q    Did you speak to Agent Ford?

Khaled - Cross - Ms. Ferrante                    122

A    Yes.

Q    How many times would you say you spoke to Agent Ford?

A    10, 15 times, maybe.

Q    About 10 to 15 times.  Now, is that over the course of the past few years since this incident?

A    Yes.

Q    The very first time you spoke to Agent Ford, do you recall when that was?

A    Yes.  It was two days after -- it was on a Sunday after my kidnapping.

Q    So very close to the incident?

A    Correct.

Q    Now, when you testified on direct you mentioned that you were a home health care aid for your father?

A    Yes.

Q    Is that officially paid?

A    Yes.

Q    And when you also testified on direct, you indicated -- withdrawn.

A    I'm sorry?

Q    That was for the record.  I'm withdrawing the question. You were talking about some of the people you know when you were speaking with Ms. Michelen, right?

A    Yes.

Q    I'm referring to just a moment ago or a few minutes ago

when you were testifying.

A    Correct.

Q    Now, you mentioned that Humayen Khan, you grew up with him?

A    Yes.

Q    How old are you again?

A    I'm 40 years old.

Q    And you got here when you were seven?

A    Yes.

Q    Would you have met him around that time?

A    I would say I met him when I was like ten.

Q    So you've known him for approximately 30 years?

A    Give or take.

Q    And you were introduced to Jarrett Bruce six or seven years prior to 2022?

A    I don't think it was six or seven years before 2022.

Q    How long would you say it was?

A    From now it would be like maybe 2021, I think.  I'm not really sure like how long ago.  Like maybe like 2020 or 2021.

Q    So a few years you had known him?

A    Yes.

Q    You had met him in person, right?

A    Oh, yeah, plenty of times.

Q    How many times would you say?

A    Lost count.

Q    Lost count?

A    Yes.  Lot of times.

Q    I understand.  Would you say it's more than 50 times?

A    Yeah.

Q    Would you say it's more than 75?  I'm talking about in-person meetings.

A    Could be.

Q    Have you spoken to him in between those in-person meetings on the phone?

A    Yeah.  Time to time we spoke.

Q    How often would you say per year?

A    Per year, on the phone maybe 10, 15 times.

Q    Per year?

A    I'd say.

Q    And to be fair, it's an estimate, right?

A    Yeah.

Q    Now, you also mentioned on direct that after the incident you spoke to Jarrett?

A    Yes.

Q    You said a few weeks after the incident?

A    Yeah.

Q    And he checked on you, right?

A    Correct.

Q    I understand that to mean he made sure you were okay?

A    Yes.  He wanted to know what was going on.  He heard that

I got hurt.

Q    He heard about it?

A    Yes.

Q    You also mentioned that when the kidnapper, the first kidnapper approached you, right, you just got out of your car?

A    Yes.

Q    What kind of car do you drive, by the way?

A    A Land Rover.

Q    Now, we're in December of 2022.  What's the year of that Land Rover?

A    A '22.

Q    Brand new?

A    Almost, yeah, about a year prior to it.

Q    Understood.  So when you bought it, though, it was brand new?

A    Yeah.

Q    And you had it for about a year?

A    Yes.

Q    And this is at the point of December 2022?

A    Yes.

Q    And when you bought that you borrowed money from Mr. Khan to buy it?

A    Yes.

Q    About $20,000 would you say?

A    A little more.

Q    What is a little more?

A    30.

Q    About $30,000?

A    Yeah.

Q    And you owed him that money as of December 2022 still?

A    Correct.

Q    When you testified on direct that you didn't owe anybody money, did you forget about that part?

A    Well, I paid him off half of it.  But Humayen said I could pay him like whenever I can.  So it was like -- it's not like I owe him.  He's like whenever you can pay it back.

Q    Understood.  So technically, though, in December of 2022 you still had a balance owed to Humayen Khan?

A    Yes.

Q    Now, I want you to think back to that moment when this kidnapper approached you.

A    Yes.

Q    You said you saw the gun almost immediately?

A    Yeah, within like two, three seconds.  Everything was so quick.

Q    Where were they holding it?

A    He pulled it out on his right hand.

Q    What time of day is it?

A    8:00 at night.

Q    And you're standing by your car?

A    Yes, I'm standing right next to my car.

Q    Fair to say it was dark out?

A    Actually, where I parked is a spotlight on top.

Q    Understood.  So you were under that spotlight?

A    Yes.

Q    Now, when you were first approached, that person, was that the person in white sneakers?

A    Correct.

Q    When you were approached, that person told you where's Robbie, he owes me money, right?

A    Yeah.  I thought that's what he said, but I believe he said this is a robbery.

Q    Now you said you believe he said this is a robbery?

A    Yeah.

Q    And you came to that conclusion how many months after the incident?

A    Well, I said it was Rob because it was the detective that I saw, like they asked me what was the thing and I was traumatized.  I told them I think they were looking for somebody else.

Q    And you actually said that to Agent Ford?

A    I said it to Agent Ford and the detective, I believe.

Q    When?

A    The detective, the same night.

Q    That same night?

Khaled - Cross - Ms. Ferrante                                128

A     Yes.

Q     You said that same night that now you think it's a robbery?

A     Yes.  It was Rob that owes me money, correct.

Q     Now, you said that the male approached you and pistol whipped you, correct?

A     Correct.

Q     Do you remember speaking to Agent Ford back in January of 2023?

A     Possibly.

Q     When you first thought about who might have done this, your first inclination was to point to Chelo, correct?

A     Yes.

Q     Who is Chelo?

A     Chelo was one of my clients, a customer that I used to deal with.

Q     In which business?

A     Marijuana.

Q     How often would you sell to Chelo?

A     Maybe once a month.

Q     At the time that this incident occurred, December 9, 2022, you had organized a purchase for Chelo, correct?

A     No.

Q     No?

A     I had a purchase for -- I'm sorry.

Khaled - Cross - Ms. Ferrante                    129

Q    I'll rephrase it.  That day, December 9, 2022, you had been discussing a sale to Chelo with one of your employees?

A    Could be.

Q    And when I say one of your employees, I'm still talking about the marijuana business.  You're in agreement with me?

A    Yes.

Q    And you also organized other sales that night, correct?

A    Yes.

Q    Ant, do you recall that name?

A    No.

Q    You don't recall Ant?

A    Ant?

Q    Yes.

A    Yes.

Q    Who is Ant?

A    One of my customers through a friend.

Q    Do you recall speaking to Agent Ford and mentioning that you had a minor marijuana business?

A    Yes.

Q    Now, you sell approximately 30 pounds per month, correct?

A    Correct.

Q    And this is at the time of the incident?

A    Yeah.

Q    Now, fair to say, based on your interviews with Agent Ford, that was your best selling month ever, December of 2022?

A     Yeah, Christmas.

Q     What does that mean in terms of dollars?  How much did you make?

A     If I sell 30 pounds, I made like $3,000.

Q     How much per pound?

A     $100.

Q     $100 per pound.  Now, on direct you stated the kidnappers told you Shaon, we've were waiting for you for a long time?

A     Yeah.

Q     That's the first time you mentioned that?

A     No, I mentioned it before.

Q     Okay.  Well, when you met with police that night did you tell them that's what you were told?

A     I'm not sure.  I might have.

Q     Okay.  In any one of the 15 or so meetings that you had with Agent Ford did you mention it?

A     I believe so.

Q     When?

A     I don't remember when.  One of the times I'm pretty sure I did.

Q     At least one time?

A     At least one time.

Q     Do you recall a meeting with Agent Ford -- I'm sorry.  Is Agent Ford in the courtroom?  Do you recognize him?

A     Yes.

Q    Where is he?

A    Sitting at the table with the grey suit on.

Q    Fair to say it's this gentleman at the back of the table sitting to the left?

A    Yes.

Q    Do you recall a meeting with Agent Ford on or about June 6, 2025, earlier this month?

A    Yeah.

Q    And do you recall telling Agent Ford that you pinpointed Chelo as a potential culprit?

A    Yeah.

Q    Now, you also said this right after the incident, correct?

A    Yeah.

Q    But on June 6, 2025 you told Agent Ford, I thought of Chelo because after the kidnapping the government alerted you to the fact that the kidnappers were African-American?

A    Yeah.

Q    And you thought of Chelo?

A    That's the only African-American I dealt with, correct.

Q    Now, you said that's the only African-American you dealt with, correct?

A    Correct.

Q    Do you remember in February 2023 speaking to Agent Ford, as well?

Khaled - Cross - Ms. Ferrante                    132

A    Okay.

Q    And being asked about that topic?

A    Yeah.

Q    And you said, I haven't sold to any black guys?

A    Yeah.

Q    But to be fair, June 6, 2025, three or so years after the incident, now you remember selling to black guys?

A    Yeah.

Q    And, again, you thought of Chelo?

A    2025, no.

Q    You talked about Chelo in 2025, correct?

A    I believe it was 2024.

Q    Okay.  You brought up Chelo let's go with 2024.

A    Yeah.  I thought it was the only person I really dealt with who was African-American.

Q    Now, you also testified on direct that you had reached out to Jarrett Bruce to get a better deal on plates?

A    Yeah.

Q    Because you thought he might have more of a quantity for you?

A    Better number.

Q    You thought he was the guy to go to?

A    I asked anybody, if possible.

Q    What did you understand the kidnapper to mean when he said we had waited for you a long time?

A    To me, I felt like they were plotting for a while to do this.

Q    And you said that Jarrett had been living with Humayen?

A    Well, he did live with Humayen at one point, correct.

Q    Had you visited Humayen's house during that time?

A    Yeah, I seen him plenty of times.

Q    And when we see the name Shaon, the man on that text message, that's you?

A    Yes.

Q    You're also Silky 1?

A    Stiky 1.

Q    That's your handle for Xbox?

A    Yes, my gamer tag.

Q    And you said that Haitham's name, Haitham Nammari, his nickname is Hack?

A    Yeah, I know him as Hack.  I believe his name is Haitham. I don't know how to pronounce his name, so we call him Hack.

Q    Any chance that Hack was in Government's Exhibit 157 or 158-A?

A    The picture, the group picture?

Q    Yes.

A    Yes, he was there.

Q    He was there?

A    Yeah.

Q    You said you had met Jarrett through Humayen?

Khaled - Cross - Ms. Ferrante                    134

A       Yes.

Q       When was that?

A       A few years back.  Like I said, maybe 2020 or 2021.

Q       And when you were released eventually from the abduction --

A       Yes.

Q       -- where were you when you had that conversation about offering the kidnappers weed?

A       Where was I?  I was in the minivan.

Q       Did you have the beanie over your face?

A       That time they just cut my ear, and I woke up from being unconscious.

Q       How long had you been unconscious?

A       I don't know but it felt forever.

Q       When you woke up from being unconscious, what did the kidnapper say right before you offered him weed?

A       When I opened my eyes I said -- he said welcome back.

Q       When he said welcome back, what made you think this is the perfect moment to let them, like to give them an IOU for weed and money?

A       Anything for me to get out of the van.

Q       And you're saying to the jury the mere promise of you eventually paying them in two days?

A       Yeah, anything for me to go home.

        MS. FERRANTE:  Judge, could I have one moment?

Khaled - Cross - Ms. Ferrante                    135

THE COURT:  Yes.

(Pause.)

Q    So the government had shown you text messages between yourself and Jarrett Bruce?

A    Correct.

Q    And that was in October of 2022?

A    Correct.

Q    And I think it ended somewhere in December?

A    Yes.

Q    Of that same year?

A    Yes.

Q    Now, you also had other conversations with other people, correct?

A    Sure.

Q    And when you did the drug dealing for marijuana, you would contact your customers on the phone?

A    Yeah.

Q    Now, I also mentioned earlier employees that you had.

A    Okay.  It was customers.

Q    Okay.  Do you remember the reference where I asked you about communicating with your employees?

A    Yeah.  I thought it was customers you're saying.

Q    Okay.  Praz, who is Praz?

A    One of my friends.

Q    Did you often send Praz to locations to help you sell

Khaled - Cross - Ms. Ferrante                    136

weed?

A    He helped me out, yeah.

Q    Did you pay Praz for his work?

A    No.  I used to give him weed.

Q    And that was considered his payment?

A    He smoked, so he would.

Q    So yes, that is a payment?

A    I guess.

Q    And if you didn't have the weed, you said you guessed, but if you didn't have the weed you would have to pay him something, right?

A    No.  I would pay him nothing if I didn't have the weed.

Q    Praz would have done it for free?

A    No.  Then what he's going to do if I didn't have weed.

Q    What did Praz do for a living?

A    He didn't do anything.  He was unemployed.

Q    So he's unemployed, he's not doing anything, and he's looking to do work for free potentially?

A    No.  If I had weed, I would give him weed.  If he would do anything for me I would give him weed.  If I didn't have weed he wouldn't do anything.

Q    Who is Mike 24?

A    One of my friends.

Q    And Mike 24, did you have conversations with him about helping you sell weed?

A    He also had weed.  So I would ask him for prices, correct.

Q    And when you would ask him for prices, did you ever get into conversations regarding eventually selling to smoke shops?

A    Could be.  I don't recall, but could be.

Q    When you say you don't recall, you gave a consent to search your phone December 11, 2022, correct?

A    Yes.

Q    And, in fact, when you gave a consent to search the phone the FBI had you sign a form?

A    Yes.

Q    They asked you to consent in writing?

A    Yeah.

Q    So you knew they were going to pull the contents of your phone?

A    Yeah.

Q    Text messages?

A    Yes.

Q    Emails?

A    Correct.

Q    Internet searches, right?

A    Correct.

Q    And you don't remember the text messages on your phone?

A    It was so long ago.  I don't remember every text message.

Khaled - Cross - Ms. Ferrante                138

Q    You don't remember a conversation with say Praz on not being able to pay him a certain amount because you had bills to pay yourself?

A    Yes.

Q    Did there come a time that you lost 300 plates?

A    No, I didn't lose 300 plates.

Q    Did there come a time when 300 plates was taken out of your inventory in some way?

A    No.

Q    And you never got into a discussion with Praz about not being able to pay your own bills because you just lost 300 plates?

A    Yeah, because I couldn't pay him.  So I had to tell him something why I can't pay him.

Q    So you lied to Praz?

A    Yeah.  Because he has a habit of always coming to me for --

Q    And when you sold, you didn't just sell in Astoria, correct?

A    It was 90 percent Astoria.

Q    It was 10 percent in other parts, right?

A    Yeah, could be.

Q    Not could be.

A    Yes.

Q    It's your business, right?

A    Yes.

Q    Did you keep track of your sales in any way?

A    Yes, some.

Q    Did you write it down in your phone?

A    Correct, yes.

Q    Did you write it in a ledger?

A    What is a ledger?

Q    A piece of paper, a notebook.

A    No.

Q    Now, when you go visit a customer, would you make a delivery?

A    Yeah.  I would do it or Praz would do it.

Q    So you would have their address somewhere, correct?

A    Or some address.

Q    I'll rephrase.  You would have an address where you would meet your customer, correct?

A    Correct.

Q    And fair to say you didn't always meet all your customers in the same spot?

A    Correct.

Q    It was different spots?

A    Correct.

Q    Fair to say if we looked at your GPS it would be all about town making deliveries?

A    I wouldn't say all around town, but it would be Queens

and I think like a few times in the Bronx.

Q    So you would travel to the Bronx to make deliveries?

A    Or Praz would.

Q    Now, Ron is your brother-in-law, correct?

A    Correct.

Q    And there were times where you would pay Jarrett Bruce for car parts for your brother-in-law?

A    Correct.

Q    And your brother-in-law would reimburse you?

A    Yeah.  He asked me to pay Jarrett for car parts, correct.

Q    And when he reimbursed you, that would just be money in your pocket?

A    Well, I don't think I ever gave Jarrett any money for -- I did, actually, yeah.  Well, there's my money I laid it out for him and he paid me back.

Q    Let's just be clear, when you say him, you're referring to Ronnie?

A    Correct.

Q    So you laid the money out for Ronnie?

A    I believe one time I did.

Q    And then you would get the reimbursement back from Ronnie?

A    Yes.

Q    Now, there's also a point in time -- withdrawn.  What is Cartel Cut 10?

A    Cartel Cut 10 is a flavor of weed.  It's called Cartel Cut.

Q    And fair to say, that is one of the flavors that was on your menu?

A    Yeah.

Q    Now, you had an extensive menu, correct?

A    Yeah.

Q    What are some of the favors you were selling?

A    Runtz, maybe Gelato.  It was different types.

Q    Now, you had a number of flavors, correct?

A    Correct.

Q    There was a point at which you had a conversation with Mike 24 regarding Chelo, looking back at October of 2022?

A    Okay.

Q    Fair to say that you were told that he was trying to get Chelo done and your response was try to get Chelo done, I don't want to hear from Rob's mouth?

A    Yes.

Q    Who is rob?

A    Rob is one of my friends.

Q    Had you sold to Rob?

A    Yeah, once or twice.

Q    How often?

A    Maybe twice in like three months I sold it to him.

Q    And when you say twice in three months, are we talking

about October to December of 2022?

A     Maybe.  I don't recall three years back.

Q     So when you said I don't want to hear Rob's mouth, what are you saying?

A     I guess maybe I just need to meet up with Rob and I didn't want to run late.

Q     Well, now that I've just discussed that with you, you still think when the kidnapper approached and said where's Robbie, I want my money, you still think they were referring to a Robert?

A     Could be.

Q     Now, let's go back to December 9, 2022.  You actually told Praz to hit up Chelo that night because he wanted to come by for something?

A     Correct.

Q     And right before that you actually sent Chelo a full list of flavors that you had on hand?

A     Yeah.

Q     I want to go back to April 11, 2025.  I know there's a lot of dates.  Right?

A     Yes.

Q     You met with Agent Ford?

A     Yes.

Q     He went over the trial process with you, correct?

A     Correct.

Q    Humayen also has an assistant, Right?

A    Correct.

Q    Ronnie?

A    Yes.

Q    Do you recall having a conversation via text between October 2022 and December of 2022 going back to Mike 24?

A    I don't remember.

Q    Did you ever have a conversation at any point with Mike 24 regarding Gun taking the last two for the night at 2,800?

A    Gun taking last two for 2,800?

Q    Yes.

A    Yeah.  It could be two pounds.

Q    At 2,800?

A    Each would be 1,400.

        MS. FERRANTE:  Judge, could I have one moment, please?

Q    Mr. Khaled, you got your weed from people in Flushing?

A    Sometimes.

Q    What are their names?

A    I don't know their names.

Q    Where would you go to pick up the weed?

A    They would give me an address.

Q    Same address every time?

A    Yeah.  At that time, it was the same address every time.

Q    Where in Queens?

A    Flushing.

Q    Anything more specific?

A    Somewhere in Flushing.  I can't -- I don't know the exact address.

Q    You said you didn't know their names?

A    Yeah.

Q    Did they have nicknames?

A    No.  They were just, it was just -- I didn't have their names.

Q    When you showed up to pick up the weed, you just said, hey you?

A    They give me the address, they tell me what car, and I go up to the car.

Q    You didn't address them at all?

A    I go up to the car and say hey.  They would -- I would go up to the car and say -- because they'll give me a different address and tell me which car they're in.

Q    But you didn't address them by saying hey Mr. Whoever or hey?

A    No, they always had like a fake name.  So it could be Kim, it could be Lee.

Q    Do you remember any of the fake names?

A    Just David, Lee, John sometimes.

Q    I want to go back to December 9, 2022.  You actually made an appointment directly with Ant for 8 or 9:00 for a sale,

correct?

A    Correct.

         MS. FERRANTE:  No further questions, Judge.

CROSS-EXAMINATION

BY MR. KAPLAN:

Q    My name is Jacob Kaplan and I represent Aasim Boone.  I'm going to ask you some questions.  If you don't understand what I'm asking or talk too fast, let me know and I'll try to rephrase.

A    Sure.

Q    So I want to follow up on the last question that you were asked.  So you had arranged to meet Ant around 8:00 that night?

A    Honestly, I don't know what time it was.  I don't know what happened three years ago.  I know, I'm sorry.  She's saying that she read it.  So I'm just --

Q    So you're making stuff up?

A    I'm not making anything up.  I just got nervous and said yeah.

Q    You've been on the stand for an hour or so, correct?

A    Correct.

Q    And during that time you've been answering questions?

A    Correct.

Q    All those questions, were you giving accurate answers?

A    Yes.

Khaled - Cross - Mr. Kaplan                146

Q    But the one question that Ms. Ferrante asked you now, are you saying you didn't give an accurate answer?

A    I got nervous and I said yeah.  I really don't know if it was 8:00 or 7:00 that I spoke to Ant.

Q    Is there anything that could refresh your recollection?

A    Sure.  I mean --

MR. KAPLAN:  Your Honor, just one second.

(Pause.)

THE COURT:  Any chance we can go to the next topic while your associate finds something?

Q    Would it be fair to say that Ant knows where you live?

A    Yeah.  He didn't know where exactly I lived.  He knew what block.

Q    Would Ant come to your block to pick up drugs?

A    Yes.

Q    Where would you meet Ant when he came to your block to pick up drugs?

A    Sometimes the backyard, sometimes my friend's house.

Q    When you say backyard, are you referring to the alleyway behind?

A    Correct.

Q    Is this the alleyway in which the kidnapping occurred?

A    Yes.

Q    So you say you met Ant in that alleyway before?

A    Yeah. (Continued on next page.)

S. KHALED - CROSS - MR. KAPLAN                147

BY MR. KAPLAN:

Q    While we wait for that, I'll move on to another topic.

Fair to say you spoke to law enforcement numerous times throughout this case?

A    Yes.

Q    You said you think you spoke to Agent Ford ten, 15 times?

A    Maybe more, yeah.

Q    Maybe more, that would include conversations with the NYPD as well, correct?

A    Yes.

Q    And some conversations where Agent Ford wasn't involved in?

A    Any time I met, it was Agent Ford.

Q    The first time you met with the detectives wasn't that right before the hospital?

A    Yes, two of the detectives that picked me up took me to the hospital.

Q    Agent Ford wasn't there, was he?

A    No, he wasn't.

Q    There were certain times you spoke to NYPD without Agent Ford being there?

A    Correct.

Q    The first time you spoke with NYPD was the night or the morning of the incident?

A    Yes.

S. KHALED - CROSS - MR. KAPLAN                148

Q    When were you speaking to law enforcement you were trying to be true and accurate as to what happened, correct?

A    Yes.

Q    You're shaking you're head.  So yes, you were trying to be true and accurate?  Because you wanted to tell them what happened to you that night?

A    Yes.

Q    When you were speaking to these detectives, were they taking notes?

A    I'm not sure, I was in the backseat.

Q    So it took place in a car?

A    Yes.

Q    Let's go through all your conversations with law enforcement.  The first conversation you were in the backseat that was a few hours after the incident, correct?

A    Yes.

Q    Fair to say you've testified today here in pretty fair detail about who was saying what, and what was happening, correct?

A    Yes.

Q    You didn't give that exact same detail to the detectives on December 10, did you?

A    Maybe, I'm not sure.  I was traumatized.  I was messed up in the head.

Q    It's understandable.  It's a good chance that the day of

S. KHALED - CROSS - MR. KAPLAN                    149

you didn't give all the details that you are giving now?

A    Yes.

Q    But when you were speaking to them you were trying to be fair and accurate?

A    Yes.

Q    And also on direct I believe you said that you were knocked out for a little bit, correct?

A    Yes.

Q    You don't recall how long that was?

A    No, it felt forever.

Q    It felt forever.  It could be five minutes, it could be half an hour?

A    Could be.

Q    When you first spoke with these detectives the night of, you told the detectives that the kidnappers asked for money and threatened to cut your ear off, correct?

A    No, they cut my ear off.  They didn't threaten me to cut my ear off -- not off, but they cut my ear.

Q    You told this to the detectives first time you spoke to them?

A    They saw my wound.  I had blood all over my left side had a black eye on my right side.

Q    You didn't tell detectives at this time that you sold drugs, did you?

A    No, I didn't.

S. KHALED - CROSS - MR. KAPLAN                    150

Q    You didn't mention anything --

A    No.

Q    -- about drugs.  Did they ask you why this happened, why you thought it happened?

A    Yeah, I thought it was just somebody is robbing me for my -- maybe they followed me because of my car.

Q    It's an expensive car?

A    I would say.

Q    You also say that you paid for the car through your drug dealing, correct?

A    No, I had, I used to work, I saved money.

Q    What did you use to work as?

A    In a hotel as front desk clerk, then I used to do Ebay.

Q    What type of products would you sell on Ebay?

A    Belts, shirts, wallets, socks.  Something like that.

Q    But you had to borrow money for this car, you borrowed from Humayen Khan, correct?

A    Yes.

Q    How much did you owe Humayen Khan at this point?

A    30,000.

Q    You said he was, pay me when you can pay me?

A    Yes.

Q    But you felt you still owed him money, correct?

A    Yes.

Q    And would Humayen Khan send you text messages listing how

S. KHALED - CROSS - MR. KAPLAN                    151

much money you owed him?

A    Yes, just to have a record that you paid some and this is the balance whenever you can.

Q    You were paying him rent also, correct?

A    Correct.

Q    So every once in a while he would send you a text message, this is how much you owe me for the rent?

A    And this is --

Q    This is how much for the car?

A    Correct.

Q    Back to this first interview with law enforcement.  You didn't tell them that one the kidnappers said:  Hey, she needs gas.  Did you?

A    Sorry?

Q    During this first interview with law enforcement December 10, 2022 you didn't tell them one of the kidnappers said:  She needs gas?

A    To the detective?

Q    Yes.

A    I don't think I spoke about the whole thing detail by detail.  I was traumatized.  I was messed up.  I barely could talk.  I was beaten real bad.

Q    This is a shorter -- with them, correct?

A    Yes, that night it would have been.

Q    You spoke with the FBI soon thereafter, January 2023, do

you recall that?

A    Yes.

Q    This is a month after, correct?

A    Yes.

Q    You had time to sit there and think about what happened?

A    Yes.

Q    During this January 10, 2023 conversation, was Special Agent Ford there?

A    Yes.

Q    During this conversation is when you told Special Agent Ford that you had been involved in some low-level weed deals, correct?

A    Correct.

Q    Do you recall telling Agent Ford during this interview that you weren't sure how the kidnappers knew that you sold weed because you hadn't not sold weed to, quote, "any black guys."

A    Yes.

Q    Do you recall telling Special Agent Ford during this interview that the term plates is referring to a quantity of marijuana?

A    Correct.

Q    So if you remember during cross you were asked a question about Special Agent Ford telling you, or law enforcement telling you, that the kidnappers were African American,

S. KHALED - CROSS - MR. KAPLAN                153

correct?

A     Yes.

Q     Before Agent Ford told you that, you didn't realize that the kidnappers were African American?

A     I mean, somewhat, but I can't point fingers.  They were all wearing masks, only the eyes were open.

Q     I understand that.  But you spent about four hours with them?

A     Yes.

Q     Was anything about the way that they spoke or communicated that indicated that they were African American or their ethnicity or race?

A     I mean, for me since I know like different kinds of race, yeah, it sounds more African American.  Because if you talk street, right, like some slang, so that's, and whatever I seen like this part, that's the only way.

Q     Do you recall telling Agent Ford during this interview that you sold around 30 pounds of marijuana a month?

A     Yes.

Q     Let's go through the economics of that.  Approximately how much profit would you make on a sale of marijuana?

A     One pound is $100.

Q     So how much would you sell a pound for?

A     Sometimes it could go 500, it could go 600, it's various numbers.

S. KHALED - CROSS - MR. KAPLAN                    154

Q    But your profit is about $100 a pound?

A    Yes.

Q    What was your general volume that you would do per day?

A    I don't remember.

Q    You testified on cross right before that you had lied to Ant by telling him you lost 300 plates, correct?

A    Yes.

Q    And Ant was one of your employees in the drug business, correct?

A    No.

Q    One of the people who worked with you in the drug business?

A    His name is Praz.

Q    Praz.  Was it Praz, it was Praz that you told that you lost 300 plates?

A    Yes, because he wanted some weed and I'm like, I can't afford to give you any.

Q    But you were only selling like 30 pounds a month?

A    Yes.

Q    Why would Praz believe that you had 300 pounds?

A    I just gave him a number.

Q    You want to give a realistic number.  It's as if you're selling a pound of weed and you lost 2 tons.

A    Better to say a bigger number, then him crying, hey, can you give me, can you give me.

S. KHALED - CROSS - MR. KAPLAN                155

Q    He would know that a 300 plates is a lot, wouldn't he?

A    Yes.

Q    He would know that because you're saying that you only did about 30 pounds a month?

A    Yes.

Q    You're sure it's only 30 pounds a month?  You're sure it wasn't more?

A    Yeah.

Q    Were you paying taxes on that?

A    No.

Q    And you spoke to law enforcement about all your drug dealing, correct?

A    Yes.

Q    You've never, since speaking to law enforcement, had you've never been arrested or anything for selling drugs, have you?

A    No.

Q    So back to this interview with Agent Ford on January of 2023, again, in this interview you didn't tell Agent Ford that one of the kidnappers said:  She needs gas.  Did you?

A    Maybe I remembered it later on, but at one time I did let them know, hey, this is what was told, as time went by I remembered things.

Q    As time went by you remembered things?

A    At that time.

S. KHALED - CROSS - MR. KAPLAN                    156

Q    As time went by, as you got closer to trial, you remembered more things, correct?

A    Not really, now the time is passing I wouldn't remember what was happened three, four, five years ago.

Q    Fair to say the first time that you told law enforcement that somebody, the person in the white shoes did something, was in April of 2025?

A    I'm sorry?

Q    Was the first time that you mentioned to law enforcement that the person in white shoes, for example, said:  She needs gas, first time is April 2025; isn't that right?

A    No, I let them know, I always told them this.  I don't remember saying it now a few months ago.  I told them before.

Q    Well, that's what I'm trying to get to.  When did you tell them?  You had an initial conversation with Agent Ford where you say you didn't him.  But at some point you did, correct?

A    Yes, at some point.

Q    Where on the spectrum of your communications with Special Agent Ford did you start telling them more specific details of who was doing what?

A    Yes, like 2023 maybe, 2024, yeah.

Q    So we went through January 2023.  You didn't mention that to them, correct?

A    Yes.

S. KHALED - CROSS - MR. KAPLAN                157

Q    Let's talk about December 2023.  Did you meet with law enforcement again back in December 2023?

A    Yes, I probably did.

Q    Was Agent Ford there?

A    Yes.

Q    This is a year after the incident, correct?

A    Yes.

Q    And now you've had more time to reflect and think about what happened?

A    Somewhat.

Q    No longer in the moment; fair to say?

A    Okay.

Q    It was during this interview that you told Agent Ford that you were trying to buy in drugs from Jarrett Bruce, right?

A    Yes.

Q    You're saying yes, are you saying yes to answer the question or your do you remember?

A    I remember.

Q    Before when Ms. Ferrante asked you the question you said yes, then you said afterwards it wasn't really true?

A    I did ask him.

Q    So you specifically remember that?

A    Yes.

Q    Telling Agent Ford that asked Jarrett Bruce for --

S. KHALED - CROSS - MR. KAPLAN          158

A    Yeah.

Q    It was during this interview in December 2022 that you first mentioned -- 2023, that you first mentioned Chelo, correct?

A    Yes.

Q    And we discussed Chelo before.  Chelo was a customer of yours?

A    Yes.

Q    Chelo would occasionally buy some drugs from you?

A    Correct.

Q    Chelo was a black man, right?

A    Yes.

Q    And Chelo went by the nickname of Ox?

A    I know him as Chelo, I don't know if he went by Ox or anything.

Q    Did you ever meet Chelo?

A    Yes.

Q    Chelo big guy or small guy?

A    Probably like me maybe.

Q    What does that mean?

A    I would say small maybe.

Q    You sold drugs to Chelo more than once, correct?

A    Yes.

Q    And you recall speaking to Chelo the day of the kidnapping?

A    I don't remember.

Q    Again, you were asked this question on cross-examination ten minutes ago and you had no problem answering yes; but now suddenly you don't remember?

A    It's, it's three years ago.  If you said -- if you're saying I did speak to him, you have the record, sure.

Q    All right.  I'll try to refresh your recollection on some things.  You can read what is on the prompter?

A    It's kind of blurry.

Q    The focus doesn't seem to be working.  How about now?  Is it a little clearer?

A    No, it's blurry.

        THE COURT:  When you had it on auto, that was your best try again.

Q    Can you see that?

A    Yes.

Q    You see the message in blue on the side?

A    Yes.

Q    Don't read it, just read it to yourself.

A    Uh-huh.

Q    How about that?  Can you read that?

A    Yes.

Q    Does reading that refresh your recollection as to whether or not you were supposed to meet Ant around 8:00 o'clock that night?

S. KHALED - CROSS - MR. KAPLAN                 160

A     Yes, it says.

Q     And the purpose of meeting with Ant at 8:00 o'clock on December 9, 2022, was to sell him marijuana?

A     Yes.

Q     And he was going to come to your apartment to pick it up, correct?

A     Yes, come to my block to pick it up.

Q     At 8:00 o'clock?

A     It says eight to 9:00 o'clock.

Q     Was 8:00 o'clock pretty much the exact time the kidnapping happened?

A     Yes, correct.

Q     And Ant knew where you lived?

A     He knew where I was.

Q     He had been there before, correct?

A     Yes, I met him on 27 Street plenty of times.

Q     He's familiar with the area, he knows the alleyway, he knows everything, correct?

A     Sure.

Q     I want to focus back on the interview with law enforcement in December of 2023.  Again, a year after the incident, correct?

A     Yes.

Q     During this interview, you don't recall telling Special Agent Ford that when the kidnappers started they said:  We

were waiting for you for a long time.  Did you?

A     I think I mentioned it.

Q     You mentioned it?

A     I think I did.

Q     Are you sure you are mentioned?

A     I don't know.

Q     You don't know.  Anything to try to refresh your recollection as to whether you said that?

A     If I didn't mention it, but I mentioned it later on.

Q     You're not sure if you mentioned it back in December 2023; fair to say?

A     It's almost year a year and-a-half ago.  I don't really remember word by word.

Q     So you have trouble remembering things that took place a while ago, correct?

A     Yes.

Q     You're saying that's a year and-a-half ago, right?

A     Yes.

Q     The kidnapping took place two and-a-half years ago, right?

A     Correct.

Q     It's a little longer than a year and-a-half?

A     Yes.

Q     A year and-a-half is hazy, but two and-a-half years ago is crystal clear?

S. KHALED - CROSS - MR. KAPLAN                162

A    No, that's why slowly what I remembered I told Agent Ford.

Q    Slowly, as in you're preparing for trial and you start remembering things?

A    Yes.

Q    Because you're speaking to Agent Ford and the prosecutors more often?

A    Yes.

Q    When you're speaking to them more often, you suddenly start to remember things?

A    I'm repeating the story over and over, I'm remembering what is going on.

Q    So the story you may have told an agent in January 2023 you may have told a different story in December 2023?

A    I may have left little bits of pieces out maybe.

Q    And the little bits of pieces that were left out in December 2023 you may have remembered to tell them in April of 2025, for example?

A    If I remembered, then I told them.

Q    And in those bits and pieces that you forgot in 2025 you were able to tell them in June 2025, correct?

A    I don't know if I didn't tell them everything I did tell them.

Q    And those pieces that you left out in June 2025, you could testify here in open court about, correct?

A    Yes.

Q    But you would agree that your memory of this event would have been better closer in time to the event itself than it is two and-a-half years later?

A    Yes or no, some things like I started remembering more when I spoke about it more often, more and more things I spoke about, to see if I could figure out the details.

Q    When you had these conversations, are these conversations with law enforcement?

A    Yes, I guess.

Q    So the more you meet with law enforcement the more you would remember about this incident?

A    Like little details I will remember, then I let them know, hey, I also remember some of this, some of that.

Q    But you agree with me what you remembered kind of changed over the, evolved, over the conversations you had with law enforcement?

A    Could have been.

Q    Is could have been your way of saying yes?

A    I don't know, yes, I guess.

Q    I'll ask you a few questions about your injuries.  You testified that the man in the white shoes had a gun that hit you in the face?

A    Yes.

Q    He hit you on the right side of face?

A      Eye.

Q      And your eye was pretty bloody and puffed up?

A      And of swollen, yes.

Q      You couldn't see out of the right eye?

A      Not really.

Q      What about your left eye, how was that?

A      In the beginning it was fine until they cut my ear, then I had blood in my eye.

Q      Once your ear was cut you couldn't really see anything?

A      Plus I was facing the floor.

Q      So fair to say that at some point, once your ear was cut, you really couldn't see anything?

A      If I was facing the floor I couldn't see anything but when I got up, when they threw bleach at me, I saw.

Q      But then after that, your ear is cut after that, correct?

A      Yes.

Q      So at that point once you were back in the car, you couldn't really see anything?

A      They put a beanie on my head.

Q      So anything that they would have said afterwards, when you say the person in the white shoes, you couldn't really see the person in the white shoes, could you?

A      No, but I heard his voice.

Q      So when you say the person in the white shoes, at some point you recognize the voice of the person in the white

S. KHALED - CROSS - MR. KAPLAN                    165

shoes?

A    He was the one mainly talking.

Q    But there were four kidnappers, right?

A    In the beginning I saw three.  As much as I -- when they were throwing me in the van I saw the driver, one guy in the back and the guy who was pushing me in.

Q    Then as time developed you saw more people?

A    As I got out I did see somebody in the passenger seat sitting.  So it could have been three people or four people. But when I got pushed in, I saw only the driver on that side because it was the left side I got into the van from, and the guy, there was another guy in the back and one guy behind me.

Q    Let me ask you a few more questions about the incident on December 9.  So you are coming back from the laundromat, correct?

A    Correct.

Q    You pulled down the alleyway behind your house, correct?

A    Correct.

Q    You backed into the spot at 21-27 27 Avenue?

A    Correct.

Q    You parked there before?

A    I always park there.

Q    You always park there.  It's an alleyway that you back into.

A    Yes.

S. KHALED - CROSS - MR. KAPLAN                    166

Q    You're with your girlfriend?

A    Yes.

Q    You sent her out before you got out?

A    I drove off to my building, dropped her off, and backed up into the parking spot.

Q    Did she have to get out for you to back out, or you just sent her away?

A    She got out, she went upstairs, and I backed up.

Q    Is that because you were expecting a drug deal to take place at 8:00 o'clock in the alleyway?

A    She had some things from her house to take upstairs, so she had her hands full.

Q    But had she been there at 8:00 o'clock and the transaction would have occurred, you would let her see and watch you deal drugs?

A    No, she had to go upstairs.  I dropped her off.

Q    It just happened to be the time that people were meeting you to sell the drugs?

A    Could have been, yes.

          MR. KAPLAN:  One minute, your Honor.

BY MR. KAPLAN:

Q    If we can show for just the witness.  Can you see what is on the screen in front of you?  The message in green, does it refresh your recollection as to whether Chelo was supposed to come by on December 9 for something?

A    Yes.

Q    Was Chelo supposed to come by December 9 for something?

A    Yes.

Q    What was he coming for?

A    He was going to see Praz for me.

Q    He was going to see Praz for you to get drugs?

A    Yes.

        MR. KAPLAN:  Thank you.  No further questions.

CROSS-EXAMINATION

BY MR. KAUFMAN:

Q    To pick up on the last question.  You said you were going to meet Chelo, Chelo was going to meet Praz for you?

A    Yes.  As the text message shows, yeah, Praz supposed to meet.

Q    This is the same Praz with 300 plates?

A    Yes.

Q    I wanted to make sure.  You don't know Lesly Valentin, correct?

A    No.

Q    Never met him, right?

A    No.

Q    You do know someone named Elvis Sansan, correct?

A    Yes.

Q    That's someone you know through Humayen Khan, correct?

A    Yes.

Q    And Elvis Sansan goes by the name L, correct?

A    I know him by Sansan.

Q    Have you never heard him called L?

A    No.

Q    You testified when you were kidnapped on the night of December 9, 2022, that was when you came home from the laundromat, correct?

A    Yes.

Q    This was right around 8:00 p.m., right?

A    Yes.

Q    Same time we've been talking that you had the arranged drug deal, correct?

A    Yes.

Q    You were not kidnapped at 10:00 p.m., correct?

A    No.

Q    Not at 11:00 p.m., right, it wasn't midnight or 12:30, right?

A    No.

Q    8:00 p.m., right?

A    Yes.

Q    And I think you just said when you got back from the laundromat you were with your girlfriend, correct?

A    Correct.

Q    That's Ms. Kraim?

A    Yes.

S. KHALED - CROSS - MR. KAUFMAN                    169

Q    What is her first name?

A    Arina.

Q    I don't think you quite answered the question.  You can fit in the parking space, right -- you and Ms. Kraim have both exited the car from that parking space before, right?

A    Yes, she would have to get out before I park; it's too tight.

Q    But you can do right around the spot where the alley is, right?

A    Sure, sure.

Q    But that's not what happened on the night of the ninth, right?

A    No.

Q    You let her out first, correct?

A    Yes, she had groceries in her hand to take upstairs.

Q    Then you drove around back, right?

A    I reversed back.

Q    You reversed back after she was up in the building, correct?

A    She was walking to the building and I reversed back.  I didn't wait for her to go upstairs.

Q    She was heading up to your apartment?

A    Correct.

Q    While you were parking your car?

A    Yes.

S. KHALED - CROSS - MR. KAUFMAN                    170

Q    Your brother-in-law was also supposed to arrive that night, correct?

A    He was there in front of the building.

Q    And that's -- I'm not going to get the pronunciation?

A    Ronnie.

Q    Is that what you call your brother-in-law?

A    Yes.

Q    And so someone named Ronnie was supposed to arrive at your apartment that night?

A    Yes.  He arrived before I did, and he was waiting for me.

Q    Does Praz know Ronnie?

A    He met him once or twice.

Q    You agree Ronnie and Robbie sound similar, the names?

A    Maybe, yes, both have R.

Q    So your brother-in-law Ronnie, he was supposed to come to your house that night; and he was?

A    He got there before I did.

Q    And you didn't have him wait downstairs for you, correct?

A    No, he was waiting downstairs for me.

Q    You didn't tell him to go -- you didn't tell him to go upstairs to your apartment?

A    Yes, when my girlfriend opened the back door to go up, I told him to go up with him.

Q    So before you parked, your girlfriend was there, she went in, the two of them went up, correct?

S. KHALED - CROSS - MR. KAUFMAN                    171

A    Correct.

Q    Then you parked, right?

A    While I was parking, they went up.

Q    So before you finished parking, correct?  Before you exited the car, on your instruction, they both went in and up, correct?

A    Yes.

Q    And you said when you dropped them off, you got out, right?  You got out of your car after you parked.

A    After I parked the car.

Q    A man came up to you, right?

A    Yes.

Q    The man with the white sneakers?

A    Correct.

Q    And you said at the time you had your phone on you, correct?

A    Yes.

Q    But the phone dropped, right?

A    Yes.

Q    And did you hear the phone drop?

A    So much going on, I didn't hear nothing.  My head is just like, do I get killed tonight or come home?

Q    Were you looking at your phone at the time you got out of the car?

A    It was in my pocket.  I was taking the rest of the

S. KHALED - CROSS - MR. KAUFMAN                    172

groceries from the back.

Q    Your phone came out of your pocket right at the location where you were grabbed, right?

A    Somewhere in the back alley, correct.

Q    So right at the spot where the kidnappers had you, your phone came out, right?

A    My clothes came off also.

Q    So the kidnappers -- your phone came out, then the kidnappers took you, right?

A    No.  So I was fighting them not to get in the van, so when I was fighting them.  They pulled my shirt off, my shirt was at my wrist all night.

Q    When they got you, you didn't have your phone?

A    Yes, I didn't have my phone.

Q    They took the belongings that you had, right?

A    Yes.

Q    They searched you to see what you had?

A    They took me -- they took my bag and whatever I had in my pouch.

Q    So it would have been clear to them that your phone had been lost at that point, correct?

A    Okay, yes.

Q    You also had a white bag, correct, like a plastic bag?

A    Either one bag had clothes in it and the other bag had Snapples.

S. KHALED - CROSS - MR. KAUFMAN                    173

Q    You dropped those bags as well?

A    Correct.

Q    Did the kidnappers grab those from you?

A    No.

Q    You just dropped them?

A    Yes.  Fell out of my hand when he hit me.  Right before he hit me, I fell and dropped the bags.

Q    Now, you said you were hit in the face with a pistol; is that right?

A    Correct.

Q    Did you see the pistol as it hit you in the face?

A    I was getting up, I felt it.  I didn't see actual pistol hitting.

Q    Did you feel any like sticks hit you, anything like sticks?

A    No, it was something metal.

Q    No sticks.  What about bottles?

A    Did I get hit by a bottle?  No.

Q    It was just the pistol?

A    Correct.

Q    You also had -- the guy beating you up, right, you said you saw he had white sneakers, correct?

A    Yes.

Q    You said there was another guy also in the back?

A    Yes.

S. KHALED - CROSS - MR. KAUFMAN                174

Q     And you observed that he was, the other guy, was tall and skinny, right?

A     Yes.

Q     The guy who, not the white sneakers guy, the other guy was tall and skinny, right?

A     Yes.

Q     And the other guy you were able to tell through what you saw was lighter skinned than the guy with the white shoes, correct?

A     Yes.

Q     The guy with the white shoes was darker?

A     Yes.

Q     And you said that you saw another car while you were in the van?

A     When they took me out of the van to pour bleach on my body.

Q     That car was a sedan?

A     Sedan.

Q     Not an SUV, correct?

A     Yes.

Q     It was silver?

A     Yes.

Q     It wasn't green or gold?

A     As much as I remember, silver.

Q     And at one point while you were in the van you said you

S. KHALED - CROSS - MR. KAUFMAN                    175

heard someone say:  She needs gas.  Correct?

A     Correct.

Q     And do you know what that referred to, which car?

A     I have no idea.

Q     You know she, they are referring to a female?

A     She needs gas.

Q     After this ordeal you were released, you said it happened around 60th Street?

A     Yes, I know it was York and upper level when you come down, so I believe it's 60th Street.

Q     Upper East Side of Manhattan, correct?

A     Yes, yes the upper level, when you come from Queens to Manhattan when you take the upper level.  I don't know if you know, you take the first exit, I believe 60th Street and York.

Q     That's an area you know from times you've come?

A     Yes.

Q     You couldn't tell what direction you were coming from, correct?

A     No idea.

Q     You were tied down?

A     Tied down, face floor, I had a beanie on my face.

Q     You just knew when you got out, you were in this spot in Manhattan?

A     Yes.

Q     From your other experiences?

S. KHALED - CROSS - MR. KAUFMAN                176

A     Yes, I know Manhattan.

Q     When you say the upper level, you're talking about the Queensborough Bridge?

A     Correct.

Q     And that part, that bridge, doesn't go to your neighborhood, it's the RFK goes to your neighborhood, correct?

A     Yes.

Q     So that's a bridge that connects to a different part of Queens than where you were, correct?

A     Yes, it's about five to seven minutes drive from where I live.

Q     That bridge goes over Roosevelt Island?

A     Yes, Queensborough Bridge.

Q     And so at this point you were able to get an Uber, correct?

A     Yes, somebody helped me and she called an Uber for me.

Q     Because you were not in Queens you were a bit of a distance, correct?

A     I was in Manhattan.

Q     So you needed to get into a car to be able to make it to where your girlfriend was in Queens, right?

A     I wanted to go home.

Q     Because you had not come back into Queens that night, correct, with the kidnappers, correct?

A     Correct.

S. KHALED - CROSS - MR. KAUFMAN                    177

Q    You had to do that yourself?

A    Yes.

Q    That was around 1:00 o'clock in the morning, a little before 1:00 o'clock in the morning?

A    I believe so.

Q    Around 12:40?

A    I don't know, I didn't have a watch, I didn't have a phone so I can't tell you.

Q    As you talked before, after this was over you thought to yourself who may have done this, correct?

A    Yes.

Q    And your thought came to Chelo, right?

A    Yes.

Q    As you said, the drug dealer that you sometimes sold to?

A    Yes.

Q    You've talked a lot about this, you being a weed dealer, right?

A    Yes.

Q    And so you said you were moving about 30 pounds a month, correct?

A    Yes.

Q    You didn't have 30 pounds at a time, that's kind of what you -- over the course of a month that's what you had?

A    Yes, right.

Q    You would have smaller amounts than that at any given

S. KHALED - CROSS - MR. KAUFMAN                178

time, correct?

A    Right.

Q    And are you the kind of person who has access to 50 pounds of weed at once?

A    Yes, some people that I know might be able to get me it if I needed it.

Q    Do you have access to $150,000?

A    No.

Q    Someone who knows you, who really knows you, knows you don't have access to $150,000, right?

A    I mean they can assume, but I didn't have it.

Q    You talk about your relationship with Jarrett Bruce knowing him?

A    Yes.

Q    And how you had communicated to him that you didn't even have $5,000 to your name?

A    Yes.

Q    And you said you know him really well, you've been with him 75 times approximately?

A    Yes.

Q    That's a lot of times, right?

A    Yeah, because I would go visit Humayen Khan and he would live there.  So if you say how many times I saw him, it could be that.

Q    You knew him to live in Astoria, Queens, right?

S. KHALED - CROSS - MR. KAUFMAN                179

A     At one point he lives in Astoria, Queens, correct.

Q     And at some point he was living both in New Jersey and Astoria, Queens?

A     Yes.

Q     And the place in Astoria where he lives is very, very close to where you live?

A     Yes.

Q     Literally one block?

A     One block and one avenue.

Q     So for example, someone was coming to hang out with Jarrett Bruce they would by nature of being there only be one block and one avenue from your house, right?

A     Okay, yes.

Q     You talked about on direct examination having a dispute with Jarrett Bruce over a license plate, right?

A     Yes.

Q     And you know through your knowing him pretty well that he's someone who has access to a large number of cars, correct?

A     Yes.

Q     He's often driving different cars?

A     Yes.

Q     In fact, he sold car parts, right?

A     Yes.

Q     He rented out cars to other people, right?

S. KHALED - CROSS - MR. VAN BUREN                180

A     Yes.

Q     Jarrett Bruce is not someone who would need someone else to get him a car if he wanted a car, correct?

A     Yes.

Q     He could get a car himself, right?

A     Yes.

            MR. KAUFMAN:  I have nothing further.

CROSS-EXAMINATION

BY MR. VAN BUREN:

Q     I have a few questions for you about Humayen Khan.  You testified earlier that his father left him some buildings.

A     Correct.

Q     That's multiple buildings?

A     Multiple.

Q     How many?

A     I wouldn't know exact number.

Q     More than five?

A     Five just on 27th Street, so.

Q     More than 25?

A     That I can't tell you.  I know 27 Street he owns five.

Q     So at least five?

A     Yes.

Q     These are residential buildings?

A     Apartment buildings.

Q     So he has tenants?

S. KHALED - REDIRECT - MS. MICHELEN                    181

A    Correct.

Q    They pay rent to Mr. Khan?

A    Yes.

Q    So he seems -- if five building on one block, he seems like he has a pretty decent cash flow?

A    Yes.

Q    He's maybe, would you say that he's liquid financially?

A    I don't think so.

Q    But he has, I guess, let me rephrase the question.  He has a decent cash flow.  You testified you earlier he lent you $30,000?

A    Yes.

Q    He has at least liquidity that he can outlay $30,000.

A    Yes.

Q    So he loaned you $30,000, and I guess is it fair to say that he also loans other people money?

A    I don't know that.

Q    You don't know if ever lent Jarrett Bruce money?

A    I don't know.

        MR. VAN BUREN:  Nothing further, your Honor.

        THE COURT:  Any redirect?

        MS. MICHELEN:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. MICHELEN:

Q    Mr. Khaled, earlier Ms. Ferrante asked you about a debt

S. KHALED - REDIRECT - MS. MICHELEN                    182

with Mr. Humayen.  Do you remember that?

A     Yes.

Q     But what I had asked you earlier when I first questioned you was whether you had any drug debts, correct?

A     Correct.

Q     For what did you owe Humayen money for?

A     For the car.  He lent me $30,000 for the car.

Q     Did you ever owe Humayen money for marijuana?

A     No.

Q     You told Ms. Ferrante that you made approximately $100 per pound?

A     Correct.

Q     Of marijuana?

A     Yes.

Q     And by that you mean that's the profit margin, correct?

A     Yes.

          MR. KAUFMAN:  Objection.  This is leading.

          THE COURT:  It is leading.

BY MS. MICHELEN:

Q     Mr. Khaled, you said earlier that you deal marijuana?

A     Yes.

Q     Have you been truthful with the Government about that?

A     No.

Q     What do you --

A     Sorry?

RIVKA TEICH, RPR, RMR, CRR
Official Court Reporter

S. KHALED - REDIRECT - MS. MICHELEN          183

Q    Have you been truthful with the Government about that?

A    Yes.

Q    Have you ever identified any of the kidnappers to the Government or anyone else?

A    No.

Q    Have you ever pointed a finger at any specific individual?

A    No.

Q    You just told Mr. Kaufman that you didn't have access to $150,000.  Do you know if Humayen had access to that kind of money?

A    I don't know.

Q    Do you know if he has more money than you do?

A    I think he does have more money than I do, yes.

Q    Throughout your 30 years of friendship with Humayen, would he help you out often?

A    There was times that I helped him out.  There is times that he helped me out.  He would take $100, $200 when we were younger, he would pay me back.

Q    How many clients approximately did you have in the marijuana business?

A    I would say six, seven.

Q    Sitting here today, do you remember exactly when you met with each of these clients on which dates?

A    No.

RIVKA TEICH, RPR, RMR, CRR
Official Court Reporter

S. KHALED - REDIRECT - MS. MICHELEN          184

Q    When did you stop selling marijuana?

A    After the incident.

Q    How many meetings would you have with marijuana clients approximately throughout your life?

A    I don't know.

Q    More than five?

A    Can you repeat the question?

Q    How many meetings approximately in your life did you have with marijuana clients?  How many times did you sell marijuana?

A    More than five.

Q    More than ten?

A    Yes.

Q    More than 100?

A    Throughout the years, yes.

Q    How many times have you been kidnapped?

A    Once.

Q    Would you say that's a memorable event?

A    Definitely.

Q    Who called the cops, do you know, when you got kidnapped?

A    I believe -- I'm not sure who called cops.

Q    Was it you?

A    No, I didn't have the phone.

Q    During your first meeting with the law enforcement officers minutes after being kidnapped and tortured, do you

S. KHALED - REDIRECT - MS. MICHELEN                185

remember specifically which details you told them?

A    No, I don't remember exact details.

Q    You've met with law enforcement many times?

A    Yes.

Q    Do you remember how many?

A    I don't know exact number.

Q    More than ten times?

A    Yes, more than ten times.

Q    Have you been completely truthful each of these times?

A    Yes.

Q    Besides the statements that you've made to law enforcement in these meetings, has the Government ever shown you any of the other evidence it has in this case?

A    I'm sorry, what do you mean?

Q    Do you know the other evidence that the Government has in this case besides what you've told us that happened to you? Have you seen any of the other evidence?

A    Yeah, I seen the picture of the guy with the white sneakers.

         MS. MICHELEN:  May I show a picture for the witness only, your Honor.

         THE COURT:  Okay.

         MS. MICHELEN:  Showing what you is marked Government Exhibit 15 for the witness only.  May I approach the witness?

         (Continued on next page.)

(Continuing)

MS. MICHELEN:  Your Honor, may I approach the witness -- I'm sorry --  with what has been marked as Government Exhibit 13 for identification.

BY MS. MICHELEN:

Q    Is this the picture you just mentioned?

A    Yes.

Q    And can you describe what you see in that picture?

A    A guy with a black mask, black jacket, black pants and white sneakers and black gloves.

Q    And who is that?

A    The person that picked me up.

Q    Is that the guy you earlier testified about having the white shoes?

A    Correct.

MS. MICHELEN:  I move to admit Government Exhibit 13 in evidence.

THE COURT:  Admitted.

(Government's Exhibit 13 received in evidence.)

MS. MICHELEN:  May we publish it to the jury?

THE COURT:  Sure.

Q    Mr. Khaled, you were shown this picture.  Do you remember when you were shown this picture?

A    The --

MS. MICHELEN:  I'm sorry.  I have to publish it.

Khaled - direct - Michelen                187

One second.

May we dim the lights so that the jury can see it on the scene, Your Honor?

Q    In the meantime, Mr. Khaled, do you remember when you saw this picture?

A    Yeah, about a week or two ago.

Q    Beside this, have you seen any of the other evidence the Government has in this case?

A    No, I didn't.

Q    Mr. Khaled, earlier when I first asked you questions, you mentioned a brand of cigarettes that the kidnappers were smoking?

A    Yes.

Q    What was that brand?

A    Black and mild.

Q    Can you spell that for the court reporter?

A    B-L-A-C-K and M-I --

MR. KAPLAN:  This was not on cross.

THE COURT:  I'm not getting the scope here.  Do you want to just move on or do you want to tell me how it relates?

MS. MICHELEN:  Just one minute, Your Honor, if I can.

THE COURT:  Yes.

Q    One more question, Mr. Khaled.  This picture, Government Exhibit 13, do you remember if the Government showed that to

you before or after you told the Government that that individual had white shoes on?

A    After I told them that he had white sneakers on.

MS. MICHELEN:  No further questions.

THE COURT:  Any recross?

MR. KAPLAN:  Yes, Your Honor.  Just a few questions.

RECROSS-EXAMINATION

BY MR. KAPLAN:

Q    On redirect, you were asked some questions about when you were shown Government Exhibit 13.  Do you remember that?

A    Yeah.

Q    Okay.  And you said you saw that about a week or two ago?

A    Correct.

Q    Okay.  So would that have been early June?

A    Yeah.

Q    Okay.  And was that about two months after law enforcement told you that the kidnappers were African-American?

A    I'm sorry.  Two months after?

Q    I will rephrase.

You testified earlier that in April of 2025 law enforcement had told you that the kidnappers were African-American.

Do you recall that?

A    They didn't tell me they were African-American.  They

Khaled - cross - Kaplan                    189

asked me if I dealt with anybody African-American.  That's why I said Chelo.

Q    That wasn't the testimony earlier.  But the question was in April of 2025, right, you said you thought about Chelo when they told you the kidnappers were African-American?

A    Yes.

Q    You didn't realize before then that they were African-American; correct?

A    I did.

Q    So, while they didn't show you specific exhibits before June of 2025, they did give you certain information about the case; correct?

A    Yeah.

MR. KAPLAN:  No further questions.

MR. VAN BUREN:  Very briefly.

RECROSS-EXAMINATION

BY MR. VAN BUREN:

Q    Mr. Khaled, just a moment ago you were speaking with Ms. Michelen and you said that Mr. Janae Cain has helped you out with a number of things throughout your relationship.

Other than the car loan that we've spoken about already, what other types of things has he helped you with?

A    Find me an apartment, got my parents an apartment.  He helps out whenever I need.

Q    Has he ever given you capital to buy drugs?

Khaled - cross - Kaplan                    190

A    Never.

Q    Has he ever helped you out of legal difficulty?

A    Never get in -- no, never get in trouble.

MR. VAN BUREN:  Nothing further.

THE COURT:  Anything else?

MS. MICHELEN:  No, Your Honor.  Thank you.

THE COURT:  Thank you.  You are excused.

(Witness excused.)

THE COURT:  You can keep going or does anybody want a break to use the bathroom or get water or anything like that?  All right.  I'm not getting affirmatives.

Let's call the next witness.

MR. WANG:  Your Honor, the Government calls Dr. Allison Lockwood.

THE COURTROOM DEPUTY:  Doctor, please stand.  Please raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY:  Please state your full name and spell your first name and last name slowly for the record.

THE WITNESS:  Allison Lockwood.  A-L-L-I-S-O-N L-O-C-K-W-O-O-D.

THE COURTROOM DEPUTY:  Thank you, doctor.  Please be seated.

**ALLISON LOCKWOOD**,

    called as a witness, having been first duly

Lockwood - direct - Wang                    191

sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WANG:

Q    Good afternoon.

        THE JURY:  Good afternoon.

        MR. WANG:  I'm sorry.  I'm addressing the witness.

Q    Good afternoon.

A    Good afternoon.

Q    Ms. Lockwood, would you please explain what you do for a living?

A    I'm an emergency medicine physician.

Q    Could you briefly describe your educational background?

A    I did four years of undergraduate, four years of medical school, four years of residency training in emergency medicine.

Q    Doctor, an ER physician, what sorts of cases do you usually SEE?

A    Anything that walks through our door or rolls through our door.  It ranges from chest pain, belly pain, assaults, stabbings.  Anything that you can think of, we've seen it.

Q    Where are you currently practicing?

A    At Elmhurst Hospital.

Q    Where else have you practiced before being at Elmhurst?

A    At Mount Sinai Queens and Mount Sinai Beth Israel.

Q    When were you practicing at Mount Sinai Queens?

Lockwood - direct - Wang                    192

A     Between 2022 and 2023.

Q     Where is that located?

A     In Astoria.

Q     Were you practicing at Mount Sinai Queens in December of 2022?

A     Yes, I was.

Q     Doctor, directing your attention to December 10, 2022, were you working at Mount Sinai Queens during the early morning hours of that day?

A     Yes, I was.

Q     What shift were you working?

A     The overnight shift.

Q     Did you treat a patient during this shift named Shaon Khaled?

A     Yes.

        MR. WANG:  Mr. Khan, for the witness only.

Q     Doctor, can you see what's on the screen as Government Exhibit 302?

A     Yes, I can.

Q     Do you recognize these records?

A     Yes.

Q     What are they?

A     These are my notes from Mr. Khaled's visit to the emergency department.

        MR. WANG:  Your Honor, the Government offers

Lockwood - direct - Wang                    193

Government 302 into evidence.

THE COURT:  Admitted.

(Government's Exhibit 302 received in evidence.)

MR. WANG:  Can we publish?

THE COURTROOM DEPUTY:  I don't think it's --

MR. WANG:  If the jury can see on their screens.

THE COURT:  They are not able to, Mr. Wang.

THE JURY:  We can see on the small screens, but not the big screens.

MR. WANG:  Can we put this for the jury.

THE COURTROOM DEPUTY:  It is.

MR. WANG:  Thank you.

Q    Dr. Lockwood, I will refer to the exhibit as needed. Based on the medical records in Government Exhibit 302, when did Mr. Khaled first arrive at the hospital?

And I can zoom in if that's helpful.

A    I have it here, it says arrival time 12/10/2022 at 12:27 a.m.

Q    I'm sorry.  Can you repeat that?

A    I see on the left here arrival date/time 12/10/2022 at 1:27 a.m., and then next to that admit date/time, same date, 1:56 a.m.

Q    Could you please describe Mr. Khaled's physical condition when he arrived at the hospital?

A    He came in looking very bruised.  He was uncomfortable.

Lockwood - direct - Wang                 194

He said that he had been tortured.

Q     During your evaluation and treatment of Mr. Khaled, what did you learn as to the cause of his injuries?

A     He told me that he had been assaulted and tortured with fists, a pistol and had had bleach thrown on him and a blow torch applied to his skin.

MR. WANG:  Mr. Chan, I would like to show the witness several other exhibits for the witness only.

Mr. Roberts, can you please put up Government Exhibit 301-A through 301-F.  I'm sorry, H.

Q     Dr. Lockwood, can you see those photos?

A     Yes, I can.

MR. WANG:  Mr. Roberts, can you please put up 301-C and 301-D.

Q     Dr. Lockwood, do you recognize photos 301-C and 301-D?

A     Yes, I do.

MR. WANG:  Mr. Roberts, can you please put up 301-E, 301-F.

Q     Doctor, do you recognize Government Exhibits 301-E and 301-F?

A     Yes.

MR. WANG:  Mr. Roberts, please put up Government Exhibit 301-G and 301-H.

Q     Doctor, do you recognize Government Exhibit 301-G and 301-H?

Lockwood - direct - Wang                 195

A    Yes.

Q    Doctor, what are the photos depicted in those eight exhibits?

A    These are photos of Mr. Khaled's injuries.

Q    Do they fairly and accurately depict his physical condition during the early morning hours of December 10, 2022?

A    Yes, they do.

          MR. WANG:  Government Exhibits 301-A through 301-H.

          THE COURT:  Admitted.

          (Government's Exhibits 301-A through 301-H received in evidence.)

          MR. WANG:  Mr. Chan, if we can please publish and start with 301-A, 301-B.

Q    Dr. Lockwood, can you please explain what we are seeing in Government 301-A?

A    In 301-A, I can see a contusion, which is basically an injury to the forehead, as well as what we call ecchymosis, which is bruising around the right eye, as well as a shallow laceration, which is a cut, and some swelling around the right eye.

Q    Please explain what we are seeing in Government Exhibit 301-B.

A    This is another view of the same injuries focusing more on the right eye with several abrasions, which is scrapes to the right eyebrow and the right cheek.

Lockwood - direct - Wang                          196

MR. WANG:  Mr. Roberts, please put up 301-C and 301-D.

Q    Doctor, please explain what we are seeing in Government Exhibit 301-C.

A    301-C is a cut behind the left ear.

Q    What are we seeing in Government Exhibit 301-D?

A    That is a bruise to the left arm, as well as what could be an abrasion or irritation or a burn to the left shoulder.

MR. WANG:  Mr. Roberts, please put up 301-E and 301-F.

Q    Dr. Lockwood, what are we seeing in Government Exhibit 301-E?

A    You can see irritation at the front of the neck, around that area of the neck.

Q    For 301-E specifically, can you please describe how long the irritation is and in what shape it is?

A    It's in a semicircle.  I don't believe I have pictures of the back of the neck, but you can see the front of the neck here, that's the semicircle, and it extends around the neck on the side you can see.

Q    Doctor, please explain what we are seeing in Government Exhibit 301-F.

A    These are abraded regions of the back where the top layer of the skin is removed.  And we can see charred borders that could have -- they look like they have been burned.

Lockwood - direct - Wang                    197

Q    Doctor, I believe you testified earlier that the victim had described to you the source of his injuries; correct?

A    Yes.

Q    Were the injuries that you observed that night and in Government Exhibit 301-F consistent with his description?

A    Yes.

         MR. WANG:   Mr. Roberts, please put up 301-G and 301-H.

Q    Dr. Lockwood, please explain what we are seeing in Government Exhibit 301-G.

A    This is irritation to the skin of the inside of the thighs.

Q    What are we seeing in Government Exhibit be 301-H?

A    The other thigh.

Q    Doctor, I believe you testified earlier that the victim had said that during the course of the evening he had had bleach thrown on him; correct?

A    Correct.

Q    Are the injuries that we see in Government Exhibit 301-G and 301-H consistent with that description?

A    Yes.

Q    Doctor, based on Mr. Khaled's injuries, what sort of medical care did he require that evening?

A    So we did -- - we decontaminated him, so anything that had been thrown on him was showered off, did something called

Lockwood - cross - Kaplan                198

pan scan, which is basically a CAT scan of most of his body looking for any signs of internal bleeding or fractures.  I repaired a cut on his face and did a lot of wound cleaning to the various wounds that he had.

MR. WANG:  One minute, Your Honor.

No further questions, Your Honor.

THE COURT:  Cross.

MR. KAPLAN:  Briefly.

CROSS-EXAMINATION

BY MR. KAPLAN:

Q     Good afternoon, doctor.

A     Good afternoon.

Q     Mr. Khaled was not admitted to the hospital for his injuries, was we?

A     He was not, in the parlance of medicine.  It says Admit date on the paperwork, but he was not admitted to the hospital in that he did not get an inpatient bed upstairs.  He was taken care of in the emergency department.

Q     Then he was discharged and told to take care of his injuries on his own?

A     And to follow up with a neurosurgeon as well.

Q     Okay.  During your time meeting with Mr. Khaled, did he ever tell you that he lost consciousness during the incident?

A     In my note it says no loss of consciousness.

Q     Okay.

Lockwood - cross - Kaufman                    199

MR. KAPLAN:  No further questions.

CROSS-EXAMINATION

BY MR. KAUFMAN:

Q    Good afternoon, Doctor.

A    Good afternoon.

Q    Doctor, you testified that Mr. Khaled came into Mount Sinai Queens at 1:27 a.m.?

A    That's on the paperwork, yes.

Q    That's in the Long Island City neighborhood?

A    In Astoria.

Q    In Astoria.

     And he described to you an ordeal where he was injured; correct?

A    Yes.

Q    It was your understanding that he was brought to the hospital by NYPD detectives; correct?

A    I do not recall.

Q    Do you remember seeing detectives by his bedside?

A    That is in my note.

Q    Right.

     And you remember hearing that he had been dropped off in Manhattan and then had kind of slowly, after a couple of stops, made his way to the hospital.

A    I don't recall that.

Q    You don't recall that, okay.  But you knew that the

injuries hadn't just happened, some time had passed before 1:27 a.m., when he arrived at the hospital?

A    No.

Q    You don't know?  You're not sure?

A    No, I don't know about the timing of it.

Q    Okay.  All right.  But he definitely was not there -- he definitely was not there -- I withdraw that.

When you treated him at the hospital, did you remove his clothing?

A    Yes.

Q    Did the detective take those clothes?

A    I don't know.

Q    Do you know if the detective was offered that clothing?

A    I don't know.

Q    But they were there; correct?

A    Often patients are already in a gown by the time I see them.

Q    But you did see detectives at the hospital?

A    That is in my note.

Q    Right.  And you did note no clothing was removed?

A    I assume so, because he was decontaminated and you usually have to remove clothing, but sometimes people come in naked.

Q    All right.  But that was not your understanding here?

A    I don't know.

Lockwood - cross - Ferrante                    201

MR. KAUFMAN:  Thank you.

CROSS-EXAMINATION

BY MS. FERRANTE:

Q    Good afternoon.

A    Good afternoon.

Q    Prior to testifying here today, you met with the Government?

A    Yes.

Q    And fair to say you met with them twice?

A    Yes.

Q    Different members of the AUSAs you met with; correct?

A    The same member.

Q    The same member.  Which one?

A    Andrew Wang.

Q    What about Agent Ford?

A    Yes.

         MS. FERRANTE:  No further questions.

         THE COURT:  Any redirect?

         MR. WANG:  No redirect, Your Honor.

         THE COURT:  Thank you.  You are excused.

         (Witness excused.)

         THE COURT:  I think we are ready for the next Government witness.

         MR. WANG:  Your Honor, the Government calls you Detective Nicholas Loccisano.

THE COURTROOM DEPUTY:  Detective, please raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY:  Please state your full name and spell your first name and last name slowly for the record.

THE WITNESS:  Detective Nicholas Loccisano, N-I-C-H-O-L-A-S, L-O-C-C-I-S-A-N-O.

THE COURTROOM DEPUTY:  Thank you, Detective.  Please be seated.

**NICHOLAS LOCCISANO**,

     called as a witness, having been first duly

     sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WANG:

Q    Good afternoon, Detective.

A    Good afternoon.

Q    First some background.  Could you explain to the jury how far you went in school?

A    I received my associate'S degree and attended a four-year college but did not graduate yet.

Q    Are you currently working?

A    Yes.

Q    Where do you work?

A    For the NYPD.

Q    What's your position with the NYPD?

Loccisano - direct - Wang                    203

A     Detective.

Q     How long have you been a detective?

A     I've been working in the detective squad for five years now.

Q     What precinct are you currently assigned to?

A     The 114th Precinct.

Q     What part of the city does the 114th Precinct cover?

A     That would be Astoria, Long Island City, Woodside, and part of Jackson Heights.

Q     What sort of cases do you investigate generally?

A     Anything from larcenies up to homicides.

Q     How many kidnapping cases have you investigated during your career?

A     This is only one.

Q     Detective, were you working on December 9, 2022?

A     Yes.

Q     What hours were you working that day?

A     I was working from 4:27 p.m. until 1:00 a.m.

Q     Do you have a partner during that shift?

A     Yes.

Q     Who?

A     Detective Mitchell.

Q     First name?

A     Christopher.

Q     Detective, on December 9, 2022, were you called to

Loccisano - direct - Wang                   204

respond to a crime scene at 2128 28th Street in Astoria, Queens?

A     Yes.

Q     Approximately when did you arrive at the scene?

A     Around 10:00 p.m.

Q     Why did you respond to the scene?

A     We were notified by patrol officers of a potential kidnapping.

          MR. WANG:  Mr. Chan, for the witness only.

          Mr. Roberts, please put up Government Exhibit 401.

Q     Detective, can you see that?

A     Yes.

Q     You have in front of you what has been marked for identification as Government Exhibit 401.

          Do you recognize it?

A     Yes.

Q     What is Government Exhibit 401?

A     It's a map of the incident location.

Q     Is this a fair and accurate map of the incident location around 2128 28th Street, in Astoria?

A     Yes.

          MR. WANG:  Your Honor, the Government moves to admit Government Exhibit 401.

          THE COURT:  Admitted.

          (Government's Exhibit 401 received in evidence.)

MR. WANG:  Please publish.

Q    Detective, looking at the map, you see 27th Street and 28th Street running parallel to one another intersecting with 21st Avenue to the northeast and Ditmars Boulevard to the southwest; correct?

A    Correct.

Q    Where, approximately, on Government Exhibit 401 is 2128 28th Street?

A    That would be approximately mid-block between 21st Avenue and Ditmars Boulevard.

Q    Okay.  Do you see the unmarked part of the street between 27th and 28th Street?

A    Yes.

Q    What is that?

A    It is a communal driveway.

Q    Would you also describe that as an alleyway?

A    Yes.

Q    That alleyway appears to connect at the northeast and southwest ends with perpendicular unmarked streets; correct?

A    Correct.

Q    Are those also alleyways?

A    Yes.

Q    Detective, did you collect any evidence from the scene?

A    Yes.

Q    What did you collect?

Loccisano - direct - Wang                206

A      I collected video evidence.

Q      How did you obtain access to video recording systems in the area?

A      Meet with homeowners.

Q      Did you view surveillance footage from those cameras at the scene or somewhere else?

A      I viewed them at the scene.

Q      Where were the cameras located that you reviewed?

A      The cameras were located in the alleyway.

Q      How many cameras?

A      Two cameras.

Q      Looking at Government Exhibit 401, can you point out where the alleyway -- I'm sorry.  Withdrawn.

       Were you able to review -- withdrawn?

       Were you able to verify that the system fairly and accurately recorded footage that night from the alleyway?

A      Yes.

Q      How were you able to verify that?

A      I was in the alleyway prior to collecting the video and then went out in the alleyway after collecting to make sure it accurately depicted the location.

Q      Were any timestamps on the footage accurate?

A      Yes.

Q      How did you confirm that?

A      I reviewed my department-issued cellphone compared to the

Loccisano - direct - Wang                        207

timestamp on the live view.

MR. WANG:  Your Honor, permission to approach the witness.

THE COURT:  Sure.

Q    Detective Loccisano, you have in front of you two discs that have been marked as Government Exhibits 201 through 206. Do you recognize the discs?

A    Yes.

Q    What are the discs?

A    They are discs containing the video I downloaded.

Q    How do you recognize those discs to contain the video?

A    I initialed and dated them after viewing them in your office.

MR. WANG:  Your Honor, the Government moves to admit both discs containing Government's Exhibits 201 through 206.

THE COURT:  Admitted.

(Government's Exhibit 201 through 206 received in evidence.)

MR. WANG:  Mr. Roberts, when you get a chance, let's put up Government Exhibit 201.

Mr. Chan, can we publish.

THE COURT:  It is published, Mr. Wang.

MR. WANG:  Can we turn off the lights, please.

Mr. Roberts, if you could start Government Exhibit 201 but pause at the beginning, please.

I'm not seeing anything on my screen.

THE COURT:  Can the jurors see?

THE JURY:  Yes.

THE COURT:  The jurors can see and I can see.

MR. WANG:  I see it now.

THE COURTROOM DEPUTY:  Okay.

(Video playing.) (Video paused.)

Q    Detective, pausing at the beginning of Government Exhibit 201, in what direction is this camera facing?

A    I don't recall off the top of my head what direction the camera is facing.

Q    Where is this camera located?

A    It's in the rear of 21-28 28th Street.

Q    Is it fair to say that this camera is pointing in northeastern direction toward the northern end of the alleyway?

A    Yes.

Q    There are some texts at the bottom of the screen that says garage door two; correct?

A    Correct.

MR. WANG:  Mr. Roberts, Let's please play from timestamp 19:36:10 for about a minute and a half, stopping at 19:37:55.

You could stop there.

(Video playing.)  (Video stopped.)

MR. WANG:  For the record, stopping the video at timestamp 19:37:41.

Q    Detective Loccisano, could you please describe for the record what we saw in that part of the video?

A    The video depicted a red Chrysler Pacifica driving down the alleyway.  The minivan then makes a u-turn and reverses down the alleyway out of camera view.

Q    How many licenses plates were on the car?

A    Just one license plate on the rear of vehicle.

MR. WANG:  Mr. Roberts, could you please start playing from timestamp 19:47:50.  Play it for approximately 50 seconds.

You could stop there.

(Video playing.)  (Video stopped.)

MR. WANG:  For the record, stopping the video at 19:48:35 seconds.

Q    Detective Loccisano, can you please describe what we saw in that portion of the video?

A    The video depicted an individual walking down the alleyway wearing a black hoodie, black pants, white sneakers, and carrying a blue bag in his right hand.

Q    Was the individual's face visible?

A    No.

Q    Why not?

A    It was covered.

Loccisano - direct - Wang                    210

MR. WANG:  Mr. Roberts, please play from timestamp 20:01:15 seconds for approximately two minutes.  I will tell you when to stop.

(Video playing.) (Video stopped.)

MR. WANG:  You can stop the video.  For the record, stopping the video at timestamp 20:03, one second.

Q    Detective Loccisano, please describe what we just saw in that video.

A    The video depicts the victim's vehicle driving down the alleyway and then parking out of camera view.

It also depicts an individual exiting the passenger seat of the vehicle.

Q    From the video are you able to see the passenger actually exiting the vehicle?

A    No.  You just see the door open and close.

Q    Detective, based on your investigation, were you able to determine what kind of vehicle this was?

A    Yes.

Q    What kind of vehicle?

A    It was A Range Rover.

MR. WANG:  Mr. Roberts, please move to timestamp 24 minutes, five seconds.  Please play.

(Video playing.)  (Video stopped.)

MR. WANG:  You could stop.

For the record, pausing the video at timestamp 25

minutes and three seconds.

Q    Detective Loccisano, what do we see in that part of the clip?

A    The video depicts the complainant being forced into the minivan by two other individuals and the video depicts the minivan driving down the alleyway with the rear passenger door still open.

Q    You said the complainant can be seen being forced into the vehicle; correct?

A    Correct.

Q    Can you describe in more detail what is happening with the complainant on the video?

A    He is being struck multiple times.

Q    Who struck him?

A    One of the males wearing all black.

Q    What color shoes was that individual wearing?

A    He was wearing white sneakers.

Q    When the minivan speeds down the alleyway and turns, in what direction does the car turn?

A    It makes a left out of the alleyway.

        MR. WANG:  Mr. Roberts, if you could please show -- Mr. Chan, for the witness only 201-A.

Q    Detective Loccisano, you have in front of you what has been marked for identification as Government Exhibit 201-A. Do you recognize it?

Loccisano - direct - Wang          212

A    Yes.

Q    What is it?

A    It's a still shot of the minivan from video collected.

Q    Is this a still from the same video we just saw, Government Exhibit 201?

A    Yes.

Q    Is it a fair and accurate excerpt from it?

A    Yes.

MR. WANG:  Your Honor, the Government moves to admit Government Exhibit 201-A.

THE COURT:  Admitted.

(Government's Exhibit 201-A received in evidence.)

MR. WANG:  Mr. Chan, if we can publish, please.

THE COURTROOM DEPUTY:  Okay.

Q    Detective Loccisano, can you please make out the license plate number on the back of the Chrysler Pacifica?

A    Yes.  It's New Jersey registration XGZF36.

MR. WANG:  Mr. Roberts, if you could please put up Government Exhibit 202.

Pausing at the beginning.

Q    Detective Loccisano, what's the timestamp at the start of this video clip?

A    19:37.

Q    And in standard time, what would that be?

A    That would be 7:37 p.m.

Michele Lucchese, RPR, CRR
Official Court Reporter

Loccisano - direct - Wang                213

Q    It says Garage door in the upper left-hand corner; correct?

A    Correct.

Q    Is this camera facing down the other direction of the alleyway, southward bound?

A    Yes.

         MR. WANG:  Mr. Roberts, let's play the entire clip.

         (Video playing.) (Video paused.)

Q    Detective Loccisano, what did we just see in Government Exhibit 202?

A    The same minivan reversing down the alleyway out of camera view.

Q    Is there a license plate visible on the front of that vehicle?

A    No.

         MR. WANG:  Mr. Roberts, if you could please put up Government Exhibit 203 and pause the beginning.

Q    Detective Loccisano, what's the timestamp for the beginning of Government Exhibit 203?

A    It is 19:48, which is 7:48 p.m.

Q    Is this the same camera angle that we just saw in Government Exhibit 202?

A    Yes.

Q    Pointing downward towards Ditmars?

A    Correct.

Loccisano - direct - Wang                    214

MR. WANG:  Mr. Roberts, let's play the entire clip.

(Video playing.)

Q    Detective Loccisano, what did we see in that video, Government Exhibit 203?

A    The individual wearing all black with white sneakers, carrying a blue bag.  He was walking in the direction of the Chrysler Pacifica.

MR. WANG:  Mr. Roberts, if you could put up Government Exhibit 204.

Q    Detective Loccisano, pausing at the beginning of Government Exhibit 204, what's the timestamp?

A    It's 19:52, which is 7:52 p.m.

Q    Again, is this the same angle we saw in the last two videos facing downward towards Ditmars?

A    Yes.

MR. WANG:  Mr. Roberts, let's please start at timestamp 20:00 and 30 seconds.

(Video playing.) (Video stopped.)

MR. WANG:  Apologies, Your Honor.  We may be having technical issues.  May we have a moment?

THE COURT:  Sure.

(Pause.)

MR. WANG:  Your Honor, if defense counsel has no objection, we can attempt to play the same video clip on a hard drive instead of a CD.  It will probably play better that

way.

THE COURT:  I'm hearing no objection.

MR. GUADAGNINO:  No objection.

MR. KAUFMAN:  No objection.

THE COURT:  We have been going for a long time.  Do you want to take a short break?

MR. WANG:  I think that would be prudent.

THE COURT:  All right.  Let's take a short break.

THE COURTROOM DEPUTY:  All rise.  Jurors, follow me.

(Jury exits the courtroom.)

DIRECT EXAMINATION BY MR. WANG:  (Continued.)

MR. WANG:  Your Honor, obviously during the break we will work out the technical issue.

(Recess taken.)

MR. WANG:  I thank the Court for its patience, and the jury.  Mr. Roberts, I believe you have Government 204 at timestamp 20:00, 28 seconds.  Let's please play.

(Video played.)

MR. WANG:  For the record, the clip ends at approximately 21 minute, 3 seconds.

Q    Detective Loccisano, please describe what we just saw in that part of the video.

A    The video depicts the individual wearing all black with white sneakers walking out of camera view towards where the complainant's vehicle is parking.

Q    And in this part of the video is that individual in the white sneakers still carrying a blue bag?

A    No.

MR. WANG:  Mr. Roberts, if you could please publish Government Exhibit 205 and pause at the beginning.

Q    Detective Loccisano, what is the timestamp at the beginning of this video?

A    It's 20:03, which is 8:03 p.m.

Q    Is it still the same camera angle facing south down the alleyway?

A     Yes.

Q     Let's please play the entire clip.

            (Video played.)

Q     Detective Loccisano, what did we see in Government 205?

A     A second individual wearing dark colored clothing is running down the alleyway towards where the other individual was walking towards.

Q     How was that individual dressed?

A     Dark colored clothing, face covered.

            MR. WANG:   Mr. Roberts, please put up Government 206 and pause at the beginning.

            (Video played.)

Q     Detective Loccisano, what is the timestamp at the start of Government 206?

A     It's 20:03, which is 8:03 p.m.

Q     Is this, again, the same camera angle facing south down the alleyway?

A     Yes.

            MR. WANG:   Let's play the entire clip.

            (Video played.)

            (Continued on next page.)

N. LOCCISANO - DIRECT - MR. WANG                218

BY MR. WANG:

Q    Detective Loccisano, what did we see in Government Exhibit 206?

A    The minivan is driving down the alleyway with the lights off.

Q    In addition to collecting surveillance footage from the alleyway, what other steps did you take that evening to investigate the kidnapping?

A    I interviewed the complainant.

Q    How did you encounter the complainant?

A    Around 1:00 a.m. my partner Detective Mitchell received a phone call from his girlfriend informing us that he was taking an Uber back from Queens to Manhattan.  We met up with him on his way back from Queens and drove him to the hospital.

Q    Where did you meet him in Queens?

A    Near his apartment.

Q    What hospital?

A    Mount Sinai in Astoria.

Q    When you first encountered the victim, what kind of physical condition was he in?

A    He had numerous injuries.

Q    Can you be more specific in describing?

A    Lacerations, bruising, contusions, it appeared some burn marks on him too.

Q    Did you and Detective Mitchell interview the victim about

N. LOCCISANO - CROSS - MR. KAPLAN                    219

what happened?

A     Yes.

Q     How long did you stay at the hospital?

A     Approximately half hour to an hour.

Q     Where did you go after that?

A     I went back to the office.

Q     What other steps did you take with respect to the investigation?

A     Reviewed video, uploaded the video, and then I ran the license plate that we viewed on that video.

Q     After December 10, 2022 did you have any other involvement in this investigation?

A     No.

          MR. WANG:  One moment, your Honor.  No further questions.

          THE COURT:  Who is doing the first cross?

          MR. KAPLAN:  I am, your Honor.

CROSS-EXAMINATION

BY MR. KAPLAN:

Q     Good afternoon, detective.

A     Good afternoon.

Q     If I ask a question and you don't understand or I talk too fast, let me know.  I'll try to rephrase.

          You testified that you met with the victim, Mr. Khaled, that night in the hospital, correct?

N. LOCCISANO - CROSS - MR. KAPLAN                220

A    Correct.

Q    And when you met with him, Mr. Khaled, right after he was released, did he tell you that the kidnappers said:  Where is Robbie, he owes me money?

A    Yes.

Q    During this interview with Mr. Khaled, did he tell you or your partner that he deals marijuana?

A    I don't recall.

Q    When you spoke with Mr. Khaled at the hospital, did he say to you that he noticed that one of the perpetrators had white sneakers?

            MR. WANG:  Objection, your Honor, hearsay.

            MR. KAPLAN:  It's about the present sense of recall.

            THE COURT:  Do you want to respond?

            MR. WANG:  This was several hours after the incident, it was not a present sense impression.

            THE COURT:  Sounds right.

            MR. KAPLAN:  Okay.

BY MR. KAPLAN:

Q    So Detective, at some point you went to get collect video footage from the alleyway, correct?

A    Correct.

Q    And to do that, you were canvassing down the alleyway to see which locations had cameras, correct?

A    Correct.

N. LOCCISANO - CROSS - MR. KAPLAN                221

Q    There are certain camera angles which were depicted in Government Exhibits 203, 204, 205 and going further down the alleyway towards Ditmars, correct?

A    Correct.

Q    Did you canvass down the alleyway to see if there were cameras depicting that area?

A    Yes.

Q    Were there any cameras?

A    I don't recall.

Q    But if there were cameras, presumably you would try to get the same surveillance video that you got from the upper block?

A    Yes.

Q    If I can ask the Government to pull up Exhibit 203 and play it for the jury.

THE JUROR:  We don't see anything.

MR. KAPLAN:  Mr. Chan, if you can publish it.

THE COURT:  It's published.

(Video played)

BY MR. KAPLAN:

Q    Is it fair to say the individual walking down the alleyway did not have anything in his right hand?

A    I'm sorry, could you play that again.  I didn't see it.

Q    Specifically if he had a glove or anything in his right hand.

N. LOCCISANO - CROSS - MR. KAPLAN                222

A     No, not that I can see.

Q     If I can ask the Government to pull up Government Exhibit 201 -- before 201, if you can pull up 204, go to 20:30.

        (Video played)

        Detective, while watching the Government exhibits can you look to see if the individual walking is wearing gloves in his hands?

A     Not that I can see.

        MR. KAPLAN:  One moment, your Honor.

        Anybody have a clearer view?  I'm trying to find the best way to show it to the detective.

        Can we try to again and go back to 20:45.

        (Video played)

BY MR. KAPLAN:

Q     Look again right about now when he takes his hand out. Can you see that the individual is wearing a glove on both hands?

A     It doesn't appear that he is.

Q     If we can pull up 201, go to 20:04:30.  In seeing that, can you see that the individual behind Mr. Khaled had something towards Mr. Khaled's back?

A     Can you play that again?

        (Video played)

Q     Could you see that the person right behind Mr. Khaled had something at his back?

                RIVKA TEICH, RPR, RMR, CRR
                  Official Court Reporter

N. LOCCISANO - CROSS - MR. KAPLAN          223

A     Didn't appear that he did.

MR. KAPLAN:  I think part of the problem is to play this video on the computer system we need a lower resolution.

THE COURT:  I was going to think that we're going to wrap for the day any way.  Do you want to wrap now and --

MR. KAPLAN:  Let's wrap now and fix the issue.

MR. WANG:  One timing consideration.  I understand that the witness has a personal obligation that may make it difficult for him to appear on Friday morning.  I don't know how much cross the other defense lawyers have, but if we're able to finish with him today, I think that would be optimal.

THE COURT:  All right.  I give you the option.  We can continue today, I might need a short break, I have a matter at 4:30, I will need to take ten minutes.  But you can spend that time working on the resolution.

MR. KAPLAN:  That's what I'll do.

THE COURT:  Let's take ten-minute break.

(Jury exits the courtroom.)

MR. WANG:  If the witness can be excused from the courtroom.

(Whereupon, the witness steps down.)

(Brief recess.)

(Jury enters the courtroom.)

THE COURT:  Everyone can be seated.

BY MR. KAPLAN:

N. LOCCISANO - CROSS - MR. KAPLAN                    224

Q    Welcome back, Detective.  You had testified that after December 10 you were no longer involved investigating this case, correct?

A    Yes.

Q    Was that because Special Agent Ford took over?

A    I don't know.  It wasn't my case to begin with, I was just assisting my partner.

Q    But you conducted an investigation on December 10 itself, correct?

A    Correct.

Q    You went to get surveillance, right?

A    Yes.

Q    You went to the hospital?

A    Yes.

Q    You spoke with the victim?

A    Yes.

Q    And as part of your investigation, did you note in your police file that the perpetrators were wearing masks and gloves?

A    I noted that they were covered up.

Q    Do you recall making any notation about gloves in your report?

A    Not that I recall, no.

Q    When you responded to the hospital and you spoke to Mr. Khaled, was he coherent?

N. LOCCISANO - CROSS - MR. HINE                    225

A     Yes.

Q     Was he answering all your questions?

A     Yes.

Q     Did he seem able to see out of both of his eyes?

A     That I don't recall.

Q     But you spoke to him for a while?

A     Yes.

Q     And you weren't able to tell if he had any issues with that?

A     No.

            MR. KAPLAN:  No further questions.

            THE COURT:  Any other questions?

            MR. HINE:  Briefly, your Honor.

CROSS-EXAMINATION

BY MR. HINE:

Q     Good afternoon, Detective.

A     Good afternoon.

Q     The Government played a couple of surveillance videos that you collected from 21-28 28 Street; is that correct?

A     Yes.

Q     In GX201 which I think is the first one that we looked at, I want to nail down some of the times that we saw on that video.  So the red van first appeared coming down the alley at approximately time stamp 19:36; is that right?

A     If that's the time you're saying, yes.

Q    And 19:36 would be in 12-hour time 7:36 p.m.; is that right?

A    Correct.

Q    And then I think the next time stamp we went to was about 19:47:50, does that sound right?

A    Yes.

Q    That would be about 7:48 p.m. in 12-hour time?

A    Correct.

Q    That was when someone wearing white shoes walked down the alley, right?

A    Correct.

Q    And then the last one that we saw was about 20:01 showing Mr. Khaled driving his Land Rover down the alley; is that right?

A    Correct.

Q    And 20:01 would be about 8:01 p.m. in 12-hour time, right?

A    That's correct.

            (Continued on next page.)

CROSS-EXAMINATION BY MR. HINE: (Continued.)

Q   So these three events, there's more after that, but just taking those first three events from 7:36 to 8:01 p.m., it's about 25 minutes elapsed over those three timestamps; is that right?

A   Give or take.

Q   Sorry to make you do math.

A   That's okay.

Q   You testified on direct that the red van that drove down the alleyway was a Chrysler Pacifica; is that right?

A   Correct.

Q   And as part of your investigation you created some wanted posters?

A   Correct.

Q   And one of those wanted posters was for this vehicle of interest, this red van?

A   Correct.

Q   And it said in the wanted poster specifically that you were looking for a Chrysler Pacifica?

A   That's correct.

Q   So you're certain that the van in question was a Chrysler Pacifica?

A   Based off badges and markings on the vehicle, yes.

Q   Thank you.  You also testified on direct that one of the investigative steps that you took was you ran the license

plate?

A    Correct.

Q    One of the ways that a license plate can be important in an investigation like this is, or one of the ways you can locate a license plate in an investigation, would be through a license plate reader; is that right?

A    That's correct.

Q    And sometimes a license plate reader is called an LPR?

A    That's correct.

Q    Did you get any LPRs back for this?

A    I believe we did.

Q    Do you recall what the LPR said or where it was located?

A    I believe it was on the George Washington Bridge.

Q    George Washington Bridge, so that would be headed, assuming it was leaving Manhattan, heading into New Jersey?

A    That's correct.

Q    Did you get any LPRs for this vehicle from New Jersey?

A    Not that I recall, no.

          MR. HINE:  Nothing further.  Thank you.

CROSS-EXAMINATION

BY MS. FERRANTE:

Q    Good afternoon.  I promise to be brief.

A    That's okay.

Q    Now, when you went to the hospital, Mr. Khaled was bruised, correct?

A    Correct.

Q    And he had some burns?

A    Correct.

Q    Fair to say he was bloody?

A    That's correct.

Q    Do you happen to recall if his eye was still swollen shut?

A    I know he had injuries to his face.

Q    When you questioned him, I'm assuming you spoke to him about what happened?

A    That's correct.

Q    And when he was responding to you, was he doing it with a soft voice?

A    Not that I recall.

Q    Did he seem upset?

A    He was very upset.

Q    How could you tell?

A    The tone of his voice.

Q    Could you be more specific?

A    He went through a traumatic event.  You could tell by the pitch in his voice that he was very upset about what happened.

Q    And when you spoke to him he still seemed upset at that point, correct?

A    That's correct.

Q    Now, as part of your investigation you speak to witnesses

Loccisano - Cross - Ms. Ferrante                    230

or the victim and you gather information?

A    That's correct.

Q    And the information that you gather leads you to your next investigative step?

A    Correct.

Q    So when you go speak to a victim and you ask them who did it, you get a description at the very least?

A    That's correct.

Q    And you also spoke to a different witness in this case, correct?

A    I believe I did, yes.

Q    It was someone who was present but not involved in the incident?

A    Correct.

Q    Merkisano, is that the name?

A    I don't recall.

Q    I might be melding your name and his.  Let's just verify. Marrigues?

A    Sounds familiar, yes.

Q    And you spoke to Marrigues because perhaps he would have seen something?

A    Correct.

Q    And at one point -- I'm sorry.  What is a DD-5?

A    It's where we type on ECMS of every step we take in the case.

Q    It's a police report, correct?

A    Correct.

Q    Now, detectives fill out DD-5s?

A    Correct.

Q    And when you went through the academy for training you learned how to fill out a police report?

A    That's correct.

Q    And, in fact, they taught you how to fill it accurately?

A    Correct.

Q    And they taught you that because at some point you may have to look at it again?

A    That's correct.

Q    You may have to be called to testify?

A    Correct.

Q    Did you happen to review your DD-5s before coming today?

A    I did.

Q    Fair to say you filled out DD-5 number five?

A    I wouldn't know the number off the top of my head.

Q    How many DD-5s would you say you filled out?

A    Less than ten.

Q    And you filled them out in this case accurately?

A    That's correct.

Q    Truthfully?

A    That's correct.

Q    If you received a description you would have taken that

description from whichever witness and put it out for the suspect to be sought?

A     Correct.

Q     And fair to say you received a description of gloves?

A     I honestly don't recall.

Q     Well, if you filled out DD-5s in this case, would anything refresh your recollection?

A     Yes, it would.

        MS. FERRANTE:  Judge, can I ask that the witness be shown this?  It's not marked.

        THE COURT:  So you're going to show it to him, right?

        MS. FERRANTE:  Yes, please.  Just the witness.

        THE COURT:  All right.

        MS. FERRANTE:  Can I walk up?  I'm just going to ask that you keep it to yourself.  Just let me know when you're done reviewing.

BY MS. FERRANTE:

A     Okay.

Q     Detective, the narrative portion, you reviewed it?

A     Yes.

Q     And you received a description of the perpetrators wearing masks and gloves?

A     That's correct.

Q     Going back to Marrigues, when you spoke to him, he could

Loccisano - Cross - Ms. Ferrante                    233

not ID anybody?

A    Correct.

            THE COURT:  Are you objecting or are you not?

            MR. WANG:  Objection.  Hearsay.

Q    I'll rephrase.  Did you receive a description specifically from Marrigues?

            THE COURT:  Sustained.

            MR. WANG:  Objection.

Q    Did you come to learn at any point the number of people you were to look for?

            THE COURT:  Sustained.

            MR. WANG:  Objection.  Based on hearsay.

            MS. FERRANTE:  Understood.  No further questions. Judge, can I get the paper?

            THE COURT:  Sure.  Any redirect?

            MR. WANG:  No, Your Honor.

            THE COURT:  Great.  So four minutes to spare, we're done for the day.  Thank you.  You're excused.  We're not sitting tomorrow because it's a federal holiday.  So we will be back on Friday.  We'll start at 10:00.

            Please come a few minutes early to get through security.  Please remember not to talk to anybody about the case, not to do any of your own research and make up your minds.  See you Friday.

            (Jury not present.)

Proceedings                                                    234

THE COURT:  Who do we have for Friday?

MR. DUGAN:  Well, we know one witness who is going to be testifying on Friday, Elizabeth Wheeler.  We have a couple other scheduling things we're working out.  We will let defense counsel and we can let the Court's deputy know tonight.

THE COURT:  All right.  Great.  Anything you all want to take up before we adjourn for day?

MR. GUADAGNINO:  Judge, I have two issues.  One involves the laptop.  It's my understanding that Mr. Bruce, Jarrett, cannot take it back with him.  It has to be sent by the government to MDC.  That's the first issue.

The second issue is that Mr. Jarrett Bruce is a Muslim and he needs a little time to pray on Fridays.  I believe it's between 1:00 p.m. and 1:30 p.m., and I think he needs his religious mat.

THE COURT:  Okay.

MR. GUADAGNINO:  I don't know if that's possible, but that's the requirement for the half hour.

THE COURT:  We can certainly take our lunch break at 1:00.  Let's plan to take our lunch break at 1:00, and that will allow time to accommodate the religious observance.  On the prayer mat, this is a mat that he has at the MDC?

MR. GUADAGNINO:  Yes, yes.

THE COURT:  Do you all have a -- I guess my

Proceedings                                             235

inclination would be it would be appropriate for Mr. Bruce to bring the mat with him when he comes to Court. I could issue an order to that effect.

MR. WANG: Your Honor, of course we wouldn't object. We'll pass it along to the MDC immediately.

THE COURT: I'll issue an order directing the MDC to permit Mr. Bruce to bring the mat with him to court on Friday. If the MDC comes back with some -- that's seems like the easiest way to get the mat here. So I'm hopeful that we'll not have any problems with that.

MR. GUADAGNINO: Thank you, Your Honor.

THE COURT: On the laptop, can you arrange for the laptop to be delivered to the MDC? I'm not sure there's a better option.

MR. DUGAN: Yes.

THE COURT: Great.

MR. KAPLAN: Judge, last point. Short of rewiring your entire courtroom, I'm going to work with the government to try to figure out a way to be able to display the videos with high resolution because the way it comes here it's not the same.

THE COURT: I can believe it. There will come a point in this trial where we will want jurors to have the opportunity to review exhibits that are in evidence. One way of doing that would be to put them on a laptop. So you all

Proceedings                                              236

might want to confer about doing that.  It's an issue that's going to come up later.  We can do it now and maybe that will make everyone's life easier.  See you on Friday.  Can you all be here at 9:45 in case anything comes up?

MR. DUGAN:  One more thing.  We have not received any exhibits, discovery, 3500 in advance of any witnesses for today.  We are going to continue to endeavor to provide a witness list two days in advance to defense counsel.

We'd ask that if they're going to be showing witnesses exhibits, that they identify those exhibits to us in advance.  And to the extent they intend to call witnesses at some point, that they produce exhibits and 3500 and identify those witnesses to us, as well.

THE COURT:  Yes.  I mean, I guess I'm sensitive to the idea of witnesses that are just being used to impeach a witness or just being used based on what the witness testifies to.  If you all are going to have your own set of exhibits, you should provide them to the government at some point.

Do you have a timetable for when you're thinking about that or all the exhibits you're thinking about at the moment are exhibits you're going to use with these witnesses?

MR. KAUFMAN:  We may have exhibits, at least from our perspective, they are things provided by the government in their exhibits and their 3500.  It's not anything that is not on their exhibits/3500 list.  If we realize that we're going

Proceedings                                                    237

to call a witness and put on exhibits that have not originated from the government, that certainly is something.

MR. WANG:  To clarify, Your Honor, I think the issue is not so much whether they want to use particular parts of government exhibits for discovery for refreshing, or even as lines of questioning for impeachment.  To the extent they actually want to admit certain excerpts from our records or discovery into evidence and they haven't been premarked or identified, some of these Cellebrites are long and voluminous and contain a lot of objectionable material.  So we're asking defense counsel at least mark anything they want to actually admit into the record.

THE COURT:  Is there anything you all have that is not on the government's exhibit list?

MS. FERRANTE:  No.

MR. KAUFMAN:  If there is, it would be like 3500, between those two.

THE COURT:  The one thing that I would like to avoid, if we can, is -- I think we avoided it today -- but if you were to have a witness on the stand and you have like 20 text exchanges or whatever, that we're going to have to go through one by one and talk about whether the hearsay exception applies.

I would love to do that outside the presence of the jury at lunch or at the beginning of the day or at the end of

Proceedings                                          238

the day.  So if you're going to have a bunch of exhibits like that where there's going to be an evidentiary discussion, I'm asking you, as we're all trying to keep this trial running efficiently, can you tee that up for me at the beginning of the day or at a break before the witness so we can handle that outside the presence of the jury?

MR. GUADAGNINO:  Absolutely.  Thank you, Judge.

THE COURT:  See you all on Friday.

(Proceedings adjourned until Friday, June 20, 2025 at 9:45 a.m.)

239

I N D E X

WITNESS                                                    PAGE


SHAON KHALED

DIRECT EXAMINATION BY MS. MICHELEN                          80

CROSS-EXAMINATION BY MS. FERRANTE                          121

CROSS-EXAMINATION BY MR. KAPLAN                            145

CROSS-EXAMINATION BY MR. KAUFMAN                           167

CROSS-EXAMINATION BY MR. VAN BUREN                         180

REDIRECT EXAMINATION BY MS. MICHELEN:                      181

RECROSS-EXAMINATION BY MR. KAPLAN                          188

RECROSS-EXAMINATION BY MR. VAN BUREN                       189

ALLISON LOCKWOOD

DIRECT EXAMINATION BY MR. WANG                             191

CROSS-EXAMINATION BY MR. KAPLAN                            198

CROSS-EXAMINATION BY MR. KAUFMAN                           199

CROSS-EXAMINATION BY MS. FERRANTE                          201

NICHOLAS LOCCISANO

DIRECT EXAMINATION BY MR. WANG                             202

CROSS-EXAMINATION BY MR. KAPLAN                            219

CROSS-EXAMINATION BY MR. HINE                              225

CROSS-EXAMINATION BY MS. FERRANTE                          228

240

# E X H I B I T S

Government's Exhibit 1201                             79

Government's Exhibit 163                             106

Government's Exhibit 164                             109

Government's Exhibit 158A                            111

Government's Exhibit 157A                            112

Government's Exhibit 13                              186

Government's Exhibit 302                             193

Government's Exhibits 301-A through 301-H            195

Government's Exhibit 401                             204

Government's Exhibits 201 through 206                207

Government's Exhibit 201-A                           212