1277

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,          )
                                   )  23-CR-292 (RPK)
                   Government,     )
                                   )
          vs.                      )
                                   )
     (1) LESLY VALENTIN,           )
     (2) JARRETT BRUCE,            )  Brooklyn, New York
     (3) AASIM BOONE, and          )  June 27, 2025
     (4) GREGORY BRUCE,            )
                                   )
                   Defendants.     )
_____

TRANSCRIPT OF CRIMINAL JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE RACHEL P. KOVNER and a JURY
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Government: JOSEPH NOCELLA, JR., ESQ.
                    Acting United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY: JOSHUA BUCHANAN DUGAN, ESQ.
                    ANDREW D. WANG, ESQ.
                    LORENA MICHELEN, ESQ.
                    Assistant United States Attorneys


For Defendant             GARY M. KAUFMAN, ESQ.
(1) Lesly Valentin:       Law Office of Gary Kaufmann, PLLC
                          377 Broadway, 8th Floor
                          New York, New York  10013


          (Appearances continued on the next page.)

Court Reporter, STACY A. MACE, RMR, CRR, RPR
225 Cadman Plaza East / Brooklyn, NY 11201
smacerpr@gmail.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

1278

APPEARANCES:   (Cont'd)


For Defendant               NICHOLAS HINE, ESQ.
(1) Lesly Valentin:         Hine Law PLLC
                            PO Box 170096
                            Brooklyn, New York   11217


For Defendant               PETER J. GUADAGNINO, ESQ.
(2) Jarrett Bruce:          30 Wall Street, 8th Floor
                            New York, New York   10005

                                    -and-

                            ANDREA FERRANTE, ESQ.
                            404 Manor Road
                            Staten Island, New York   10314


For Defendant               JACOB KAPLAN, ESQ.
(3) Aasim Boone:            DAVID GELFAND, ESQ.
                            Agnifilo Intrater LLP
                            445 Park Avenue, 7th Floor
                            New York, New York   10022


For Defendant               PHILLIP C. HAMILTON, ESQ.
(4) Gregory Bruce:          ETHAN VAN BUREN, ESQ.
                            Hamilton Clarke, LLP
                            48 Wall Street, Suite 1100
                            New York, New York   10005


Court Reporter:  Stacy A. Mace, RMR, CRR, RPR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.


                            ooo0ooo

(In open court - jury not present.)

(Defendants entered the courtroom.)

THE COURTROOM DEPUTY:  All rise.

(Judge RACHEL P. KOVNER entered the courtroom.)

THE COURT:  Good afternoon.  Everybody can be seated.

THE COURTROOM DEPUTY:  United States of America versus Lesly Valentin, Jarrett Bruce, Aasim Boone and Gregory Bruce.

Counsel, please state your name for the record.

MR. WANG:  Good afternoon, Your Honor.

For the United States, the same appearances.

THE COURT:  Good afternoon.

MR. VAN BUREN:  Good afternoon, Your Honor.

For the defense, the same appearances.  Everybody is present at counsel table.

THE COURT:  Great.  And I understand we just got our last juror.

Did you have a limiting instruction you wanted to give me on this?

MR. KAPLAN:  So I sent a proposed limiting instruction to the Government.  I didn't hear back.

Did you have any --

THE COURT:  Do you want to read it to me?

MR. KAPLAN:  Yes, Your Honor.  Hold on.

You are about to hear evidence that in January of 2023, Aasim Boone and Jarrett Bruce allegedly committed a crime relating to an entity called POFI Construction. Mr. Boone and Mr. Jarrett Bruce have not been arrested or charged with any crimes related to POFI Construction.  These allegations, themselves, are not the basis for the federal crimes charged in this case.

Evidence about these allegations are being offered by the Government on the theory that it's relevant to show the relationships between -- excuse me -- relationship between Aasim Boone and Jarrett Bruce.

It will be improper for you to infer that Aasim Boone and Jarrett Bruce committed the federal crimes charged in this case because of the allegations concerning POFI Construction.

THE COURT:  Any objections to that instruction?

MR. WANG:  No objection, Your Honor.

THE COURT:  Can you --

MR. KAPLAN:  I'll e-mail it.

THE COURT:  That would be great.

MR. KAPLAN:  I'll e-mail it to the Court and everyone.

THE COURT:  Perfect.

All right.  I think we can get the jurors.

THE COURTROOM DEPUTY:  All right, Judge.

MR. DUGAN:  Do you want the witness on the stand, Your Honor?

THE COURT:  Yes.

(Witness entered and resumed the stand.)

(Pause.)

THE COURT:  Are you going to go into that evidence right away, like I should give the instruction now or you'll give me a high sign?

MR. DUGAN:  Give you a what sign -- I am not going to go into it right away.

THE COURT:  So just when you are going to, let me know.

MR. DUGAN:  Yes.

THE COURTROOM DEPUTY:  Jurors entering.

(Jury enters.)

THE COURT:  Okay.  Everybody can be seated.

Welcome back.  And I think we're ready to resume the direct.

THE COURTROOM DEPUTY:  Detective, you're still under oath.

THE WITNESS:  Yes.

(Continued on the following page.)

**CRISTOFER SCHIAVONE**,

　　　previously called as a witness by the Government, having

　　　been duly sworn/affirmed by the Courtroom Deputy, was

　　　examined and testified further as follows:

DIRECT EXAMINATION (Continues)

BY MR. DUGAN:

Q　　Good afternoon, Detective.

A　　Good afternoon.

Q　　When we broke yesterday, we were talking about the execution of a search warrant that you participated in involving Gregory Bruce's phone?

A　　Yes.

Q　　Can you just remind us what happened when you executed that search warrant?

A　　We had a brief conversation with Mr. Bruce.  We explained to him why we were taking his phone.  He provided information to us with regard to a random phone call that he received and text messages with instructions, and that he deleted those messages.

Q　　And what did he say about the phone call and the text message?

A　　He just said he received a random phone call with instructions to contact Homeboy, I believe.  And then he deleted those messages.

Q　　Did he give a specific name?

A    No.

Q    And prior to that, we had listened to a phone call between Gregory Bruce and Jarrett Bruce.

     Do you remember that?

A    I do.

Q    And do you recall a reference to Homeboy during that phone call?

A    I do.

Q    Was -- based on having listened to that phone call, was what Gregory Bruce told you consistent with that phone call?

     MR. HAMILTON:  Objection.

     THE COURT:  Overruled.

A    Yes, to parts of it.

Q    How so, can you explain?

A    He did -- we know that he received a phone call.  It did mention Homeboy.  And he did delete those messages.

     MR. HAMILTON:  Your Honor, objection, with respect to that last portion concerning deletion, it's non-responsive.

     THE COURT:  Overruled.

     MR. HAMILTON:  Every time --

     THE COURT:  Overruled.

     MR. HAMILTON:  -- that it's been testified to.

BY MR. DUGAN:

Q    To be clear, who was that phone call between, the phone call that you listened to?

A    It was between Jarrett Bruce and Gregory Bruce.

Q    Okay.  When we broke, we were also looking at certain messages that were recovered on Gregory Bruce's phone.

Do you remember that?

A    I do.

MR. DUGAN:  Continuing with that, I'd like to show the witness only what has been marked as Government Exhibit 152.

And if we could zoom in.  And scroll down.

BY MR. DUGAN:

Q    And, Detective Schiavone, do you recognize what's been marked as Government Exhibit 152?

A    I do.

Q    What is Government Exhibit 152?

A    It's a Cellebrite extraction report from Gregory Bruce's phone, messages.

MR. DUGAN:  And can we scroll back up, please?

And the Government moves to admit Government Exhibit 152 into evidence.

THE COURT:  Admitted.

(Government's Exhibit 152 was received in evidence.)

MR. DUGAN:  Please publish, Mr. Chan.

(Exhibit published.)

Q    And, Detective Schiavone, who are these messages between?

A    Gregory Bruce and a number ending in 7 -- 7413.

Q    And the contact name associated with it?

A    Janae.

MR. DUGAN:  And can we scroll down to February 7th?

(Exhibit published.)

MR. DUGAN:  A little bit further.  And a little bit further down.  And one more down to the next blue one.  Okay.

BY MR. DUGAN:

Q    And, Detective Schiavone, can you see what that message says?

A    Yes.

Q    What does that message say?

A    It says:  Inf said to fall back off the situation with Lil' Bro.

Q    And who sent and received that message?

A    It was sent from 7413, which was Janae to Gregory Bruce.

Q    And what was the date of it?

A    February 7th, 2024.

Q    And do you see an icon above the "from"?

A    I do.

Q    Above the "from" line there.

A    Yes.

Q    And what's that icon?

A    It's a trash can.

Q    And under MDC, a notation for deletion date?

A    Yes.

Q    And what was the deletion date there?

A    February -- February 11th, 2024.

Q    And what was the message deleted reason?

A    User deleted.

MR. DUGAN:  We can take this down, please.

Q    Did you listen to phone calls from Jarrett Bruce's recorded jail line from after February 7th of 2024?

A    Yes.

Q    Were you able to determine who was making those calls?

A    Yes.

Q    Who was -- well, were you able to tell whether Jarrett Bruce was making those calls?

A    Yes.

Q    What did you determine?

A    That the person making those phone calls were not Jarrett Bruce.

Q    After February 7th?

A    Correct.

Q    I want to go back now to Aasim Boone.

And we spoke about the post-arrest interview that you conducted with him?

A    Yes.

Q    And I just want to show you first what's been marked as Government Exhibit 1 -- sorry, Government Exhibit 2.

THE COURTROOM DEPUTY:  Mr. Dugan, publish this or

not?

MR. DUGAN:  Not yet.

THE COURTROOM DEPUTY:  Okay.

BY MR. DUGAN:

Q    And, Detective Schiavone, do you recognize Government Exhibit 2?

A    I do.

Q    What's Government Exhibit 2?

A    It's a photo of Aasim Boone.

MR. DUGAN:  Government moves to admit Government Exhibit 2 into evidence.

THE COURT:  Admitted.

(Government's Exhibit 2 was received in evidence.)

MR. DUGAN:  And we can publish.

May we publish, please, Mr. Chan?

(Exhibit published.)

MR. DUGAN:  And we can take it down.

BY MR. DUGAN:

Q    We also spoke yesterday about Aasim Boone's iCloud account?

A    Yes.

Q    And we spoke about a phone of his that ended in 9299?

A    Yes.

Q    Did you attempt to locate the phone that ended in 9299?

A    Yes.

Q    Were you able to do so?

A    No.

Q    Yesterday we introduced as evidence, but did not listen to, what has been in evidence as Government Exhibit 5481.  And I'd like to listen to that now.

        MR. DUGAN:  And so, maybe give people a moment. It's in -- it's a listening aid in the binder.

        (Pause.)

        MR. DUGAN:  I think we can play it now.

        (Audio recording played.) (Audio recording stopped.)

Q    Detective Schiavone, do you recognize -- do you recognize the voices on that portion of the call?

A    Yes.

Q    Whose voices were they?

A    Ms. Sampson and Mr. Boone.

Q    Ms. Sampson, being Charle Sampson?

A    Correct.

Q    In connection with this investigation, did you review video -- we're changing gears here -- did you review video from the crime scene?

A    Yes.

Q    Did you review video of Shaon Khaled being abducted?

A    Yes.

Q    And as part of reviewing that video, did you do anything to enhance that video?

A    Yes.

Q    What did you do?

A    I zoomed in.

Q    Okay.  And did you create a clip -- did you create an excerpt of that video that's zoomed in?

A    Yes.

MR. DUGAN:  I'd like to show the witness what's at Government Exhibit 201-I.  And we could pause it there.

BY MR. DUGAN:

Q    And just for purposes of identification, Detective Schiavone, from the portion that's played, do you recognize this video?

A    I do.

Q    What is this video?

A    It's the video of the abduction.

Q    And does this portion also have another portion of the video in it as well?

A    Yes.

Q    Okay.

MR. DUGAN:  Could we start at the beginning?

And the Government moves to introduce Government Exhibit 201-I.

THE COURT:  Admitted.

(Government's Exhibit 201-I was received in evidence.)

MR. DUGAN:  And, Mr. Chan, may we publish?

And would it be okay to dim the lights just very briefly?

We can play.

(Video played.)  (Video stopped.)

MR. DUGAN:  And we can take this down and we being put the lights back on.

BY MR. DUGAN:

Q    Detective Schiavone, you've spent time with Shaon Khaled?

A    Yes.

Q    Do you have a sense, from spending time with him do you have a sense of approximately how tall he is?

A    About 5-9.

Q    Were you able to tell from the portion of the video that we showed how tall the individual in the white sneakers was compared to Shaon Khaled?

A    He was taller.

Q    And were you able to tell how tall he was as compared to any other items in the video or any other points of reference in the video?

A    Yeah, he was taller than the minivan.

MR. DUGAN:  Your Honor, at this time it might be a good time to address what we had been discussing.

THE COURT:  Sure.

Okay.  So you are about to hear evidence that in

January of 2023, Aasim Boone and Jarrett Bruce allegedly committed a crime relating to an entity called POFI Construction.  Mr. Boone and Mr. Jarrett Bruce have not been arrested or charged with any crimes relating to POFI Construction.  These allegations, themselves, are not the basis for the federal crimes charged in this case.

Evidence about these allegations is being offered by the Government on the theory that its's relevant to show the relationship between Aasim Boone and Jarrett Bruce.

It will be improper for you to infer that Aasim Boone and Jarrett Bruce committed the federal crimes charged in this case because of the allegations concerning POFI Construction.

BY MR. DUGAN:

Q    So now we're going to switch gears and talk about POFI or POFI Construction.

Did you -- while reviewing evidence on or reviewing information, I should say, on Aasim Boone's iCloud account, did you find information about an entity known as POFI Construction?

A    Yes.

Q    And did you, in reviewing information on Jarrett Bruce's -- on Jarrett Bruce's iCloud account, did you also find information about POFI or POFI Construction?

A    Yes.

Q    And did you investigate whether either of them had a relationship with POFI Construction?

A    Yes.

Q    What did you determine based on that investigation?

A    Neither of them had any affiliation with that company.

Q    And I'd like to show you what's been marked first as Government Exhibit 122B.

MR. DUGAN:  And if we can pull up next to it also 122C.

BY MR. DUGAN:

Q    And, Detective Schiavone, do you recognize Government Exhibit 122B?

A    Yes.

Q    Do you recognize Government Exhibit 122C?

A    I do.

Q    Okay.  And what are these?  What are these -- what are these?

A    One is a e-mail and one is an application.

MR. DUGAN:  The Government moves to admit Government Exhibit 122B and 122C into evidence.

THE COURT:  Admitted.

(Government's Exhibits 122B and 122C were received in evidence.)

MR. DUGAN:  And may we publish, please?

And can we look first at 122B because I think it's a

little hard to see both at the same time.

(Exhibit published.)

BY MR. DUGAN:

Q    And, Detective Schiavone, what's Government Exhibit 122B?

A    It's an image of an e-mail.

Q    And who is the e-mail from and who is it to?

A    It's from simb110282@icloud.com to a representative of Chase Bank.

Q    What's the subject?

A    Aasim Boone.

Q    And it has two attachments?

A    Yes.

Q    And what does it say in the body of the e-mail?

A    Good morning, attached are the documents that were requested.  Thank you for your time.

MR. DUGAN:  Can we take this down and now show 122C. And maybe you can zoom in a little.

Q    And can you describe what Government Exhibit 122C is?

A    It's a certificate of a company.

Q    A certificate of -- sorry, a certificate of what?

A    For a company.

Q    Okay.  A certificate of incorporation?

A    Correct.

Q    And what's the com -- or what the name of the company?

A    POFI or POFI Construction Corp.

Q     And what's the date of incorporation?

A     January 1st, 2023.

Q     And does it give -- under "registered agent" what does it say?

A     Aasim Boone.

        MR. DUGAN:  We can take this down.

        And can we now pull up, for the witness only, what has been marked as Government Exhibit 1001.  And can we scroll to page 54 -- or actually first, 51.  If we could scroll through pages 51 through 54.

BY MR. DUGAN:

Q     And, Detective Schiavone, do you recognize the portions of Government Exhibit 1001 that we just looked at?

A     Yes.

Q     What is Government Exhibit 1001?

A     It's a Chase account record.

Q     And who's it for?

A     It's for the business POFI Construction, and the name on is it Aasim Lamont Boone.

        MR. DUGAN:  Government moves to admit Government Exhibit 1001 into evidence.

        THE COURT:  Admitted.

        (Government's Exhibit 1001 was received in evidence.)

        MR. DUGAN:  May we please publish?

            (Exhibit published.)

            MR. DUGAN:  And if we could go -- yes, if we could start here.

BY MR. DUGAN:

Q    What do you -- what do you see here, Detective Schiavone?

A    Basic account information, along with personal information.

Q    And what's the -- what's the business address there?

A    It's 26 Bruckner Boulevard in the Bronx.

Q    And what's the -- what's the name given at the bottom?

A    Aasim Lamont Boone.

Q    And what's the title given there?

A    President.

            MR. DUGAN:  And if we could go to page 54 of these records.

            MR. ROBERTS:  That is page 54.

            MR. DUGAN:  Sorry.  If we could go to 51 and if we could zoom in.

            (Exhibit published.)

Q    And, Detective Schiavone, what is this?

A    It's an image of a check.

Q    And who is the check made out from and who is it to?

A    It's from Long Island University to POFI Construction Corp.

Q    And what's the amount?

A    $503,949.15.

Q    And what's the date?

A    December 22nd, 2022.

    MR. DUGAN:  And can we go to page 52, please.

    (Exhibit published.)

BY MR. DUGAN:

Q    And what's this?

A    It's an image of a check.

Q    And who is it -- what are the names on the check?

A    It's from POFI Construction Corp. to Aasim Boone.

Q    And how much is it?

A    $800.

    MR. DUGAN:  And can we look at 53, please?

    (Exhibit published.)

Q    And what's this?

A    It's another image of a check.

Q    Okay.  And who is it made out to and from?

A    It's from POFI Construction Corp.

Q    How much?

A    To Aasim Boone.

Q    Sorry.

A    In the amount of $1,058.

Q    And what are the digits, I guess the last four digits on that account number?

A    0660.

MR. DUGAN:  And can we look at 53, please.

MR. ROBERTS:  This is.

MR. DUGAN:  Sorry.

Can we look at 46, please?

(Exhibit published.)

MR. DUGAN:  And zoom in.

BY MR. DUGAN:

Q    And, Detective Schiavone, can you describe what this is?

A    It's a Chase statement.

Q    And for what account?

A    For the POFI Construction Corp. ending in 0660.

Q    And the name associated with the account?

A    It's POFI Construction Corp.

Q    And if we scroll down, under Deposits and Additions, what does it say?

A    It's $504,049.15.

Q    And I guess the first line item, that first deposit is how much?

A    With regards to the one dated January 1st --

Q    Yes.

A    -- January 3rd?

Q    Yes.

A    My apologies.  $503,949.15.

Q    And what does that amount correspond to?

A    That was the same amount that was on the check issued

from Long Island University to POFI Construction Corp.

Q    And scroll down to Withdrawals, Other Withdrawals.

     The first line item, what does it say?

A    It's $503,949.15.

Q    And what's the date on that?

A    January 13th.

     MR. DUGAN:  Okay.  We can take this down.

BY MR. DUGAN:

Q    And did you, in addition to the information that we saw, did you find information relating to POFI Construction on Jarrett Bruce's iCloud account?

A    Yes.

     MR. DUGAN:  One moment, please.

     (Pause.)

     MR. DUGAN:  May we please pull up, for the witness only, what's been marked as Government Exhibit 148 and 148A?

Q    Detective Schiavone, what are Government Exhibits 148 and 148A?

A    It's a Cellebrite extraction report from an iCloud account and a picture.

     MR. DUGAN:  The Government moves to admit Government Exhibit 148 and 148A into evidence.

     THE COURT:  Admitted.

     (Government's Exhibits 148 and 148A were received in evidence.)

MR. DUGAN:  And may we please publish?

(Exhibit published.)

BY MR. DUGAN:

Q    And starting with 148, the metadata, what -- what do you see from that?

A    It was captured from an iPhone on January 3rd, 2023 at 3:12 p.m.

Q    And what's the source, what information do you have from the source file?

A    It says iCloud library.

Q    And associated, what -- is there an account associated with it?

MR. DUGAN:  We can zoom in.

A    Yes.  It says Jarrett Bruce.

Q    And what is -- if you look over at 148A, what does the picture show?

A    It's a deposit receipt.

Q    From what -- from what?

A    I'm sorry.  It's a Chase deposit receipt for the amount of $503,949.15.

Q    And what's the date on that?

A    It's dated January 12th, 2023.

Q    And can you see the last four digits of the account number?

MR. DUGAN:  If we could zoom in there.

Schiavone - direct - Dugan                                        1300

A     Yes.  It's 0660.

Q     And --

          MR. DUGAN:  We can take this down.  Thank you.

Q     -- in connection with this investigation, did you review or do you know whether Jarrett Bruce gave a statement after he was arrested?

A     Yes.

Q     Have you reviewed that statement?

A     I have.

          MR. DUGAN:  And the Government moves to admit Government Exhibits 237, 237 -- the Government moves to admit Government Exhibit 237-I, Government Exhibit 237-II, and Government Exhibit 237-III into evidence.

          THE COURT:  Admitted.

          (Government's Exhibits 237-I, 237-II, and 237-III were received in evidence.)

          MR. DUGAN:  And can we pull those up, please?

          And, Mr. Chan, may we publish?

          (Exhibit published.)

          MR. DUGAN:  And let's play 237-I, II and III back to back.

          (Video played.)  (Video stopped.)

          MR. DUGAN:  And 237-II.

          (Video played.)  (Video stopped.)

          MR. DUGAN:  And 237-III.

(Video played.)  (Video stopped.)

MR. DUGAN:  And we can take this down.

BY MR. DUGAN:

Q    And just so the record is clear, Detective Schiavone, did you recognize the people in that video?

A    Yes.

Q    Who are the people in that video?

A    It's Detective McCann, Special Agent Ford, and Jarrett Bruce.

Q    As part of your involvement in this investigation, at some point did you review material from a phone that was obtained from the Metropolitan Detention Center in Brooklyn?

A    Yes.

Q    I'd like to discuss that with you now.

MR. DUGAN:  Can we please pull up for the witness what's been marked as Government Exhibit 155, and scroll down.

Q    And, Detective Schiavone, do you recognize what's been marked as Government Exhibit 155?

A    Yes.

Q    And what is Government Exhibit 155?

A    It's a Cellebrite extraction report.

Q    And is that a Cellebrite extraction report from the phone we were just discussing?

A    Correct.

MR. DUGAN:  The Government moves to admit Government

Exhibit 155 into evidence.

THE COURT:  Admitted.

(Government's Exhibit 155 was received in evidence.)

MR. DUGAN:  May we publish, please?

(Exhibit published.)

BY MR. DUGAN:

Q    And, Detective Schiavone, can you just read the first green message there?

A    Hey, this Inf.  You can send and address the paper work.

Q    And based on your involvement in this investigation, do you have an understanding who "Inf" is?

A    Yes.

Q    Who is "Inf"?

A    Jarrett Bruce.

MR. DUGAN:  We can take this down.

May we please show the witness what has been marked as Government Exhibit 156, and scroll in -- down.  We can -- not this.

Can we show 159, I'm sorry.  And can we scroll in.

Q    And, Detective Schiavone, do you recognize this?

A    I do.

MR. DUGAN:  And do we have 159A also?

And can we pull 159A, as well, for the witness.

Q    And do you recognize both 159 and 159A?

A    Yes.

Q    What are these?

A    It's a Cellebrite extraction report of an image.

Q    And where is it from?

A    With regard -- the source?

Q    Yes.  Is it the same phone we've been discussing?

A    Yes.

        MR. DUGAN:  The Government moves to admit Government Exhibit 159 and 159A.

        THE COURT:  Admitted.

        (Government's Exhibits 159 and 159A were received in evidence.)

        MR. DUGAN:  May we publish, please?

        (Exhibit published.)

BY MR. DUGAN:

Q    And, Detective Schiavone, do you recognize the person in this image?

A    I do.

Q    Who is that person?

A    It's Jarrett Bruce.

Q    And based on this information, as well as the other information you reviewed on the phone, did you determine -- did you -- did you determine who was using that phone?

A    Yes.

Q    Who was using the phone?

A    Jarrett Bruce.

MR. DUGAN:  And may we please show what is already in evidence at Government Exhibit -- actually one moment, please.

(Pause.)

MR. DUGAN:  And may we please show the witness, the witness only, Government Exhibit 157 and 157A.

Actually, first, can we show the witness first 158 and 158A.

BY MR. DUGAN:

Q   And, Government Exhibit 158A is already in evidence, but, Detective Schiavone, do you recognize Government Exhibit 158 and 158A?

A   Yes.

Q   What is it?

A   It's --

Q   Or what are they?

A   It's a Cellebrite extraction report from the phone we've been discussing, and it's an image.

MR. DUGAN:  The Government moves to admit Government Exhibit 158 and to publish both Government Exhibit 158 and 158A.

THE COURT:  Admitted.

(Government's Exhibit 158 was received in evidence.)

MR. DUGAN:  And may we publish, Mr. Chan?

THE COURTROOM DEPUTY:  Okay.

(Exhibit published.)

BY MR. DUGAN:

Q    And do you recognize who is in this image?

A    I do.

Q    Who is in this image?

A    It's the victim and Jarrett Bruce.

Q    And which one is the victim?

A    He's in the middle with the necklace.

Q    Sorry.  And can you tell from looking at Government Exhibit 158, the metadata -- what can you tell from looking at the metadata?

A    It was modified September 27th, 2024.

Q    And at what time?

A    9:51.

Q    And can you see what the source file is?

A    It's in a Google Android photo apps.

Q    Photo app.

        MR. DUGAN:  And we can take this down.

        And can we show the witness only what has been marked as Government Exhibit 157 and 157A.

Q    And, Detective Schiavone, what's -- what are Government Exhibit 157 and 157A?

A    It's a Cellebrite extraction report of a picture.

Q    And is it from the same phone we've been discussing?

A    Yes.

MR. DUGAN:  The Government moves to admit Government Exhibit 157 and 157A into evidence.

THE COURT:  Admitted.

(Government's Exhibits 157 and 157A were received in evidence.)

MR. DUGAN:  May we publish, please?

(Exhibit published.)

BY MR. DUGAN:

Q    And, Detective Schiavone, what is Government Exhibit 157A?

A    It's a cropped image of the picture we just saw before.

Q    And looking at Government Exhibit 157, what are you able to tell about it from the metadata?

A    It was modified on September 27th, 2024 at 9:51.

MR. DUGAN:  And can we pull --

Q    And where is the source location?

A    The same location, Google Android photos.

MR. DUGAN:  And can we pull up Government -- could we take down Government Exhibit 157A and pull up Government Exhibit 158.

(Exhibit published.)

MR. DUGAN:  And can we scroll in just to -- yes, scroll in to both.

Q    And at the modified -- at the modified time, what is the time -- can you -- what is the time -- what is the modified

time in relation to 157 and 157A?

A    A few seconds.

MR. DUGAN:  One moment.

(Pause.)

MR. DUGAN:  Nothing further.

THE COURT:  Cross.

CROSS-EXAMINATION

BY MR. KAUFMAN:

Q    Good afternoon, Detective.

A    Good afternoon.

Q    You are a detective with the NYPD, right?

A    Correct.

Q    You are not an FBI special agent, right?

A    Correct.

Q    You, however, do work on federal cases, right?

A    I do.

Q    And that's as part of the Violent Crime Task Force, right?

A    Correct.

Q    That's where NYPD detectives work under federal agents to bring federal cases, right?

A    Yes.

Q    Right.  The federal agent is ultimately in charge of the investigation, right?

A    It's -- I'd say it's dual.

Q    Well, the federal agent is the person called the case agent, correct?

A    Correct.

Q    Right.  As an NYPD detective, you're never the case agent, correct?

A    Co-case.

Q    But case agent has the term "agent" in it, right?

A    Correct.

Q    Usually, it is an FBI special agent who is the case agent, correct?

A    For the FBI side of the case, yes.

Q    Right.  And the case agent in this case is FBI Special Agent Tom Ford, right?

A    Yes.

Q    Who is sitting right there, right?

A    Correct.

Q    It's not you, right?

A    I'm not a special agent.

Q    Right.  And you're not the case agent on this case, correct?

A    I'm an investigator for the NYPD side.

Q    Working for Agent Ford on this case?

A    Right.

Q    You're the one testifying today, right?

A    Correct.

Q    Not Agent Ford, right?

A    Yes.

Q    You got involved in the investigation into the kidnapping of Shaon Khaled on December 10th, 2025, correct?

A    I believe we were notified that -- yeah, that day.  That day.

Q    That's a day after it happened, correct?

A    Correct.

Q    Right.  And that was when the Joint Task Force took over, correct?

A    Yes.

Q    Right.  Under -- under Agent Ford, right?

A    The both of us.

Q    Right.  Agent Ford was there from the beginning, right?

A    Correct.

Q    Right.  And the following day on the 11th, you were given several items related to the case, correct?

A    Which items were those?

Q    You were given a cell phone, correct?

A    Okay, yes.

Q    Right.  And you learned that that phone belonged to Shaon Khaled, right?

A    Yes.

Q    Right.  And that phone was recovered from the ground where he was kidnapped, right?

A    Yes.

Q    Right.  It was dropped during the kidnapping, right?

A    Correct.

Q    Right.  In front of the kidnappers, right?

A    Yes.

Q    And you were given Mr. Khaled's clothing, correct?

A    Yes.

Q    Right.  Did you submit the clothing for DNA testing?

A    I did not.

Q    No.  Did anyone on your team?

A    I don't believe so.

Q    Okay.  You were, however, given some DNA swabs from the scene, right?

A    If you've got something to reference, I'll --

Q    Sure.

         MR. KAUFMAN:  If you could put up for the witness only, it's CF-9, page 64.


         (Continued on the following page.)

SCHIAVONE - CROSS - MR. KAUFMAN

1311

(Continuing.)

MR. KAUFMAN:  It's top -- if you could zoom in on the top.

Q   On December 11th, you were given DNA swabs from the scene, correct?

A   Yes.

Q   And those were from are wooden sticks that Mr. Khaled was hit with when he was taken, correct?

A   Correct.

Q   And it was also from a bag that was dropped at the scene, correct?

A   I believe so.

Q   Right.

    And you submitted these swabs for DNA testing, correct?

A   I did not.

Q   They were submitted for DNA testing, correct?

A   Correct.

Q   Right.

    And they did not return DNA for Lesly Valentin, right?

A   No.

Q   They did not return DNA for anyone sitting over at that table, correct?

A   Correct.

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

SCHIAVONE - CROSS - MR. KAUFMAN

1312

Q    When you got involved, you -- and I believe you testified to this on direct -- you reviewed New Jersey LPR requests for XGG -- XGZF36, correct?

A    Repeat the question.

Q    When you got involved, there was already a New Jersey LPR request out for the license plate from the Chrysler Pacifica that night, correct?

A    The detective squad already had done that.

Q    That was already taken care of before you got there, right?

A    Yes.

Q    But you never got any results for that vehicle in New Jersey, correct?

A    No.

Q    Right.

And as you stated before, you were given the cell phone that belonged to Mr. Khaled, right?

A    Yes.

Q    And I believe you said you kept it then in your office, right?

A    Correct.

Q    Right.

And this, as we said before, was the cell phone recovered from the crime scene, correct?

A    Correct.

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

Q    The one that was dropped by Mr. Khaled?

A    Yes.

Q    Right.

And you had this phone on December 12th, 2022, when it start receiving messages, correct?

A    Correct.

Q    Messages from a number that was (732)456-9980, correct?

A    Yes.

Q    And it received those messages between 6:48 and 8:15 p.m. on December 12th, correct?

A    Yes.

Q    Right.

But you didn't see the messages until 8:56 a.m. the following day, correct?

A    Correct.

Q    That was on the 13th, right?

A    Yes.

Q    But --

MR. KAUFMAN:  If we could put up GX 162, already in evidence, so this would be published.  Can we zoom in a little bit.

Q    And when you saw this, you saw that the first message said to let the sender know when you are ready for a drop location, correct?

A    Correct.

Q    Right.

And that message was sent at 6:48 p.m., correct?

A    Correct.

Q    And the next message said if they didn't have the demand in one hour, that person was -- Mr. Khaled was going to be in jeopardy, correct?

A    Yes.

Q    Right.

And that was sent on -- at 7:02 p.m. on December 12th, right?

A    Correct.

Q    Once again, you didn't see this, right, because it wasn't read until 8:56 the next morning, correct?

A    Correct.

Q    Nothing happened to Mr. Khaled the night of December 12th, correct?

A    Thankfully not.

Q    Now, 40 minutes after you got these texts at 8:56 in the morning, your team began interacting with the person sending the texts, correct?

A    Yes.

Q    Was that -- you said it was not you who was doing that?

A    Not me.

Q    Was it Agent Ford?

A    No.

SCHIAVONE - CROSS - MR. KAUFMAN

1315

Q    Who was it?

A    It was another agent from the FBI.

Q    Which agent?

A    I don't remember his name.

Q    But you were there?

A    I wasn't with them, no.

Q    You were part of the discussion?

A    Yes.

Q    You knew it was happening while it was happening?

A    Correct.

        MR. KAUFMAN:  If we could scroll up.

Q    And so your team -- it was your team doing it, someone working with your team, correct?

A    Another agent, yes.

Q    And they were pretending to be the person who went by the name Stiky1, right?

A    I think that's what the victim has on his phone.

Q    Right.

        The person with the number, the 0431, correct?

A    The victim's phone, yes.

Q    And the first thing --

        MR. KAUFMAN:  If we could scroll up.  Up.  The other up.  Yup.

        If we could switch it to Mr. Hine.  Sorry.  Cross-communication.  All right.  All right.  Perfect.  And

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

thank you, Mr. Roberts, for trying.

Q    The response was from your team was, how do I even know it's you, right?

A    Yes.

Q    And it made sense to text that, right?

A    Yes.

Q    That was thought out, right?  Because you couldn't be sure that the person sending the text was actually connected to the kidnapping, correct?

A    I mean, it's possible.

Q    And before doing that, at this point, you hadn't ruled out all of the people who might want to harm Shawn Khaled, correct?

A    Correct.

Q    You hadn't conducted any investigation into his enemies, correct?

A    I mean, it was still in the early stages of the investigation.

Q    Right.
     You did at some point learn that Mr. Khaled was a marijuana dealer, correct?

A    Yes.

Q    But you never investigated the other dealers in his neighborhood, correct?

A    No.

SCHIAVONE - CROSS - MR. KAUFMAN

1317

Q    Right.

You never investigated the other dealers in the Bengali community, correct?

A    No.

Q    You didn't ever look into a guy called Chelo, correct?

A    No.

Q    And that's who Mr. Khaled initially thought did this, right?

A    I don't believe he was specific -- it was a specific individual.

Q    Did you ever look into a guy called Praz?

A    No.

Q    Do you even know who Praz is?

A    I do not.

Q    Did you ever look into a guy called Ant?

A    No.

Q    Do you know who he is?

A    I do not.

Q    Second, you don't investigate kidnappings every day, correct?

A    Not every day.

Q    You've been doing this, what, you said about 20 years?

A    Eighteen with NYPD, five years on this task force.

Q    So 18 total or 23 years total?

A    Eighteen total.

SCHIAVONE - CROSS - MR. KAUFMAN

1318

Q    Eighteen total.

And I believe you said in that 18-year career, you had about five or six kidnappings?

A    Correct.

Q    It's not the most common crime, right?

A    Thankfully not.

Q    And the detectives in this case, both before you and when you got on, you talked to a number of people about what had happened on the night of December 9th, correct?

A    Rephrase the question.

Q    By the time you got on the case, Detective, some of your colleagues had already talked to a number of people in the Astoria neighborhood about what had happened, correct?

A    I'm sure the case detectives, yes.

Q    And then on the 10th and 11th you were talking to people about it, correct?

A    I was talking to those case detectives, yes.

Q    Word was out about this kidnapping, correct?

A    Yes.

Q    Right.

You couldn't rule out someone who simply heard about the kidnapping and wanted to take advantage of the situation as a sender of the text, right?

A    Correct.

Q    Someone could have sent the text to take advantage of a

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

SCHIAVONE - CROSS - MR. KAUFMAN

1319

bad situation without having been involved earlier on, right?

A    It's possible.

        MR. KAUFMAN:  So if we can go back to those texts. If we could put that back on the screen.

Q    So that's why you asked -- your colleagues asked for some proof that the person was connected to the kidnapping, right? How do I know it's you, right?

A    Yup.

Q    And when the --

        MR. KAUFMAN:  If we can scroll up.  Up.  The other up.

Q    And when the 9980 phone responded, it didn't give you that, it didn't give you any indication or any information that connected it to the actual kidnapping, correct?

A    No.  But the phone was still active.

Q    Right.

        Rather, the 9980 phone asked you what car you were coming in, right?

A    Yes.

Q    And who you were coming with?

A    Correct.

Q    And it wanted that before providing you with the drop location, correct?

A    Correct.

Q    And at this point, I think as you said, your team was

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

still in communication with the texter, correct?

A    Yes.

Q    And you were also still speaking to Mr. Khaled, right?

A    Yes.

Q    Because Mr. Khaled, after all, had given you consent to use his phone, right?

A    Yes.

Q    And at this point, Mr. Khaled had gotten out of the hospital by the time you were on the case, correct?

A    Correct.

Q    Right.

So he could have come with someone in law enforcement to a location given by the 9980 phone, right?

A    We wouldn't have done that.

Q    You could have done it?

A    We wouldn't bring a victim to a drop location.

Q    But you could have texted, someone else is going to be there, someone from the NYPD or the FBI, someone could have arranged to meet with this guy, correct?

A    Correct.

Q    Right.

Between your two agencies, the NYPD and the FBI, you have access to many vehicle, correct?

A    Yes.

Q    Right.

Not all of them are marked police vehicles, correct?

A    Correct.

Q    And Mr. Khaled, as you understood, still had his Land Rover, correct?

A    Yes.

Q    And the 9980 phone asked about a vehicle, it didn't seem to know anything, it didn't text anything about a Land Rover, correct?

A    Correct.

Q    Right.

So at this point, your team could have given a type of car, correct?

A    Correct.

Q    Could have given a person's name, right?

A    Okay.

Q    Right.

And you could have sent some sort of undercover law enforcement to a location given to you by the 9980 phone, right?

A    And the 9980 phone may not have shown up at all.

Q    They may not.  But you never tried, right?

A    Well, what was the next text message?

Q    Let's go.  Let's see those text messages.

You said, I need to feel safe about it first too, correct?

SCHIAVONE - CROSS - MR. KAUFMAN

1322

A     Correct.

        MR. KAUFMAN:  Scroll up.

Q     Then right after, how do I know I'm not going to jacked when I pull up, right?

A     Yes.

Q     And then the one after that it says, I don't even want to see you, I want to drop it and get out, correct?

A     Correct.

Q     Right.

        That is a text message saying, I don't actually want to see you, right?

        That's what those words mean, right?

A     Well, the victim would be in fear for seeing him.

Q     Let's keep going.

        What's the last one?  What does the last one say?

A     Lose my number bro.

Q     Lose my number bro.

        And when is it sent?

A     December 15th at --

Q     Right.

        And the one before that was December 13th, I can't get 150 just like that, right?

A     Correct.

Q     And as we said before, you only got these messages in the morning of December 13th, right?

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

SCHIAVONE - CROSS - MR. KAUFMAN

1323

A    Yes.

Q    So by the end of that day, you're already making excuses to not meet up with this person sending the texts?

A    They're unresponsive.

MR. KAUFMAN:  Let's scroll up.

Q    They're unresponsive for how long, a couple of hours, right?

A    Correct.

Q    So you've given up, you're not trying to actually find out who's sending these text messages?

A    Well, that's why we asked for subscriber information on the phone and location data.

Q    And that tells you who subscribes to the number, right?

A    It's going to tell you where they are when they're using the phone.

Q    Tells you -- and someone who buys a phone doesn't have to be the user of the phone, correct?

A    Correct.

Q    Someone who's subscribed to a phone doesn't have to be the person who uses that phone?

A    Correct.

Q    Right.

And someone who's in a location where a phone is at one point is not necessarily always going to be with that phone, correct?

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

A    Correct.

Q    But if you respond to meet up with someone sending texts and they come, you are finding out who that person is, right?

A    That would be the goal.

Q    And you didn't do that?

A    We attempted to.

Q    Where do you give the car information that is asked for and a name which is the -- which are the only two requirements for the drop location?

A    Sometimes in my experience when you're that eager and you respond and give those exact information, the person's going to be aware that maybe you're working with law enforcement and wouldn't show up to.  So play into the ruse, you would wait around a little bit.

Q    But here you didn't even try, right?

A    We did try.

Q    Not very hard though, right?

A    That's your opinion.

Q    What you did is you did something called a pen register trap and trace for the 9980 phone number, correct?

A    Correct.

Q    Right.

         And that's what you're talking about where you're getting the information for the phones, correct?

A    The location, yes.

SCHIAVONE - CROSS - MR. KAUFMAN

1325

Q    And a pen register trap and trace is where you get the information for the messages that are being sent and the messages that have been sent, correct?

A    Yes.

Q    Right.

That's where you get subscriber information, right?

A    Subscriber information and the location data, yes.

Q    Right.

And the subscriber information gave you a date of purchase, correct?

A    And a location.

Q    Didn't give you a time, correct?

A    I'd have to look back at that report.

MR. KAUFMAN:  We'll pull it up later.

Q    Now, a phone -- it says -- what you did get it, you got information about the time the phone was activated, correct?

A    Yes.  From those results, yeah.

Q    Right.

Not when it was actually purchased, it was when it was activated, correct?

A    Yes.

Q    You would agree that a phone can be activated remotely, right?

A    I wouldn't be 100 percent on that answer.

Q    Well, you know someone could, for example, not pay their

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

SCHIAVONE - CROSS - MR. KAUFMAN

1326

phone bill, right?

A     Correct.

Q     And that when they don't pay their phone bill, the phone company can deactivate a phone, correct?

A     Correct.

Q     And then they can reactivate it as well, correct?

A     Yes.

Q     That could be done remotely, right?

A     I think so.

Q     And you traced the 9980 phone to Linkn Wireless in Asbury Park, correct?

A     Correct.

Q     And you would agree that's -- for your investigation, you felt like that was a pretty important location, right?

A     Yes.

Q     Right.

        And especially, you know, after you never followed through with your opportunity to actually meet up with the person making the threats, right?

A     Well, that's your opinion.

Q     Is it -- as we talked about, it's true that a person who buys a phone is not always the person who uses a phone, correct?

A     Yes.

Q     Right.

SCHIAVONE - CROSS - MR. KAUFMAN

1327

Someone can buy a phone for someone else, right?

A    Yup.

Q    So a person -- you would agree that a video of a person buying the phone, buying a phone is not as good as actually meeting up with the person making threats, correct?

A    That's your opinion.

Q    You think it's -- you think it's the same thing to see someone -- we've talked about the fact that someone buying a phone might not be the user the phone, correct?

A    Correct.

Q    But meeting up with someone who is using the phone is a better indicator of who is using the phone, right?

A    If they had the phone on them, yes.

Q    Okay.  Now, the video you have doesn't even have a person purchasing the 9980 phone, correct?

A    Correct.

Q    Right.

You didn't go down to Asbury Park on December 15th, 2022, correct?

A    I did not.

Q    Agent Ford did not go down to Asbury Park on December 15th, 2022, correct?

A    Yes.

Q    You sent David Bonacarti down there, correct?

A    Yes.

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

SCHIAVONE - CROSS - MR. KAUFMAN

1328

Q   He's another detective in your task force, right?

A   Yes.

Q   But this wasn't his case, correct?

A   No.

Q   This was never his case, right?

A   No.

Q   He's not really part of this investigation, right?

A   Not true.

Q   He helped out on December 15th, 2022, right?

A   He assisted, yes.

Q   He didn't do a very good job, right?

A   Excuse me.

Q   He didn't do a very good job?

A   That's your opinion.

Q   Well, his job that day was pretty simple, right?  Right?

His job that day was to go down to the Linkn Wireless and get a video of someone purchasing a 9980 phone, correct?

A   Correct.

Q   He did not do that, correct?

A   He did come back with video surveillance.

Q   Right.

And the video surveillance he came back with did not show a purchase, correct?

A   Not a completed transaction, if that's your question.

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

Q    Yes.

The video didn't show the individual leaving the store with a phone, being handed a phone from someone in the store, correct?

A    Correct.

Q    And them leaving the store with that phone, correct?

A    Correct.

Q    It did --

MR. KAUFMAN:  If we could put up GX 230.  It's already in evidence, so it can be published.

Go to one minute and 50 seconds into the video.  Go back a few seconds.

Q    It does show a man being handed a phone by a store employees, right?

A    Yes.

Q    And he's the only person in the video you have, the video that was brought back, who's being given a phone by a store employee, right?

A    Is there somebody walking in next?

Q    Is that person given a phone by a store employee?

A    Can you play the rest of the video?

Q    Sure.

MR. KAUFMAN:  The next person, if we can go to the...

We can go a little further.

SCHIAVONE - CROSS - MR. KAUFMAN

1330

Q    Now, this person, he's never given a phone by a store employee in the video, correct?

A    Okay.

Q    And you don't have a video of either of these guys leaving the store, correct?

A    Correct.

Q    Right.

A    From this surveillance.

Q    From the store.

And as you -- this is the only video you have ever seen from this store, correct?

A    Yes.

Q    And this is the only video as far as you know that Agent Ford has ever seen from this store, correct?

A    Yes.

Q    This investigation was your investigation, right?

A    Well, a moment ago, you told me it was Special Agent Ford's.

Q    Well, and Agent Ford's, correct?

A    Yes, it is.

Q    Right.  This video, though, doesn't show cash being exchanged, correct?

A    No.

Q    It doesn't show a credit card being handed over, right?

A    Correct.

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

SCHIAVONE - CROSS - MR. KAUFMAN

1331

Q      And the man --

MR. KAUFMAN:  If we go to eight minutes -- to 18 -- eight minutes, 40 seconds.

Q      This video does show a man handing over a phone, correct?

A      Yes.

Q      That's under a sign that's says repair on the top of the store, correct?

A      Correct.

Q      Right.

So as we established, Detective Bonacarti, right, he failed in his mission to bring back video of a cell phone purchase at Linkn Wireless, correct?

A      I don't think that was his intention.

Q      I didn't ask you his intention.

He just didn't bring it back?

A      Correct.

Q      Right.

He did get video of this man who ended at the end getting into a car, correct?

A      Correct.

Q      A car I believe you identified as a Ford Explorer with New Jersey plate H51RBS, correct?

A      Yes.

Q      Right.

You did eventually go down to Asbury Park, correct?

A    Yes.

Q    Right.

      And you went on January 30th, 2023, right?

A    Yes.

Q    And you did go to Linkn Wireless, right?

A    I did.

Q    Right.

      And that was about 45 days after Detective Bonacarti went there --

A    Correct.

Q    Right?

      You did not collect video from December 12th, 2022, when you were there, correct?

A    Correct.

Q    Right.

      You did not get video that showed a purchase on December 12th, 2022, correct?

A    Correct.

Q    But you learned that video surveillance at that store lasts for 60 days, right?

A    I'm unaware if I asked him how long the video saves for.

Q    But regardless, we don't -- your team never had that video, correct?

A    Correct.

Q    You spoke to some store employees when you were down

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

there, correct?

A     Yes.

Q     You spoke to the owner, Henry Burrns, right?

A     Yes.

Q     And an employee names Jocylin Ruiz, right?

A     Correct.

Q     And you showed them --

          MR. KAUFMAN:  If we could put up GX 7.  That's already that evidence.

Q     You showed them that picture, right?

A     Yes.

Q     And your conversations didn't bring you any closer to learning who that person was, correct?

A     I don't believe so, no.

Q     You also went to a body shop, I believe you said, correct?

A     Correct.

Q     About at a thousand Asbury Avenue?

A     I believe that's the address, yes.

Q     You spoke to a man named Jean Meraddisse?

A     Yes.

Q     And you saw the parking lot next to his shop, correct?

A     Yes.

Q     Right.

          And you saw the cars at his shop, right?

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

A     Yes.

Q     Right.

      And you didn't make any notes about any of those cars, correct?

A     No.

Q     You showed him a picture of the Ford Explorer from Detective Bonacarti's surveillance, right?

A     Possibly.

Q     Right.

      He only gave you information about one person who drove that car, correct?

      MR. DUGAN:  Objection.

      THE COURT:  Sustained.

Q     A week later, Agent Ford and Agent Louizias went back to Asbury Park, correct?

A     Yes.

Q     That was February 8th, 2023, right?

A     Yes.

Q     You did not go back that day, correct?

A     I did.

Q     You did go?

      Is there a reason you would not be in a -- a 302 is a report that is made in a federal investigation, correct?

A     Correct.

Q     And it's important to be accurate in these 302s, correct?

A    Correct.

Q    Is there a reason why your name would not be listed as one of the law enforcement officers who went down there on that date?

A    Because I met up with them later in the day.

Q    So you did not go to Linkn Wireless with them that day?

A    No, I did not.

Q    Okay.  You were with them when they went to 3rd Avenue?

A    Yes.

Q    Okay.  And that's where I think you testified yesterday to seeing a Ford Explorer with H51RDS, correct?

A    Correct.

Q    That was the only vehicle that the picture you showed --

          MR. KAUFMAN:  GX 17, if we could put that up.

Q    It's the only vehicle that was parked outside that location, correct?

A    Based on this picture, yes.

Q    Well, you were there?

A    Yes.

Q    It was the only one, right?

A    Yes.

Q    You didn't bring back any photos of any vans from that day, correct?

A    No.

Q    And you said you were actually there when this phone was

SCHIAVONE - CROSS - MR. KAUFMAN

1336

taken?

A    Yes.

Q    And it's -- how many times did you go down and canvass in Asbury Park, New Jersey?

A    Maybe twice myself.

Q    And this is the place where you saw this car, correct?

A    Correct.

Q    You never saw it anywhere else?

A    No.

Q    You never saw anyone driving it, right?

A    No.

Q    You talked -- fair to say you talked a lot about phone and iCloud data?

A    Yes.

Q    Right.

        You talked about data you collected and reviewed in this case, right?

A    Correct.

Q    And one of the first pieces of phone data that you collected in this case was related to cell tower dumps for December 9th, and December 10th of 2022, correct?

A    Yes.

Q    And that includes the tower at 2121 27th Street in Queens, right?

A    Yes.

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

SCHIAVONE - CROSS - MR. KAUFMAN

1337

Q    And that was on December 9th, 2022, right?

A    Correct.

Q    From 7:30 to 8:15 p.m., right?

A    Yes.

Q    This tower dump did not contain the 0476 number you associated with Mr. Valentin, correct?

A    Correct.

Q    Right.

        You also obtained tower dump for 62nd Street and 1st Avenue, correct?

A    Yes.

Q    That was for December 10th, 2022, right?

A    Yes.

Q    From the hours of 12:30 a.m. to 1:30 a.m., right?

A    Yes.

Q    That also did not contain the 0476 number, right?

A    I don't believe so.

Q    Right.

        And that time period, 12:30 a.m. to 1:30 a.m., that was a time period that the 0476 number, the number you referred to as the Valentin phone, was active, correct?

A    Yes.

Q    Right.

        And that was in the chart that you showed, 1302, correct?

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

SCHIAVONE - CROSS - MR. KAUFMAN

1338

A    Correct.

Q    You know Special Agent Elizabeth Wheeler, correct?

A    I do.

Q    Right.

       You worked with her as she was preparing her report for this case, correct?

A    I wasn't with her.

Q    But you spoke to her?

A    I'm aware that she is familiar with the case, yes.

Q    Right.

       She used to be in your task force, correct?

A    Correct.

Q    You worked with her for a long time, right?

A    Yes.

Q    There is a time where you put on your --

       MR. KAUFMAN:  If we could put up 1302.

       Go to the third page.  12:27 a.m.

Q    That is a time when the 0476 phone does connect to a cell tower, right?

A    A tower, yes.

Q    Okay.  That's a tower in Queens, correct?

A    It appears so.

Q    Right.

       And there are several cell sites between that tower and the river, correct?

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

A    Correct.

Q    In that little snippet that you put in that box, we can even see some towers over on Roosevelt Island, right?

A    Correct?

Q    Between that Halletts Point section of Queens and Manhattan, correct?

A    Yes.

Q    There's some items in your chart that I'd like to discuss.

You point out locations where the Valentin phone was on December 8th, 9th and 10th, correct?

A    Yes.

Q    And that's based on data you had from the -- both the phone and the iCloud, correct?

A    Correct.

Q    Right.

And that data --

MR. KAUFMAN:  If we can go to the 9th, the middle page, right.

Q    That data had the Valentin phone in Asbury Park between 8:57 a.m. and 12:52 p.m. on December 9th, 2022, correct?

A    That's what -- yes.

Q    Right.

And if an LPR, a license plate reader showed a car Mr. Valentin was driving, for example, on the 9th, at

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

12:31 p.m., that would be consistent, right, with where his cell tower was connecting on that day, correct?

A    But what's your question, with regards to the car or --

MR. KAUFMAN:  Let's put up GX LVB1.  If we can go to the one that shows the 9th at 12:30.

Q    So this -- you would agree, this shows that on December 9th at 12:31 p.m., H51RBS is in an area right around Asbury Park, New Jersey, correct?

A    Yes.

Q    And that is consistent with its connection to cell phone towers in that area at that time, correct?

A    Correct.

Q    Okay.  Now, back to your chart, 1302.

You don't show anything between 1:51 p.m. and 7:00 p.m., correct?

A    Yes.

Q    Right.  But you're not saying that there's no activity on the Valentin phone after 1:51 p.m., right?

A    Right.

Q    There's activity that's going until 7:00 p.m. right?

A    Yes.

Q    It's just not corrected to cell sites, right?

A    Well, the last activity is 7:00 p.m., yes.

Q    Right.  And this chart or your investigation, it doesn't say why there was not activity, correct?

A      Correct   .

Q      Right.

       A phone's battery could have died, correct?

A      Correct.

Q      It could have been turned off, right?

A      Yes.

Q      It could have just not been used, right?

A      Correct.

Q      If someone's just holding their phone and they're not sending texts or getting texts, it's not going to show up, correct?

A      If you're not doing anything with the phone, no.

Q      Or if the battery is off, same thing, correct?

A      Correct.

Q      Now, I want to go to a point -- you made a point to bring out in your chart.

       MR. KAUFMAN:  Let's go to the last page.

Q      You felt -- at 12:21, you felt the need to point out that the Valentin phone uses Facetime in the early hours of December 10th, 2022, right?

A      Well, that was the activity.

Q      And you mentioned Facetime several times on direct examination, right?

A      Correct.

Q      You would agree Facetime is a pretty common way people

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

communicate, right?

A    Yes.

Q    And you reviewed the Valentin iCloud records for that week, December 7th to December 15th, 2022, correct?

A    Yes.

Q    Mr. Valentin uses Facetime a lot, correct?

A    Yes.

MR. KAUFMAN:  Well, let's look at GX 107.  This is already in evidence.  This is the -- if we can scroll down just so we can see the exhibit number.

Q    This is GX 107, right?

A    Correct.

Q    This is the Valentin iCloud for one week, correct?

A    The timeline, yup.

Q    A full week from December 7th, 2022 to December 15th, 2022, right?

A    Yes.

MR. KAUFMAN:  Let's go to line 79 on the...

Q    And where it says -- you see where it says log entry?

A    I do.

Q    And that shows that that is from December 8th, 2022, correct?

A    Yes.

Q    10:57, correct?

A    Correct.

SCHIAVONE - CROSS - MR. KAUFMAN

1343

Q    And does it show you what the phone is doing at that time?

A    It's a Facetime.

Q    It's a Facetime.

MR. KAUFMAN:  And if we go down to line 84.

Q    12:08 p.m., same day, right?

A    Yes.

Q    More Facetime, right?

A    Yes.

MR. KAUFMAN:  Let's go to one -- line 138.

Q    There's -- same day, right?

A    Yes.

Q    1:18 p.m.?

A    Yes.  Facetime.

(Continued on the following page.)

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

Schiavone - cross - Kaufman                    1344

CROSS-EXAMINATION

BY MR. KAUFMAN:

Q    More FaceTime, right?

A    Yes.

          MR. KAUFMAN:  Let's go to 195.  195, 196.

A    I see them both.

Q    Now, it's the next day, December 9th, right?

A    Yes.

Q    1:18 a.m.?

A    Yes.

Q    1:19 a.m.?

A    Yes.

Q    And then 197 also, right?  And 198.  That's all FaceTime; right?

A    It is.

          MR. KAUFMAN:  Let's go to 227.

Q    It's the middle of the same day, correct?  Now we're in afternoon; right?

A    Correct.

Q    12:39 p.m.?

A    Yes.

Q    More FaceTime; right?

A    Yes.

Q    Also 226 and 224 and 223; right?

A    Yes.

MR. KAUFMAN:  All right.  And let's go to line 350 and 351.

Q    That is the next day, the 10th; right?

A    Yes.

Q    And this is at 12:57 p.m. and 12:58 p.m., right?

A    Yes.

Q    That's more FaceTime, right?

A    Correct.

MR. KAUFMAN:  Let's go to 466 and 467.

Q    This is also the 10th, right?  A little later in the day, right?

A    Yes.

Q    3:09 p.m.?

A    Yes.

Q    More FaceTime, right?

A    Correct.

MR. KAUFMAN:  And let's go to 814.

Q    And this is the next day, right, the 11th; correct?

A    Yes.

Q    1:20 p.m.?

A    Yes.

Q    More FaceTime, right?

A    Yes.

MR. KAUFMAN:  Let's go to lines 1119 and 1120.

Q    And, so, that's -- now, we're on the next day, the 12th,

Schiavone - cross - Kaufman                    1346

correct?

A    Which line?

Q    1119 and 1120.

A    Yes.

Q    So that's now on the next day, December 12, 1:14 to 1:15 p.m.; correct?

A    Yes.

Q    More FaceTime, right?

A    Yes.

        MR. KAUFMAN:  Let's go to 1389.

Q    And that's a little later that -- that's the 13th at 5:21 p.m.?

A    Correct.

Q    More FaceTime, right?

A    Yes.

        MR. KAUFMAN:  Then let's go to line 16 -- 18.

Q    Now we're on the next day, the 14th; correct?

A    Yes.

Q    11:39 p.m., right?

A    Yes.

Q    And this is a period, you'd agree, that's after the kidnapping occurred; correct?

A    Correct.

Q    After all threats had been sent from the 9980 phone; correct?

Schiavone - cross - Kaufman                    1347

A    Yes.

Q    This iCloud is still using FaceTime, right?

A    It is.

MR. KAUFMAN:  If we can go to -- let's go to 1672. Sorry.  1812 and 1813.  Actually, let's go to 1672 and 1676.

Q    This expression:  Hit me?

A    Yes.

Q    The phone uses that expression a lot, right?  It is a common expression, hit me, right?

A    For certain people.

Q    It means call me, right?

A    Yes.

MR. KAUFMAN:  Let's go to 1812 and 1813.

Q    And that's later, that's almost midnight on the 14th; correct?

A    It is.

Q    He's still using FaceTime here, right?

A    Yes.

Q    He uses FaceTime 163 times that week, right?

A    If that's what you say, I can agree.  There was multiple.

Q    A lot?

A    Yes.

Q    Is it is -- this phone, this iCloud, FaceTime is one of, if not the major, one of the most major means of communication; correct?

Schiavone - cross - Kaufman                1348

A    Okay.

Q    Right.  You would agree that FaceTime could be a pretty good way for like a drug dealer to communicate, right?

A    It's your opinion.

Q    You're a law enforcement officer?

A    It's a form of communication.

Q    Would you agree that you would expect a large number of short communications from a drug dealer?

A    Yes.

Q    Right.  There is a lot of drug activity on these phones that week; correct?

A    There's activity -- there's activity of drugs on that phone, yes.

Q    We will get into it in a little bit.

        Let's go back to your chart, page 3 of 1302.

        You have here that at 12:23 a.m. the Jarrett Bruce phone texts the Valentin phone with Sim contact, right?

A    Yes.

Q    That is 20 minutes, as we see 12:43, 20 minutes before Shaon Khaled is released; correct?

A    Yes.

Q    That is four hours and 19 minutes after he is taken; correct?

A    Correct.

Q    Right.  And that is when the Valentin phone is first

Schiavone - cross - Kaufman                    1349

given the Boone's phone contact information, correct?

A     Correct.

Q     Right.  And that's when he texts:  Yo, hit me, I'm behind, correct?

A     Yes.

Q     And he texts it from a cell site in Queens, correct?

A     The tower's in Queens, yes.

Q     And I believe you testified on direct that at that time, the Boone phone is picked up in Manhattan, correct?

A     I believe it was upper Manhattan, yeah.

Q     Before that, the Boone phone had come from the Bronx, right?

A     Yeah, I believe so.

Q     And before that, it was in Westchester, correct?

A     There was some in Westchester County, yes.

Q     And before that, it was in the north New Jersey, correct?

A     Correct.

Q     It had not been in Queens for over four hours, correct?

A     If that's what the reference indicate, then I agree.

Q     It then says that -- you said after this 211, the next call to -- I believe on direct you testified to Jarrett Bruce is December 13th at 6:00 p.m., correct?

A     If that's what I testified to, then yes.

Q     Okay.  There were no calls between the Valentin phone and the Bruce phone on December 11, correct?

Schiavone - cross - Kaufman                    1350

A       Correct.

Q       None on December 12, correct?

A       Correct.

Q       Not until the evening of the 13th, correct?

A       Yes.

Q       Not during that time where the 9980 phone is purchased, correct?

A       Just rephrase your question.

Q       There were no calls between the Valentin phone and the Bruce phone on the 12th, correct?

A       I don't believe so.

Q       And that's the date that the 9980 phone was purchased, correct?

A       Yes.

Q       And started making threats, correct?

A       Correct.

Q       Great.

        I want to talk to you about a couple of things in the iCloud that you mentioned on direct examination.

        MR. KAUFMAN:  If we can go to GX-109.  109-I, I think.

Q       This is a conversation --

        MR. KAUFMAN:  On page 6.

Q       This is a conversation where you were showing distances, you said, the amount of time, right?

Schiavone - cross - Kaufman                1351

A      Yes, I remember.

Q      And you said that it takes 35 minutes about to get --

A      Roughly, yes.

Q      Have you ever driven on Route 18 in central New Jersey?

A      I have not.

Q      Do you know Route 18 in central New Jersey at all?

A      I do not.

Q      You're not aware it's the road that goes from the Jersey Shore to New Brunswick, New Jersey?

A      Are you asking me?

Q      Do you know this or you don't know?

A      I don't know.

Q      Yet you testified you know how long it takes to get from one place to another on Route 18?

A      Just based on a Google search.

Q      Right.  Google search doesn't account -- accounts for traffic only in the moment that you are putting it in, correct?

A      Sure.  It's not precise.

Q      Right.  So you don't know what traffic is like on Route 18, for example, as it gets near New Brunswick?

A      Yes.

Q      As it merges with Route 1?

A      Correct.

        MR. KAUFMAN:  I want to go to GX-110.  This is

Schiavone - cross - Kaufman                    1352

something you put in about -- actually, let's start with GX-113.  I changed my mind.

Q    This is a picture you put in yesterday on direct about drugs, right?

A    Yes.

Q    Right.  And this is sent on December 8, 2022, correct?

A    Yes.

        MR. KAUFMAN:  All right.  And let's go to GX-111, page 3.

Q    This is on December 10, 2022, correct?

A    Yes.

Q    And this is where there's still perc available comment is going on, he said, right?

A    Yes.

Q    So it looks like here, on the 10th of December, 2022, Mr. Valentin is selling some drugs, right?

A    It appears so.

        MR. KAUFMAN:  Let's go to GX-10.  Sorry, I meant 110.

Q    And this starts December 4 -- this was also -- you put this in about drug communication, correct?

A    Correct.

Q    And this starts with December 10th, 2022, correct?

A    December 14.

Q    December 14th.  Sorry.  December 14, 2022, correct?

Schiavone - cross - Kaufman                1353

A    Yes.

Q    And December 16, 2022, correct?

A    You got to scroll down more.

Q    Scroll?

A    Yeah.  It's there.  December 16th.

Q    2022, right?

A    Yes.

        MR. KAUFMAN:  And if we could go to GX-112.

Q    Well, as we're putting that up, we have just seen drug activity from the Valentin iCloud on December 8, correct?

A    Yes.

Q    December 10th, right?

A    Yes.

Q    December 12th, correct?

A    Yes.

Q    December 14th, right?

A    Yep.

Q    And December 16th, right?

A    Correct.

Q    And GX-112, this you brought in --

        MR. KAUFMAN:  If we can scroll up.  Right.  Scroll up.

Q    This is sent around, I think, the 13th or the 14th about I'm going to get some money soon, right?

A    Yes.

Schiavone - cross - Kaufman                    1354

Q    And that is -- so that day, the 13th, 14th, where the Valentin phone is saying I'm going to get some money soon, you would agree that is in the middle of the week where he is moving a lot of product, correct?

A    It's at the time that the text messages are coming from the 9980 number as well.

Q    But it is also a week where we are seeing a lot of drugs being communicated about, correct?

A    Yes.

Q    Right, on the 8th, right?

A    As stated.

Q    On the 10th, right?

A    Correct.

Q    On the 12th, right?

A    Yes.

Q    On the 14th, right?

A    Uh-hum.

Q    And on the 16th, right?

A    Correct.

Q    You could make a lot of money selling drugs, correct?

A    You'd have to ask him to confirm that.

Q    You've never investigated drug dealers?  You've been a cop for 18 years?

A    I don't know how much money he makes.

Q    You've seen people a lot of money selling drugs, correct?

Schiavone - cross - Kaufman                          1355

A      That doesn't mean I know how much he makes.

Q      You made a point to put in a picture of a couple guns, correct?

A      They're in there, yes.

Q      There was no gun recovered in this case, correct?

A      There was not.

Q      And you testified about DNA swabs from sticks, correct, from the scene?

A      Correct.

Q      Because some of the information you got was that Mr. Khaled was actually hit with sticks at the scene, correct?

A      Yes.

Q      There is no allegation of any large capacity guns in this case, correct?

A      Correct.

Q      And those pictures were of like machine guns and stuff, right?

A      They're firearms.

Q      You can't tell from the pictures where those pictures were taken, right?

A      Correct.

Q      You can't tell who took those pictures, right?

A      Correct.

Q      Nowhere does it say yo, I have this gun, correct?

A      Yes.

Schiavone - cross - Kaufman          1356

Q    It does or it does not?

A    It does not.

Q    You also brought in a text from Bruce to Valentin where it talks about bringing phones, correct?

A    Yes.

Q    That text is sent February 3 -- February 13, 2023, right?

A    Yes.

Q    That is more than two months after what we're talking about in this case, correct?

A    Correct.

          MR. KAUFMAN:  All right.  If we can put up GX-108.

Q    You showed this text exchange between the Valentin phone and someone you called Hood, right, someone called Hood?

A    Yes.

Q    You identified him as Jodlyn Olivier, right?

A    Correct.

Q    And you learned he rented a car shop from Jean Meraddisse, right?

A    Yes.

Q    And he bought and sold cars as part of his business, right?

A    Mr. Olivier, yes.

Q    Mr. Olivier.  He kept the cars that he was selling at his shop, right?

A    Yes.

Schiavone - cross - Kaufman                1357

Q    Right.  So this text talks about a van, right?

A    Yes.

Q    It doesn't describe the van, right?

A    It does not.

Q    It doesn't say a color?

A    No.

Q    It doesn't says a make?

A    No.

Q    It doesn't say a model?

A    No.

Q    It doesn't say how long that person has been trying to sell the van, right?

A    Correct.

Q    It doesn't say to sell the van fast, correct?

A    No.

Q    It doesn't say I'll take any price, correct?

A    It says six, this is the lowest I'll take.

Q    Right.  It says to list it for 65, right?

A    Yes.

Q    You understand that to mean $6,500?

A    I do.

Q    But it says six is the lowest I'll take, correct?

A    Yes.

Q    With an exclamation point right there, right?

A    Yes.

Schiavone - cross - Kaufman                1358

Q    The lowest I'll take, right?

A    Right.

Q    This text is prioritizing getting more money for the van, correct?

A    It states he wants to start at 65, but the lowest he will take is six.

Q    It does not prioritize selling fast?

A    Correct.

Q    And it could take longer if you are trying to get something for a specific price, right?

A    Yes.

Q    You arrested Mr. Valentin on July 20, 2023, correct?

A    I believe it was the 17th.

Q    That was when you got the warrant, wasn't it?

A    Okay.  So, then, yeah, three days later.  Yes.

Q    You arrested him at the Bradley Beach, New Jersey police department, right?

A    Yes.

Q    And you saw him when you got there, right?

A    Yes.

Q    Right.  And you took his pedigree information, right?

A    I did.

Q    And you observed Mr. Valentin to be slightly below average height, correct?

A    Yes.

Schiavone - cross - Kaufman                1359

Q    About 5'8", 5'9"?

A    Roughly.

Q    He's stocky, right?

A    Yes.

Q    A little heavyset?

A    Yes.

Q    235 pounds is what you learned, right?

A    Yes.

Q    He also has a dark complexion, correct?

A    Correct.

Q    He is neither light-skinned, tall, nor skinny, correct?

A    Correct.

Q    And when you spoke to Mr. Valentin, you told him you were arresting him for a kidnapping, correct?

A    In connection to a kidnapping.

Q    You told him -- I think you even said I'm going to be upfront with you, right?

A    Yes.

Q    And you told him exactly what you were doing, right?

A    Yes.

Q    Right.  You were trying to get him to talk about it, right?

A    Yes.

Q    Right.  You asked him what he was doing on December 9th and 10th 2022, right?

Schiavone - cross - Kaufman                    1360

A    Correct.

Q    We saw some clips from that conversation, right?

A    Yes.

Q    And he didn't come up with any excuses, correct?

A    He said he didn't recall.

Q    Right.  He didn't come up with any alternative explanations, right?

A    The only thing he said was he wouldn't be doing that.

Q    Right.  He said he didn't remember what he was doing that day, correct?

A    He didn't recall, but it wasn't for that.

Q    You would agree that most people can't tell you what they were doing on a given night seven months later, right?

A    I agree.

Q    You told him that you had video of him purchasing a phone, correct?

A    Yes.

Q    That's not true, right?

A    He was ID'd as a person who walked into that store.

Q    But you don't have video of him purchasing a phone, correct?

A    Upon speaking with the staff, that was the phone --

Q    That's not what I asked.

     You told him you had video of him purchasing a phone, correct?

Schiavone - cross - Kaufman                     1361

A      Well, I can confirm that for you.

Q      We talked about the video you have.  That's the only video that you have from LINKN Wireless, right?

A      We spoke to the representatives of LINKN Wireless.

Q      But that's not what you told Mr. Valentin.  You told him you had video of him purchasing a phone.

A      I said you were ID'd as well.

Q      But you also did say you have video of him purchasing a phone, correct?

A      I did.

Q      And that's not true, right?

A      If you're going to go with the completed video.

Q      Well, you talked about something called a ruse, right?

A      Yes.

Q      That you will sometimes use when you're interrogating people, right?

A      Correct.

Q      A ruse is a lie?  It's another word for a lie?

A      It is.

Q      And you lie to people to get the result you want in your interrogation, right?

A      It's not what I want.

Q      Your lying for fun?

A      I'm looking for the truth.

Q      So you think a lie helps you get to the truth?

Schiavone - cross - Kaufman                    1362

A    Sometimes.

Q    Truth was not what you were using?  You were using lies?

A    No.

Q    Well, in the conversation, it's fair to say you were trying to -- you were trying to push Mr. Valentin, correct?

A    I had told him that we had video surveillance of him going into the store, and we did speak to those --  or other agents spoke to the representative who worked there, and they were able to confirm that that was the device that was provided to that individual.

Q    You're trying -- you were trying to make Mr. Valentin think he was really in trouble in that conversation, correct?

A    I was trying to make him understand that he was ID'd as a person who got that device.

Q    You told him a cell site put in him in Queens, correct?

A    I did.

Q    And you told him that was the same tower that the victim was on, correct?

A    Correct.

Q    You specifically said Queens, right?

A    Yes.

Q    And you didn't tell him that the Queens tower had him in Queens four hours after Mr. Khaled was taken, did you?

A    No.

Q    And you said about him being on the same tower, that's

Schiavone - cross - Kaufman                    1363

simply not true, correct?

A    He's on a tower.

Q    Is he on the same tower as Mr. Khaled?

A    I'd have to double check.

Q    All right.  Sure.

          MR. KAUFMAN:  Let's go to Agent Wheeler's report. Which you were pointing to yesterday on direct, GX-706.  If we can put that up and go to page 10.  Zoom in a little bit.

Q    This red flag, that's Khaled, right?

A    That's the residence.

Q    Right.  And that's the tower -- you actually didn't have Mr. Khaled pinging on a tower that night, correct?

A    His number is not in the report.

Q    Right.  And, in fact, he didn't have his phone?  You knew he didn't have his phone, correct?

A    During what part?

Q    Well, you knew his phone was dropped when he was kidnapped, correct?

A    At the scene.

Q    And the scene is the red flag?

A    Correct.

          MR. KAUFMAN:  If we can go down and over.  Over here, in this area of Hallets Point, that's the only place Mr. Valentin's phone pinged in Queens, correct?

A    Yes.

Schiavone - cross - Kaufman                    1364

Q     That is not the same place Mr. Khaled was in, correct?

A     It's based on the tower location.

Q     There are different towers, correct?

A     Right.

Q     And I told him specifically he was pinging in the same tower as Mr. Khaled, correct?

A     I was trying to confirm why he was in Queens that day.

Q     That's not the question.

      You told him he pinged on the same tower as Mr. Khaled, correct?

A     Yes.

Q     Not true, correct?

A     Correct.

Q     Okay.  And you didn't tell him that Mr. Khaled, in fact, hadn't been at that location for 4 hours and 19 minutes before he's pinged up for the first time, correct?

A     Correct.

Q     You tried to show him that he was tied to the 9980 phone because of the Ford Explorer, right?

A     And the cell location data.

Q     We just talked about the untrue cell location data?

A     Which number are you referring to?

Q     Well, you did tell him he was on the same tower as Mr. Khaled, right?

A     I believe there is another report that shows the 9980

Schiavone - cross - Kaufman                    1365

with a 0426 number.

Q    As you said before, you made a point to say, when we were talking about where a phone is, it's pinging to a tower, correct?

A    Correct.

Q    It can't tell you where someone actually is, correct?

A    Not their specific location.  A tower, yeah.

Q    But you did bring up the Ford to him, correct?

A    I did.

Q    You told him the Ford was registered to his friend, right?

A    Yes.

Q    The friend doesn't drive the Ford, he does, correct?

A    Correct.

Q    And at the end of the interview, we showed a clip yesterday where Mr. Valentin asked for coffee, correct?

A    I believe I asked him if he wanted something.

Q    Right.  He said a coffee, right?

A    A coffee and a Black and Mild.

Q    And a Black and Mild.  Right.

         And you seemed confused by what a Black and Mild was, correct?

A    I just didn't hear him when he said it the first time.

Q    And he told you -- he clarified, he said he meant a cigarette, correct?

Schiavone - cross - Kaufman                   1366

A    Correct.

Q    And the term he used to clarify was a cigarette, correct?

A    They're two different things, yes.

Q    But you gave him a regular cigarette, correct?

A    He was fine with that, yes.

Q    Right.

You gave -- in your conversation, you were telling Mr. Valentin that you were giving him a chance to cooperate, right?

A    Yes.

Q    Something that, if he was guilty, he could do to make things easier on himself, correct?

A    Correct.

Q    He didn't express any interest in that, correct?

A    Correct.

Q    He just simply said he didn't know what you were talking about on that date, correct?

A    Yes.

Q    All right.  We talked about some of the lies you told Mr. Valentin in your post-arrest interview.

Isn't it true Mr. Valentin is not the only person you lied to at a post-arrest interview, correct?

A    If you are referring to a ruse, yes.

Q    A ruse is another word for a lie, right?

A    Whatever word you'd like to use.

Q    When you arrested Aasim Boone, you rused him, right?

A    Yes.

Q    You lied to him, right?

A    A ruse, yes.

Q    You lied to him about Lesly Valentin, right?

A    Yes.

Q    You told him Lesly Valentin gave his name, correct?

A    Yes.

Q    But that wasn't true, right?

A    Correct.

Q    You said it to get the information you wanted from Aasim Boone, right?

A    It was to see what his reaction would be.

Q    It wasn't just to see his reaction.  You wanted to get him to give you information, correct?

A    I didn't know how he would react.

Q    He seemed mad about being this, Mr. Boone, right?

     He seemed mad, right?

A    Me?

Q    Boone.

A    Oh, yes.

Q    Right.

     You would agree it's reasonable to be mad if someone lies about you and it's something you had nothing to do with, right?

Schiavone - cross - Kaufman                1368

A     Yes.

          MR. KAUFMAN:  I have nothing further.

          THE COURT:  Is this a good time for an afternoon break?

          MR. KAPLAN:  Yes.

          THE COURT:  Let's take a 10-minute break.

          THE COURTROOM DEPUTY:  All rise.

          Jurors.

          (Jury exits the courtroom.)

          THE COURT:  Anything you all want to take up?

          MR. KAPLAN:  Judge, do you plan on going to 4:30 or 5:00?

          THE COURT:  I'm happy to go to 5:00 if it helps.

          MR. KAPLAN:  I'll let you know where I am at 4:30. But if it's going to Monday.

          THE COURT:  So, I'll tell you what.  I don't have an agenda about this.

          Is it all your preference to stop at 4:30 unless it looks like we are going to finish the witness?

          MR. KAPLAN:  I don't think we're finishing the witness.

          THE COURT:  Unless somebody affirmatively tells me that they want to keep going, I'll stop at 4:30.

          MR. KAPLAN:  Thank you.

          (Recess taken.)

Schiavone - cross - Kaplan                1369

(In open court - jury not present.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Are we ready for the jury?

MR. KAPLAN:  We are ready.

MR. GUADAGNINO:  I have one thing.  Ms. Ferrante has a family obligation next week.  She's going to be leaving us after today.  I'm not saying we are, but if we could go past the 4th of July, she will be back on that Monday.

THE COURT:  I hope it's a fun vacation.

MS. FERRANTE:  Thank you.

THE COURTROOM DEPUTY:  Jurors entering.

(Jury enters.)

THE COURT:  Everybody can be seated.

CROSS-EXAMINATION

BY MR. KAPLAN:

Q    Good afternoon, Detective Schiavone.

A    Good afternoon.

Q    I would like to start where my colleague stopped about the ruse in the interrogation of Mr. Boone.  But before we get there, Detective, you were working with the NYPD FBI task force with Special Agent Ford, correct?

A    Yes.

Q    And as part of this task force, you were one of the members investigating the kidnapping of Shaon Khaled?

A    Yes.

Q    And it's fair to say that you have been investigating this kidnapping since December of 2022?

A    Yes.

Q    Pretty much shortly after it occurred?

A    Yes.

Q    And you were working alongside Special Agent Ford for pretty much the entire time?

A    Correct.

Q    You were working with Agent Ford when Lesly Valentin was arrested in July of 2023?

A    He wasn't there that day, but, yes.

Q    But you were part of the arrest, weren't you?

A    Yes.

Q    And you were actually part of the interview process?

A    Correct.

Q    You were also part of the arrest of Mr. Boone on January 30, 2024, correct?

A    Just the interview.

Q    Just the interview.  So you were one of the agents who arrested him?

A    No.

Q    But you were there for the interview?

A    Correct.

Q    And so was Special Agent Ford?

A    Yes.

Q    In fact, it was just the two of you that day interviewing Mr. Boone, correct?

A    Correct.

Q    Now, before you and Special Agent Ford started interrogating Mr. Boone, did you already discuss your planned ruse?

A    No.

Q    So you didn't talk to each other and say hey, we're going to come up with this ruse to get him to talk?

A    I'm not sure.

Q    You're not sure.  But you were looking to get information from Mr. Boone, weren't you?

A    Yes.

Q    At the same time you were also looking to see if Mr. Boone would be willing to cooperate with your investigation, right?

A    Correct.

Q    In order to get that cooperation or those statements, you were willing to use, like you said, a ruse?

A    Yes.

Q    Okay.  And when you call it a ruse, it's just a fancy way of saying lying, right?

A    Correct.

Q    Okay.  So you and Special Agent Ford agreed to lie to Mr. Boone by telling him that Lesly Valentin had given them his

Schiavone - cross - Kaplan               1372

name?

A   Yes.

Q   But, in fact, Lesly Valentin had never given Mr. Boone's name to law enforcement?

A   Correct.

Q   You would know that because you were there for the interview of Lesly Valentin?

A   Yes.

Q   As far as you know, Lesly Valentin didn't give Mr. Boone's name at any other occasion, correct?

A   Correct.

Q   But despite knowing that Lesly Valentin never gave his name, Mr. Boone's name, you still decided to lie or ruse toward Mr. Boone that night, correct?

A   Yes.

Q   Was it your idea to lie or was it Special Agent Ford's idea to lie?

A   Probably both of ours together.

Q   Do you remember if you discussed it together before you went in?

A   I don't know if it just happened kind of in the moment or if there was a brief discussion before that, but we did ruse him, yes.

Q   You have been an NYPD detective for 16 years, correct?

A   Detective for 12.

Schiavone - cross - Kaplan                    1373

Q     For 12.  And before that, you were a patrolman?

A     Yes.

Q     And safe to say that you were provided some training while when you were at the NYPD, correct?

A     Yes.

Q     Was it a yearly training?

A     No.

Q     How often was the training?

A     What training are you referring to?

Q     Well, what type of training would you get as part of NYPD specifically towards interrogations?

A     I believe we had detective bureau Intertek, and then we had a -- I think it was a one three-day course with regards to interrogation.

Q     And these were courses specific towards law enforcement officers conducting interrogation?

A     Specifically to members in the detective bureau.

Q     As part of this training, do they train you how to lie to suspects?

A     I think they give techniques on how to talk to people.

Q     Well, were part of those techniques to talk to people to create lies when talking to them?

A     I mean, specifically the training I had was a real long time ago.  Specifically, I can't say exactly what those techniques were.

Schiavone - cross - Kaplan                     1374

Q     Where did you learn this technique of lying to suspects?

A     A ruse?  When I -- shortly thereafter I got to the detective bureau.

Q     So this is a common sort of theme in the detective bureau?

A     It's an interrogation tool.

Q     When you joined the task force, did you have any training with the FBI?

A     No.  With regard to what specifically?

Q     Well, any training with the FBI.

A     We do tactics.

Q     Tactics, okay.  Would you get any training at the FBI in conducting interrogations?

A     I did not.

Q     It's fair to say you've conducted numerous interrogations in your career?

A     I have.

Q     How many would you say?

A     A lot.

Q     50?

A     More than that.

Q     100?

A     Maybe over that.  Yes.

Q     A few hundred, fair to say?

A     Sure.  Yes.

Schiavone - cross - Kaplan                          1375

Q     How many of these suspects that you spoke to did you lie to?

A     I couldn't tell you a number.

Q     50 percent?

A     I don't have to lie to everybody.  Some people are willing to talk and have a conversation and others are not.

Q     I understand that.  But my question is of the people you spoke to, how many did you lie to?

A     I really couldn't give you a hard number.  I will let you know that have I rused people in the past, yes.

Q     But you have rused a number of the people in the past, not just one or two?

A     I couldn't give you a hard number.

Q     You can't ballpark it?

A     I mean, if you're asking if I have done it, I have.  As for how many times, I don't have that specific number.

Q     When you lie to a suspect, tell the jury generally what the lies are about?

A     It depends on the case.

Q     Okay.  So you may lie about evidence that you have against the suspect, correct?

A     Yes.

Q     You may say that you had cell site information that put him in the cell cite as the victim when that's not true?

A     Sure.

Schiavone - cross - Kaplan                 1376

Q    Okay.  You may also say, like in this case, that another person had given a suspect's name to law enforcement?

A    Yes.

Q    You lie to them because you want them to feel that there's more pressure because there's evidence against them?

A    Just want to see if they were going to elicit a response.

Q    And the response you're looking for is either some sort of confession or possible cooperation?

A    It depends on how they answer the question.

Q    The purpose of lying to them is to get something that you want out of them?

A    Well, I think the purpose is that sometimes we're already getting lied to, so then we would try to get them to corroborate their story with a possible ruse.

Q    But that's not always?  Sometimes you go in with a ruse?

A    Not always.

Q    Not always, but sometimes you do go in with a ruse, correct?

A    Not always.  It depends on the case.

Q    In this case specifically for Mr. Boone, there was a ruse, correct?

A    Yes.

Q    Okay.  And we already saw portions of Mr. Boone's interrogation on direct, correct?

A    Yes.

Schiavone - cross - Kaplan                 1377

MR. KAPLAN:  I would like to play another portion and mark this as AB-235-A.

Do you have any objection?

MR. DUGAN:  No objection.

MR. KAPLAN:  I would like to move it into evidence.

THE COURT:  Admitted.

(Defense Exhibit AB-235-A was received in evidence.)

Q    Because of the technological limitations, I can't show the video and the transcript at the same time.  What I will do is -- it's a short video -- I'll play the video and then I'll play the video again and this time you will just see the transcript, okay?

Did you hear?

A    I did.

Q    Was that Agent Ford referencing Lesly Valentin giving Aasim Boone's name?

A    I believe he said we arrested him in July.

Q    Who is he referring to?

A    Do you have the transcript?

Q    It's up now.

A    Yes, referencing Valentin.

Q    I will play it again.

(Video playing.) (Video stopped.)

Q    So that was part of the ruse that you employed with Special Agent Ford to get Aasim Boone to talk, correct?

Schiavone - cross - Kaplan          1378

A     I mean, it's a fact that we did arrest him.

Q     The second part, he gave us your name?

A     Yes.

Q     So that part wasn't; true?

A     No.

Q     Okay.  Now, you did this in order to elicit a response from Mr. Boone?

A     Correct.

Q     And Mr. Boone responded?

A     Yes.

Q     Okay.

          MR. KAPLAN:  I would like to play another portion AB-235-B and admit it into evidence.

          THE COURT:  Admitted.

          (Defense Exhibit AB-235-B was received in evidence.)

          (Video playing.) (Video stopped.)

          MR. KAPLAN:  I'm going to pull up the transcript so that we can all see.

Q     Instead of playing it again, we can just look at the transcript.

          So Mr. Boone said we business like that, like, yo, meet up, weed shit, shit like that, I don't fuck with him, we don't fuck with each other at all, like that at all.  And in response to that, Special Agent Ford said that's not what he said, correct?

Schiavone - cross - Kaplan                1379

A      Yes.

Q      So Mr. Boone was describing his relationship with Mr. Valentin as doing, quote, weed shit.  And the response that Special Agent Ford said is that that's not what Lesly Valentin told us, correct?

A      That's not what he said, yes.

Q      In fact, Lesly Valentin never said anything to Special Agent Ford or to you about his relationship with Mr. Boone?

A      Correct.

Q      Then, in response, Mr. Boone said we don't know.  I'm talking about we never spent more than probably 30 minutes.

And in response, Special Agent Ford said I'm telling you, that's not what he told the Federal Government, correct?

A      Yes.

(Continued on next page.)

CROSS-EXAMINATION (Continuing)

BY MR. KAPLAN:

Q    So in this portion Mr. Boone is talking about his limited interactions with Mr. Valentin, and the response from Special Agent Ford, who was not even in the interview with Lesly Valentin, is that that's not what Valentin told law enforcement, correct?

A    Correct.

Q    And this was done in an attempt to get Mr. Boone to talk?

A    Yes.

Q    You testified that you, as part of this investigation, you went through Lesly Valentin's iCloud account, correct?

A    Yes.

Q    And going through the iCloud account, you saw evidence of drugs, correct?

A    Yes.

Q    And you saw evidence of conversations about drugs?

A    Correct.

Q    You also went through Mr. Boone's iCloud as well, correct?

A    Yes.

Q    And going through Mr. Boone's iCloud, did you also see evidence of drugs?

A    I don't believe so.

        MR. KAPLAN:  I'd like to show the witness what's

been marked as AB-E and AB-E-1.

Mr. Chan, right now it's just for the witness.

THE COURTROOM DEPUTY:  Yes.

BY MR. KAPLAN:

Q    Detective Schiavone, do you see the Cellebrite extraction report?

A    Yes, I do.

Q    And is that for Aasim Boone's iCloud?

A    Yes, it is.

Q    And that's from May 5th of 2023?

A    Correct.

Q    And let me show you a picture.

And is that a picture that was on Mr. Boone's iCloud?

A    Yes.

MR. KAPLAN:  I'd like to move AB-E and AB-E-1 into evidence.

MR. DUGAN:  No objection.

THE COURT:  Admitted.

(Defense Exhibits AB-E and AB-E-1 were received in evidence.)

MR. KAPLAN:  Mr. Chan, I'd like to publish this to the jury.

THE COURTROOM DEPUTY:  Okay.

(Exhibit published.)

BY MR. KAPLAN:

Q    Detective, that's marijuana; isn't it?

A    Yes, it is.

Q    And, in fact, that's a lot of bags of marijuana, correct?

A    Yes, it is.

Q    Would you say maybe 20, 25 bags of marijuana?

A    If you'd like ME to count them, I can, but there's a multiple, yes.

Q    Are you familiar as part of your experience in law enforcement about how much weight each of these bags might contain?

A    That's not my specialty, so no.

Q    But just looking at it, it could be a pound of marijuana, correct?

A    It could be.

          MR. KAPLAN:  Take that down.

Q    So, earlier we played one interaction where you and Special Agent Ford lied to Mr. Boone about Lesly Valentin, correct?

A    Yes.

Q    That's not the only time you said something like that during the interview, is that right?

A    Would you like to refresh my memory?

Q    I could refresh your memory.

          MR. KAPLAN:  And, Mr. Chan, this is just for the

witness.

BY MR. KAPLAN:

Q    Detective, do you recall Special Agent Ford saying: We're focusing on Mr. Valentin right now because he is the one that gave us your name?

A    I mean as I stand here right now, no.  But if I watch the video and that's what's said, yes.

Q    Okay.  And do you recall you, yourself, saying to Mr. Boone:  Why would he pick you, why would he pick your name?

A    Yes.

Q    And you said it again later on:  Why would he pick you?

A    Yes.

Q    And a little later on you say:  So he gave us your name?

A    Yes.

Q    It's fair to say it wasn't once that you used this ruse?

A    Yes.

Q    It was numerous times throughout this interview?

A    Correct.

Q    And how long was this interview?

A    If you look at the time stamps from the start to finish, you can get the accurate time.

Q    As part of this interview, you also tried to elicit Mr. Boone's statements by telling him:  Well, maybe you didn't know what was happening that night, correct?

A    Yes.

Q    Okay.  And that was something similar that you did with Lesly Valentin, correct?

A    Yes.

Q    Right.  You said maybe he was duped, correct?

A    Correct.

Q    And Mr. Valentin responded:  I wasn't duped?

A    Yes.

Q    All right.

      MR. KAPLAN:  I would ask if the Government can play GX-235-II.

      (Pause.)

      MR. KAPLAN:  While we're waiting for the Government to pull it up.

BY MR. KAPLAN:

Q    Are you aware that many suspects are convicted for false confessions based on ruses?

A    I'm sorry?

Q    Are you aware that there are many --

      THE COURT:  Sustained.

      MR. KAPLAN:  You can play it now.

      (Video played.)  (Video stopped.)

Q    Do you recall being played that video on direct?

A    I don't believe so.

Q    Do you know what Mr. Boone was referring to when he said

that?

A     Do you have the transcript?

Q     I do.

        MR. KAPLAN:  Again, just for the witness.

        (Pause.)

A     Okay, yes.

Q     So, were you trying to tell Mr. Boone that maybe you were there, but you didn't know you what you actually were gonna do?

A     Yeah.  To minimize his involvement, yes.

Q     Okay.  So when he said:  I ain't no saint, but I know what the fuck I'm doing when I'm doing it, he was -- it was in response to that kind of ruse that you were using this time?

A     The minimization --

Q     Yes.

A     -- of being there?

Q     Yes?

A     Yes.

Q     And that's another kind of ruse that you use when interviewing suspects --

A     Yes.

Q     -- right?

        Another one is you try to befriend them, right, to see if they'll talk?

A     Build rapport.

Q    Okay.  What other types of ruses do you have in your NYPD bag?

A    I mean what specifically is your question?

Q    In terms of ruses you use to get a defendant to talk.

A    I guess it depends on the case, depends on the person.

Q    Right.  So --

A    Sometimes people are cooperative and they'll kind of tell you what happened.

Q    And if they're not?

A    And if they're not, you try to minimize their involvement.  Sometimes you feel more comfortable if you're -- if you feel like you're less involved.

Q    And the other way is just straight out lying to them about the evidence against them?

A    Yeah.  Ruse them, lie to them, yes.

Q    Because you believe that if you make the evidence against them seem worse, they'll be more desperate and they'll say something?

A    It depends on how that person feels.

Q    Okay.  But I'm talking about what your intention is.

A    My intention is just to elicit a response.  I can't -- I don't what they're gonna say.

Q    Now, there was a portion of the interview when you and Special Agent Ford walked out, correct?

A    Yes.

Q    Okay.  And the video was still playing --

A    Uh-hum.

Q    -- correct?  And I believe you saw a snippet of that yesterday?

A    Yes.

           MR. KAPLAN:  I'll ask the Government if they can play the portion where he walks out.

           (Continued on the following page.)

SCHIAVONE - CROSS - MR. KAPLAN

1388

(Continuing.)

(Video recording played.)

MR. KAPLAN:  You can pause a second.

(Video recording stopped.)

BY MR. KAPLAN:

Q    Did you hear Mr. Boone say, this is movie shit?

A    Yes.

Q    And do you recall Mr. Boone referencing the phrase, movie shit, earlier in your interview?

A    If you have the transcript to reflect that, yes.

MR. KAPLAN:  If we can switch to the podium.

Q    Do you see that?

A    Yes.

Q    Okay.  And this was in response to you and Special Agent Ford telling him about the facts of the evidence that you had, correct?

A    Correct.

Q    And his response was, this is movie shit, right?

A    Correct.

Q    And you said, this is not movie shit, correct?

A    Correct.

Q    All right.

MR. KAPLAN:  The Government can play the rest of that video.

(Video recording played.)

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

MR. KAPLAN: You can pause that.

(Video recording stopped.)

Q    Now, I believe we played this on your direct.

Mr. Valentin says something about a snake ass, and he uses the N word?

A    Yes.

Q    And then he also says, the N word's a, quote, fucking greaseball, right?

A    Yes.

Q    And that was shortly after he referenced the movie shit, which again, referenced his conversation with you and Special Agent Ford, correct?

A    Okay.

Q    Is that a yes?

A    If that's what's reflected in the video and the transcripts, yes.

Q    Thank you.

So I want to talk about the iCloud for a few minutes. On direct you testified about going through the iClouds for -- of Lesly Valentin and Jarrett Bruce, correct?

A    Yes.

Q    And you testified about the drugs that you saw on these iClouds, correct?

A    Correct.

Q    And you testified about the conversations on Lesly

Valentin's iClouds pertaining to drugs?

A    Yes.

Q    As part of your investigation, did you go through Shawn Khaled's iCloud?

A    His phone was looked through, yes.

Q    He was the victim, right?

A    Yes.

Q    Now, going through his iCloud, did you also see evidence of drug dealing?

A    Yes.

Q    And did you look as specifically at messages between Mr. Khaled and a person name Praz?

A    I did not.

Q    Do you know who Praz is?

A    I did not.

Q    Did you look at messages between Mr. Khaled and a person named Ant?

A    No.

Q    You don't know who Ant is either, right?

A    No.

Q    As part of going through Mr. Khaled's iCloud account, did you see texts scheduling a drug deal for 8:00 o'clock on December 9th, 2022?

A    I didn't personally review that, no.

Q    But you went through Mr. Khaled's iCloud?

A     Yes.

Q     Okay.  But you didn't go through the text messages of the iCloud?

A     It was shared responsibility.  I didn't look through everything myself.

Q     Okay.  Do you know which agent or which officer went through the text messages of Shawn Khaled?

A     I do not.

Q     You do not.

      As part of the team member, were you informed that other agents had gone through Mr. Khaled's text messages?

A     Yes.

Q     Okay.  And at in point in your investigation do you have a notation that he was scheduled for a drug deal at 8:00 p.m. on December 9th, 2022?

A     No.

Q     You testified on cross that you never investigated a person named Chelo, right?

A     Chelo?

Q     Chelo.

A     No.

Q     Do you know what Chelo's role is in this case?

A     I do not.

Q     Did you ever see any mentions of Mr. Chelo in Mr. Khaled's iCloud?

A    Personally, no.

Q    As part of your investigation, have you heard the name Chelo in this investigation?

A    No.

Q    You also went through the iClouds for Aasim Boone and Charle Sampson, correct?

A    Yes.

Q    Did you personally go through those iCloud?

A    Not personally, no.

Q    So some other agents went through those iClouds?

A    Yes.

Q    On direct, you were shown a number of pictures from the iCloud, remember?

A    Yes.

Q    Did you picture pick which pictures should be played -- should be shown to the Court?

A    No.

Q    Was it someone on the prosecution team that picked the pictures?

A    I believe so.

Q    But like you say, you, yourself, never went through those iClouds?

A    Personally.

        MR. KAPLAN:  Can the Government please put up GX 124.  This is in evidence already.

Q    This is an extraction report from iCloud, correct?

A    Yes.

Q    And this is Mr. Aasim Boone's iCloud?

A    Yes.

Q    And the address attached to this iCloud is 75 Sterling Boulevard in Englewood, New Jersey?

A    Yes.

Q    So as part of this investigation, you were aware that Mr. Boone had a connection to 75 Sterling Boulevard in Englewood, New Jersey, correct?

A    Yes.

Q    And you also were aware that Mr. Boone had a connection to 25 Parkview Terrace in Englewood, correct?

A    Do you have a report for that?

MR. KAPLAN:  If the Government can pull up GX 1001 at Page 5.

Q    Do you see the address?

A    Yes.

Q    Okay.  So as part of this investigation, the Government had information linking Aasim Boone to an address at 25 Parkview Terrace in Englewood, correct?

A    Yes.

Q    I'd like to go through some pictures that you went through on direct from Mr. Boone's iCloud.

MR. KAPLAN:  Would the Government please display

AVERY N. ARMSTRONG, RPR, NYRCR
*OFFICIAL COURT REPORTER*

Government Exhibit 125-A-1.

Q    You were shown this picture on direct, weren't you?

A    Yes.

Q    In this picture, can you see the shoes that Mr. Boone's wearing?

A    Barely.

Q    Barely.

        MR. KAPLAN:  Can the Government play the video -- first few seconds of the video which is GX 125-A.

        (Video recording played.)(Video recording stopped.

Q    What color are Mr. Boone's sneakers in that video?

A    Black with a white stripe towards the bottom.

Q    But on the picture that you were shown on direct, you couldn't see the shoes, could you?

A    You just saw a little bit of one shoe that was black.

        MR. KAPLAN:  If we can pull up Government Exhibit 127-A.

Q    Again, what color are Mr. Boone's shoes in 127-A?

A    Dark colored, possibly black and white.  It appears to be New Balance.

        (Continued on the following page.)

Schiavone - cross - Kaplan                    1395

CROSS-EXAMINATION

BY MR. KAPLAN:  (Continuing)

          MR. KAPLAN:  I would like to show the witness a picture.  Mr. Chan, just for the witness.

Q    Detective, can you see that or make it a little bigger?

A    Bigger.  Okay.

Q    This is from Mr. Boone's iCloud?

A    Yes.

Q    And it's March 27, 2021?

A    Yes.

Q    Let me show you the picture.  And is that the picture from the iCloud?

A    It is.

          MR. KAPLAN:  I would like move Defense Exhibit AB-A and AB-A-1 into evidence.

          THE COURT:  Admitted.

          (Defense Exhibits AB-A and AB-A-1 received in evidence.)

          MR. KAPLAN:  Mr. Chan, if you can display it to the jury.

Q    Detective, do you see Mr. Boone in this picture?

A    Can you zoom in a little bit.

Q    Trying to.

A    Yes.

Q    Okay.  He is wearing the gray sweatshirt, correct?

Schiavone - cross - Kaplan                    1396

A      Yes.

MR. KAPLAN zoom out.

Q      What color sneakers is he wearing in that picture?

A      Appears to be gray New Balances.

Q      What color sweatshirt is he wearing?

A      Gray.

Q      Pants, can you see or it's kind of hard to see?

A      Too hard -- dark-colored pants.

Q      Now I want to show you a picture from Charle Sampson
iCloud.

MR. KAPLAN:  Mr. Chan, just for the witness, please.

Q      And this is Defense AB-B and AB-1.  Detective, do you see
whose on the screen AB-1?

Do you want me to zoom in?

A      Yes.

Q      This is from, I believe, Charle Sampson's iCloud?

A      Okay.

Q      Is that a yes?

A      If that's what you're saying it is.

Q      I'm asking you.  As part of your role in this
investigation, do you know if this is Charle Sampson's iCloud?

A      I viewed it.  What the -- the Apple ID for the iCloud
account, I don't know off the top of my head.

Q      Okay.  And this picture is from December 22, 2022, is
that correct?

A     That's correct.

Q     Let me show you the picture.

      Do you see Mr. Boone in that picture?

A     I do.

      MR. KAPLAN:  I would like to move Defense Exhibits AB-B and AB-B-1 into evidence.

      THE COURT:  Admitted.

      (Defense Exhibits AB-B and AB-B-1 received in evidence.)

      MR. KAPLAN:  Mr. Chan, if you could display it for the jury.

Q     What color shoes is Mr. Boone wearing in that picture?

A     Multi-colored sneakers.

Q     Not white; right?

A     No.

Q     And he's wearing gray sweatpants and a gray sweatshirt?

A     With a black vest, yeah.

Q     And just to go to AB-B, the date of this is December 22, 2022, correct?

A     Yes.

Q     Do you remember being asked a question on direct of whether or not Charle Sampson had anything in her iCloud in December 2022?

A     Yes.

Q     If asapcha@icloud is Charle Sampson's iCloud, is this a

Schiavone - cross - Kaplan                          1398

picture from December 2022 in her iCloud?

A     I believe when I answered that question I said I wasn't sure because there was some data from November and then there's some data from January.

Q     Now we're showing you this.

A     If you have something to reference, like the phone number to confirm the extraction report, the front page.

Q     Okay.  We can do that later, but as of now --

A     If you're going to ask me to confirm it, if you want to bring up the first page for the extraction report, then I can let you know if that's Ms. Samson's extraction report.

Q     I'll bring it up along the way.  Not just yet.

        All right.  So, I want to show you another picture. This one is also from the same iCloud.

        MR. KAPLAN:  Mr. Chan, just for the witness.  I'll make it a little bigger for you.

Q     Can you see that?

A     Yeah.

Q     That's the same asapcha@icloud.com?

A     Again, if you're going to reference that to Ms. Samson, if you can show me the first page, I can confirm that for you.

Q     But for right now I'm just asking if that's the iCloud this came from?

A     Yes.

Q     And this the date is November 23, 2023?

Schiavone - cross - Kaplan                1399

A      Yes.

Q      I'll show the picture.  Do you see Mr. Boone in this picture?

A      Yes.

        MR. KAPLAN:  I would like to admit AB-C and AB-C1 into evidence.

        THE COURT:  Admitted.

        (Defense Exhibits AB-C and AB-C1 received in evidence.)

Q      Detective, whose in this picture?

A      Mr. Boone.

Q      Whose with him?

A      I believe that's Ms. Samson.

Q      That's Charle Sampson, correct?

A      I believe so.

Q      Well, you have been involved in this case since December of 2022, correct?

A      I had one interaction with her.

Q      But have you seen a picture of her as part of your investigation?

A      Once.

Q      And you believe that's her in this photo?

A      I believe so, but I spent more time with the other three individuals.

Q      Okay.  What color sneakers and clothing is Mr. Boone

Schiavone - cross - Kaplan                      1400

wearing in this picture?

A    He's wearing a dark-colored sweatshirt, light jeans or sweats, and dark-colored reflective sneakers with white bottoms.

THE COURTROOM DEPUTY:  Mr. Kaplan, you didn't say publish.  I wasn't sure.

MR. KAPLAN:  Sorry.  Could you please publish. Thank you, Mr. Chan.  I was ready to move on.

Q    Just for the jury, this is Mr. Boone and Charle Sampson in the picture?

A    Yes.

Q    I have one more picture for you, Detective.

MR. KAPLAN:  Mr. Chan, this time only for the witness.  Hopefully, I remember.

Q    Detective, can you see what's marked in this picture as Defense AB-D?

A    Can you scroll down?  Can you zoom out?  Just to confirm what you marked, the exhibit.

Yes.

Q    Is this from Mr. Boone's iCloud?

A    It is.

Q    Is that a picture of Mr. Boone?

A    If you make it bigger.

Q    I'm going to give you the picture in a second.  Hold on.

A    Thank you.

Schiavone - cross - Kaplan                    1401

Yes, it is.

MR. KAPLAN:  Mr. Chan, I ask that Defense Exhibits AB-D and AB-D-1 be displayed to the jury.

THE COURT:  They are admitted.

(Defense Exhibits AB-D and AB-D-1 received in evidence.)

Q    So, in this picture Mr. Boone is wearing a green sweatshirt and a green Yankee sweatpants, correct?

A    Yes.

Q    He's wearing white Nike sneakers?

A    Correct.

Q    And what is the person next to him wearing?

A    A green shirt, green sweats, and white Nike sneakers.

Q    Do they seem like the exact same Nike sneakers?

A    They appear to be.

MR. KAPLAN:  May I just approach the witness?  I don't know if you can see this.

A    Sure.  Thank you.

Q    Detective, does that refresh your recollection as to what Charle Sampson's iCloud was?

A    Yes.

Q    What was her iCloud?

A    Her username?

Q    Yes.

A    It's going to be asapcha@icloud.com.

Schiavone - cross - Kaplan                    1402

Q    Is that the iCloud that I showed you some pictures of from before?

A    Yes.

Q    Including the pictures of December 2022?

A    Yes.

MR. KAPLAN:  Judge, I don't know if we can stop now. This is a good time.

THE COURT:  Yes.  This is a good place to stop for the weekend.  We will resume Monday at 10:00.  Please remember don't do any research.  Don't talk to it anybody.  Have a good weekend.

THE COURTROOM DEPUTY:  All rise, jurors.

(Jury exits the courtroom.)

(Witness leaves the stand.)

THE COURT:  So, sounds like we have -- are you still expecting three more brief witnesses after this one?  And that's going to be for Monday.

MR. DUGAN:  Our current expectation as of right now is we are only going to have one more witness after this one.

THE COURT:  Okay.  So, do you think we are going to close on Monday?

MR. DUGAN:  Our -- well, I think our preference would be to not do our closings and then have defense counsel close the next day.  So I think it sort of depends on how much longer cross is.  We don't expect the next witness is going to

be very long.  I think if we were going, I mean, conceivably if we were going to start summations by 11:00 or 12:00, would that make sense?

THE COURT:  All right.  Sounds good.  Potentially closing Monday unless things go longer than expected with the witnesses.  Okay.  Let's see.  The Government sent me a verdict sheet.  It looked uncontroversial.  I didn't get any objections to the verdict sheet.

Do you want to --

MR. KAUFMAN:  The only thing from the verdict sheet that we originally had seen, I believe that guilty is first rather than not guilty.  It's the Government's burden, I believe not guilty should appear before guilty.

THE COURT:  Okay.  I don't think it's going to matter what order it's in.

Any objection to my putting -- reversing guilty and not guilty?

MR. WANG:  No, Your Honor.

THE COURT:  I will do that.  One thing I was wondering on the charge is whether we should be -- do you all have a desire for me to repeat something more specific about other crimes evidence or do you feel like that was covered in the course of the trial and do you want the existing other crimes evidence instruction?

MR. VAN BUREN:  I think from us we would ask that

Proceedings                                                  1404

you repeat the New Jersey related instruction.  I drafted and circulated among counsel language that's basically essentially what Your Honor has already said, but in the past tense.  I haven't really -- it was just this afternoon.  I haven't heard back.  I'm happy to share that language with the Court.  We would ask that that be included.

THE COURT:  Okay.

MR. HINE:  One more point on the jury charge.  The defense had also circulated to the Government proposed language regarding transcripts and the use of transcripts and transcripts are evidence.  Would that be appropriate?

THE COURT:  I agree that would be appropriate.

How about if we -- do you think we can convene a little early on Monday to resolve these issues or we can do it over the lunch break, whatever you prefer.  If you give me any additional stuff you want included, I would circulate a revised charge and we can either discuss it Monday morning or over lunch.  Let's just do it Monday morning.

If we come in at 9:30, I think we will be fine.  Try to send it to me tonight, and then I will send something out to you that incorporates whatever.

So any other crimes charges, any transcript charges, any other thing that you have in mind, send it to me tonight if you can and then I will send out a revised charge that includes all that and we can discuss this on Monday.

Proceedings                                                    1405

Anything else?

MR. KAPLAN:  I may, on the revised charge, try again with the circumstantial one or two words.  Can't hold it against me for trying.

THE COURT:  Okay.  Great.  Any other issues you want to take up?

MR. DUGAN:  I guess for planning purposes, is there a point at which the Court thinks it would make sense to start summations and is there a point at which it wouldn't?

THE COURT:  Well, I take the point that you don't want to -- that we should have a logical amount of summations.

Do you all have estimates at this point of how long your summations are going to be?

MR. DUGAN:  We estimate our summation will be, give or take, two hours.

THE COURT:  Okay.

MR. KAPLAN:  I don't expect each individual to be more than an hour, I think it's fair to say.

MR. KAUFMAN:  Probably less.

MR. KAPLAN:  I think less than --

THE COURT:  All right.

MR. KAPLAN:  If the Court was inclined, I think we could do it all in one day on Tuesday.  I know the Government has concerns about starting, doing their theirs, and then us having overnight.

Proceedings                                              1406

We have concerns of us going and then the Government having overnight.  We come in on Monday.  I think there will be more time with this witness, probably another hour to two hours between everyone, and then there's another witness. Would the Court be willing to then start -- we can discuss jury charge.  Would the Court be willing to start Tuesday morning with the Government's summation?

MR. KAUFMAN:  It may be helpful -- I think everyone wants it all in one day.  If maybe the Court, based on the Court's schedule, if potentially we go a little late on Tuesday so we can get them all in a day, even if it means going to 6:00 or 6:30.

THE COURT:  I would say more often than not when I ask the jury that, they get upset and tell me they all scheduled their childcare, that being plan A is making me a little nervous.  I guess my personal preference is that if we have gone on for a short time on Monday, we can realistically get through all of the summations -- maybe not the rebuttal summation on Monday.  Maybe just do it.  If you're telling me your preference is that you all are of the view that you just want to do whatever we can get through in terms of testimony on Monday and then break.

MR. KAPLAN:  I think that's....

MR. HAMILTON:  That would be the consideration for the early break for them for staying late.  But then the

Proceedings                                                    1407

additional consideration on staying late is we do recognize that the holiday is coming up.  You're getting out a little early on Monday, yes.  You are actually staying later on Tuesday.  So you can get the case and start deliberating on your holiday.  All in all, it's a decent deal.

THE COURT:  I'll tell you what.  I think we have lost the jurors for the day.  I don't think we are going to find it out on Monday.  I'm happy to pitch it to them.

When the jury is here on Monday, I will ask them about this idea that our collective idea is that rather than start the summations on Monday, we would do them all on Tuesday and the consequence is that it might last a little longer than expected on Tuesday, is that going to be okay with them, and depending on what they say --

MR. WANG:  We can also try to start a little earlier on Tuesday, 9:30.

THE COURT:  Yeah, we could do that too, okay, so i think we have no absolute answer, but we have some ideas to pitch to the jurors.  All right.  Anything else?

MR. DUGAN:  Not from the Government.

THE COURT:  I hope you all have a great weekend. You too.

THE COURTROOM DEPUTY:  All rise.

(Matter adjourned to June 30, 2025 at 9:30 a.m.)

Michele Lucchese, RPR, CRR
Official Court Reporter

1408

# I N D E X

**WITNESS**                                                    **PAGE**


**CRISTOFER SCHIAVONE**

DIRECT EXAMINATION (Cont'd) BY MR. DUGAN          1282

CROSS-EXAMINATION BY MR. KAUFMAN                  1307

CROSS-EXAMINATION BY MR. KAPLAN                   1369

SAM      OCR      RMR      CRR      RPR

1409

**E X H I B I T S**

<u>Exhibit</u>                                                    <u>Page</u>

Government's Exhibit 152                                 1284

Government's Exhibit 2                                   1287

Government's Exhibit 201-I                               1289

Government's Exhibits 122B and 122C                      1292

Government's Exhibit 1001                                1294

Government's Exhibits 148 and 148A                       1298

Government's Exhibits 237-I, 237-II, and

237-III                                                 1300

Government's Exhibit 155                                 1302

Government's Exhibits 159 and 159A                       1303

Government's Exhibit 158                                 1304

Government's Exhibits 157 and 157A                       1306

SAM       OCR       RMR       CRR       RPR

1410

# E X H I B I T S

| <u>Exhibit</u> | <u>Page</u> |
|---|---|
| Defense Exhibit AB-235-A | 1377 |
| Defense Exhibit AB-235-B | 1378 |
| Defense Exhibits AB-E and AB-E-1 | 1381 |
| Defense Exhibits AB-A and AB-A-1 | 1395 |
| Defense Exhibits AB-B and AB-B-1 | 1397 |
| Defense Exhibits AB-C and AB-C1 | 1399 |
| Defense Exhibits AB-D and AB-D-1 | 1401 |

SAM     OCR     RMR     CRR     RPR